**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
www.flsb.uscourts.gov

|  |  |  |
|---|---|---|
| In re: | ) ) ) | Chapter 11 |
| Healthcare Holdings of Florida LLC, *et al.*[1] | ) ) ) | Case No. 24-21355-SMG |
| Debtors. | ) ) ) ) | (Joint Administration Pending) |

**DECLARATION OF GARY R. LOFFREDO IN SUPPORT**
**OF THE CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Gary R. Loffredo, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct to the best of my knowledge, information, and belief, including the information included in the exhibit attached hereto:

**Background**

1.      My name is Gary R. Loffredo, I am over the age of eighteen, and I am competent to testify.

2.      I act as the manager and chief executive officer (either directly, or by virtue of intercompany ownership) of the above-captioned debtors and debtors in possession (collectively, the "Debtors," and each, a "Debtor"). I have served in that capacity since 2011, and I have worked

---

[1]  The Debtors and last four digits of their tax identification numbers are: (i) Healthcare Holdings of Florida LLC (6887); (ii) Healthcare Holdings 9 LLC (3633); (iii) HHMA Holdings LLC (3691); (iv) HHMA LLC (3901); (v) Able Palms Holdings, LLC (9363); (vi) Able Palms Home and Health Care Services, Inc. (3931); (vii) Home Care Resources Holdings, LLC (1385), (viii) Home Care Resources Home Health Agency, LLC (0617), (ix) CWGL Holdings, LLC (1945), (x) Senior Nannies Holdings, LLC (5172), (xi) Senior Nannies Management Services, LLC (5336), (xii) SN Home Healthcare, LLC (9996), (xiii) Senior Nannies Home Care Services, LLC (8991), and (xiv) Senior Advantages Assisted Living Placement Services, LLC (1293). The mailing address of the Debtors is 3313 West Commercial Boulevard, Suite 130, Fort Lauderdale, Florida 33309.

actively with the Debtors' other members of management and proposed professionals to prepare for the commencement of the Debtors' chapter 11 cases (the "Chapter 11 Cases").

3.      The Debtors constitute a business enterprise that collectively provide a full suite of home care services, including custodial care, skilled care, and senior placement services, particularly for senior patients in the State of Florida.

4.      As the Debtors' organizational chart makes clear (a copy of which is attached hereto as **Exhibit A**), the Debtors' business is separated into two, equally important arms: the "Healthcare Holdings" arm, which is dedicated to the Debtors' Medicare services, and the "Senior Nannies" arm, which is dedicated to the Debtors' private care, private payer services, as well as the Debtors' operations, management, sales, and senior placement.

5.      I am familiar with and knowledgeable of the Debtors' day-to-day operations, business, and financial affairs, and books and records as they exist, as well as the circumstances leading to the commencement of the Chapter 11 Cases.   I submit this declaration (this "Declaration") to assist the Court and other parties in interest in understanding the circumstances and events that led to the commencement of the Chapter 11 Cases and in support of the motions and applications that the Debtors filed with the Court, including the "first-day" pleadings filed concurrently herewith (the "First Day Pleadings").   I am authorized to submit this Declaration on behalf of the Debtors.

6.      Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents as they exist, information provided to me by employees and/or management of the Debtors, my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial condition, or from my discussions with the Debtors' proposed restructuring counsel, Pack Law.   If

2

called upon to testify, I would and could testify competently to the facts set forth in this Declaration on the basis of the information that I have gleaned from the sources listed above.

7.      I am advised by counsel that this Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334, and that venue is proper in the United States Bankruptcy Court for the Southern District of Florida pursuant to 28 U.S.C. §§ 1408 and 1409.

## Introduction[2]

8.      As detailed through this Declaration, the Debtors have maintained high-quality patient care, but have faced economic head winds from strained cash flow, in combination with unrelenting litigation unrelated to the Debtors' ongoing operations.  Through these Chapter 11 Cases, the Debtors plan to effectuate a restructuring that will pave the way for a financially sound future and the continued provision of excellent service for seniors around the State of Florida.

## The Debtors' Prepetition Business, Corporate Structure, and Capital Structure

### I.      Corporate Structure and History.

9.      As set forth more fully in the Debtors' organizational chart attached hereto as **Exhibit A**, the Debtors' business is comprised of fourteen Debtor entities and two unaffiliated non-Debtor operating entities (referred to herein and in the First Day Pleadings as the "Non-Debtor Operating Entities" or "NDOEs") that collectively provide a full suite of health and wellness services throughout the State of Florida.  The Debtors' business spans fourteen (14) office locations and provides services to forty-six (46) counties across the state of Florida.

10.      The Debtors' current business began in 2009 exclusively as a private care, private payer business under the "Senior Nannies" brand, operated by Claudia Wechter (the Debtors'

---

2  Capitalized terms not otherwise defined in the Introduction have the meanings ascribed to such terms elsewhere herein or in the First Day Pleadings, as applicable.

current President and ultimate approximately 50% owner). Today, the "Senior Nannies" arm of the Debtors' business is comprised of six (6) Debtor entities that not only manage the private care aspects of the Debtors' business, but also the management, sales, operations, and senior placement services provided by the Debtors. These Debtor entities are distinguished by their separate and unique role in the Debtors' overall operations, as described in the paragraphs that follow.

a. ***Senior Nannies Home Care Services, LLC.*** Debtor Senior Nannies Home Care Services, LLC ("Senior Nannies Home Care") maintains the bulk of the Debtors' home care services. Senior Nannies Home Care maintains the Debtors' caregiver registry, which is comprised of some approximately 1,300 caregivers that provide all manner of custodial and skilled care (performed primarily by certified nursing assistants and home health aides), including "Activities of Daily Living" (such as bathing, dressing, ambulation assistance, transferring, eating/feeding, and continence care) and "Lifestyle Services" (such as meal preparation, shopping and errands, light housekeeping, safety supervision, laundry, and accompaniment to appointments).

b. ***SN Home Healthcare, LLC.*** Debtor SN Home Healthcare, LLC ("SN Home Health") primarily manages the Debtors' skilled and custodial care services, which generally include all manner of skilled care (performed primarily by registered nurses and licensed practical nurses), including but not limited to, physical therapy, occupational therapy, speech therapy, respiratory therapy, catastrophic care, wound care, tube feedings, tracheostomy, and med management. SN Home Health directly or indirectly manages approximately thirty-seven (37) employees.

c. ***Senior Advantages Assisted Living Placement Services, LLC.*** Debtor Senior Advantages Assisted Living Placement Services, LLC ("Senior Advantages") provides personalized placement services that assist seniors in locating independent or assisted living communities based on their geographic preference, care requirements, and budget. Senior Advantages holds contracts with over 1,000 independent or assisted living facilities in Florida. Senior Advantages does not have any separate employees, instead holding the relevant contracts with facilities so Senior Nannies Management (as defined herein) employees can provide placement services in exchange for commissions for facilities.

d. ***Senior Nannies Management Services, LLC.*** Debtor Senior Nannies Management Services, LLC ("Senior Nannies Management") handles all management, operations, administrative, sales, and other supplemental work that enables the Debtors' entire corporate body to provide quality care services across the Debtors' business. Senior Nannies Management employs approximately seventy-five (75) employees across various departments to ensure the Debtors' operations continue smoothly, allowing the remaining constituent parts of the Debtors' business to put care first.

4

e. ***Senior Nannies Holdings, LLC and CWGL Holdings, LLC.***  Debtors Senior Nannies Holdings, LLC ("Senior Nannies Holdings") and CWGL Holdings, LLC ("CWGL") are holding companies in the "Senior Nannies" arm of the Debtors' business that manage and oversee the entirety of the Senior Nannies brand and maintain corporate and business formalities across the various Debtor entities.

### 2023 Expansion Into Medicare.

11.     In 2023, the Debtors' business expanded to accommodate not only private care, private payer services, but also to provide Medicare services throughout the State of Florida.  The Debtors' Medicare services, provided by the "Healthcare Holdings" arm of the Debtors' business, is maintained by eight (8) Debtor entities and two (2) NDOEs.  The Debtors' Medicare business is largely separated by location, as described in the paragraphs that follow.

a. ***HHMA Holdings LLC and HHMA LLC (Broward County Medicare).***  Debtors HHMA Holdings LLC ("HHMA Holdings") and HHMA LLC ("HHMA") are responsible for maintaining the Debtors' Medicare operations in Broward County, Florida, and manage approximately twenty-seven (27) employee caregivers and approximately seven (7) contractor caregivers.

b. ***Able Palms Holdings, LLC and Able Palms Home and Health Care Services, Inc. (Pasco County and Pinellas County Medicare).***  Debtors Able Palms Holdings, LLC ("Able Palms Holdings") and Able Palms Home and Health Care Services, Inc. ("Able Palms") are responsible for maintaining the Debtors' Medicare operations in Pasco County and Pinellas County, Florida, and manage approximately forty-four (44) employee caregivers and approximately seven (7) contractor caregivers.

c. ***Home Care Resources Holdings, LLC and Home Care Resources Home Health Agency, LLC (Miami-Dade County Medicare).***  Debtors Home Care Resources Holdings, LLC ("Home Care Resources Holdings") and Home Care Resources Home Health Agency, LLC ("Home Care Resources") are responsible for maintaining the Debtors' Medicare operations in Miami-Dade County, Florida, and manage approximately eighteen (18) employee caregivers and approximately four (4) contractor caregivers.

d. ***Healthcare Holdings 9 LLC (Palm Beach County Medicare).***  Debtor Healthcare Holdings 9 LLC ("Healthcare Holdings 9") is entirely responsible for managing and operating NDOE Anchor Health Homecare Services, LLC ("Anchor") pursuant to the *Management Services Agreement*, dated as of August 14, 2023 (the "Anchor MSA").  Pursuant to the terms of the Anchor MSA, Healthcare Holdings 9 is responsible for, *inter alia*, all management and administration of Anchor (including supervision of staff and personnel), billing and collection services for all Anchor

5

medical and technical personnel and caregivers, liaising with third-party payers and facilities, providing human resources services, overseeing Anchor's financials and cash management (including payroll), maintaining all insurance requirements of Anchor, maintaining necessary licenses and certifications, and a litany of other vital responsibilities; in short, Healthcare Holdings 9 is 100% responsible for the administration and operation of NDOE Anchor. Additionally, concomitantly with the Anchor MSA, Healthcare Holdings 9 and Aron Greenfeld, the sole equity interest holder of Anchor, entered into the *Letter Agreement* (the "Anchor Purchase Agreement"), pursuant to which Healthcare Holdings 9 has the right and obligation to purchase all of the equity interests in Anchor on a specified "Transfer Date"[3] (the "Anchor Transfer Date"). NDOE Anchor maintains the Debtors' Medicare operations in Palm Beach County, Florida and manages approximately thirty-three (33) employee caregivers and approximately nine (9) contractor caregivers.

e. ***Healthcare Holdings of Florida LLC (Hillsborough County Medicare).*** Debtor Healthcare Holdings of Florida LLC ("HHF") is entirely responsible for managing and operating NDOE Magnet Home Health Care Services, LLC ("Magnet") pursuant to the *Exclusive Management Services Agreement*, dated as of November 7, 2023 (the "Magnet MSA"). Pursuant to the terms of the Magnet MSA, HHF is responsible for, *inter alia*, all management and administration of Magnet (including supervision of staff and personnel), billing and collection services for all Magnet medical and technical personnel and caregivers, liaising with third-party payers and facilities, providing human resources services, overseeing Magnet's financials and cash management (including payroll), maintaining all insurance requirements of Magnet, maintaining necessary licenses and certifications, and a litany of other vital responsibilities; in short, HHF is 100% responsible for the administration and operation of NDOE Magnet. Additionally, concomitantly with the Magnet MSA, HHF and Marie Seignon, the sole equity interest holder of Magnet, entered into that certain *Equity Purchase Agreement* (the "Magnet Purchase Agreement"), pursuant to which HHF has the right and obligation to purchase all of the equity interests in Magnet on a specified "Closing Date"[4] (the "Magnet Transfer Date"). NDOE Magnet maintains the Debtors' Medicare operations in Hillsborough County,

---

[3] As set forth in the Anchor Purchase Agreement, the "Transfer Date" is "the earlier of: (i) the date that is the date immediately following the date on which the prohibitions on the sale or transfer of billing privileges as set forth in 42 C.F.R. Section 424.550 (commonly referred to as the 36-Month Rule), as may be amended from time to time, no longer apply as related to [Anchor] [(the "Anchor 36-Month Rule Date")]; or (ii) a date selected by [Healthcare Holdings 9] of which [Healthcare Holdings 9] shall give prior notice to [Anchor]." The Anchor 36-Month Rule Date shall not occur for a significant period of time, and the Debtors accordingly do not have a position at this time as to its obligations or intentions with respect to the Anchor Purchase Agreement.

[4] As set forth in the Magnet Purchase Agreement, the "Closing Date" is "the earlier of: (i) the date mutually agreed upon by HHF and [Marie Seignon]; or (ii)" the date on which certain conditions have been satisfied, including but not limited to certain representations and warranties being true, including the representation that Magnet "has not undergone a 'change in majority ownership' as defined in 42 C.F.R. S 424.502 by sale" within thirty-six (36) months since enrolling in Medicare or since Magnet's most recent change in majority control (the "Magnet 36-Month Rule Date"). It is the intention of the Debtors to proceed with setting the Magnet 36-Month Rule Date as the Magnet Transfer Date, or as shortly thereafter as is reasonably possible in light of these Chapter 11 Cases, and proceed with the purchase of Magnet as contemplated by the Magnet Purchase Agreement on such date.

Florida and manages approximately nine (9) employee caregivers and approximately eight (8) contractor caregivers. Additionally, HHF serves as the administrative parent and holding company for the entirety of the Debtors' Medicare business, comprising the "Healthcare Holdings" arm of the Debtors' corporate structure.

## II.    The Debtors' Business and Continued Dedication to Excellent Patient Care.

12.    While I have been advised by the Debtors' proposed restructuring counsel that the Debtors and their business likely qualify as a "health care business," as defined by section 101(27A) of the Bankruptcy Code, in light of the Debtors' dedication to providing not just quality but exceptional home patient care, this section of this Declaration provides the Court and other parties in interest greater insight into the Debtors' business and patient protection measures that help guaranty top-of-the-line care to the Debtors' patients, thanks ultimately to the Debtors' competent network of caregivers.

13.    The Debtors provide a full suite of patient care services, with a special emphasis on quality home care, particularly for senior and worker's compensation patients. The Debtors' care is focused on home health care and operates through a series of "private-pay," "long-term care" (i.e., LTC) insurance, Medicaid LTC and workers' compensation programs on the "Senior Nannies" side; and on "Healthcare Holdings" side, Medicare contracts.[5] The Debtors' business provides both skilled services (primarily through registered nurses, licensed practical nurses, and various therapists including physical therapists) and unskilled services (primarily through certified nursing assistants and home health aides) to patients at their homes pursuant to the terms of the Payer Contracts. The Debtors' highest priority always has been, will be throughout the pendency

---

[5]   These payer contracts, styled under a variety of names including *Provider Agreement*, *Provider Relations Agreement*, *Supplemental Staffing Agreement*, *Services Agreement*, etc. (collectively, the "Payer Contracts"), generally outline the services provided by the Debtors to contract counterparties and patients (collectively, the "Payers"), and detail the Debtors' obligations, services, patient protection measures, confidentiality arrangements, and other key provisions governing the Debtors' business.

of these Chapter 11 Cases, and will be after emerging from chapter 11, the highest standard of patient care and the highest degree of welfare and security for the Debtors' caregivers.

14.     The Debtors' dedication to patient and caregiver satisfaction has always been a key priority, and the Debtors' record of the same is unimpeachable.  As set forth in Section V *infra*, the events leading to these Chapter 11 Cases are wholly anomalous and do not implicate patient care, but rather stem from litigation matters and business decisions.  While the Debtors have been forced to weather the economic effects of the COVID-19 pandemic and the below-described business-related litigation, the Debtors' commitment to quality patient care and good will has always been a chief aspect of their business and never a liability precipitating the need for a reorganization.

15.     Further, the Debtors are subject to a variety of licensing and oversight mechanisms that ensure patient care is always at a premium.  Most notably, the Florida Agency for Health Care Administration ("AHCA"), self-described as the "chief health policy and planning entity for the state . . . primarily responsible for the state's estimated $35 billion Medicaid program . . . , the licensure of the state's more than 50,500 health care facilities and the sharing of health care data," oversees the Debtors' and the NDOEs' operations.  Additionally, the Centers for Medicare & Medicaid Services ("CMS"), the agency within the United States Department of Health and Human Services responsible for administering the Medicare program and determining and issuing Medicare certification and Clinical Laboratory Improvement Amendments ("CLIA") certification, have robust certification and approval processes to which the Debtors and the NDOEs (who engaged in Medicare services) are obligated to comply.  Each of the Debtors and NDOEs that provides care to patients is appropriately licensed, registered, or otherwise on record with AHCA

8

and (for Medicare providers) CMS.[6]  Moreover, each of AHCA and CMS shall receive notice of these Chapter 11 Cases and an opportunity pursuant to the Consolidated Creditor List and Notices Motion (as defined herein) to be included on the Debtors' master service list to the extent the same would benefit AHCA and CMS' respective oversight of the Debtors and the Chapter 11 Cases.

16.     The Debtors are in an excellent position to maintain the ability of patients to protect their rights and to minimize direct dependence by patients on the Debtors.  The Debtors have excellent relationships with their Payers and are in constant communication with the same. Additionally, many of the Debtors' Payers are large institutional entities that are all well-known in the Florida healthcare industry.  These institutional Payers are well-equipped to remain in constant communication with the Debtors and patients to ensure the Debtors maintain their obligations under the Payer Contracts and patients' needs are met and rights are protected.  The fact that the Debtors have enjoyed longstanding relationships with their institutional Payers speaks to the Debtors' quality of care.  These continued relationships will provide additional oversight of the Debtors' operations by Payers during these Chapter 11 Cases as the Debtors continue to perform under the Payer Contracts.

17.     The Debtors also prioritize protection of patient information.  With respect to the NDOEs, each of the Anchor MSA and the Magnet MSA have attached as <u>Exhibit A</u> (and made part of each by reference) a *Business Associate Agreement* which sets forth various safeguards and

---

[6]  Specifically, (i) Debtor Senior Nannies Home Care is an AHCA licensed "nurse registry" (as defined by 400.462(25) and generally governed by 408.801 *et seq*. (the "<u>Health Care Licensing Law</u>") and associated state regulations), (ii) Debtor SN Home Healthcare is an AHCA licensed "home health agency" (as defined by 400.462(15) and generally governed by the Health Care Licensing Law and the associated state regulations) and is Medicare and CLIA certified by CMS, (iii) Debtor HHMA is an AHCA registered "clinical laboratory" (as defined by 483.803(2)) and is Medicare and CLIA certified by CMS, (iv) Debtor Able Palms is an AHCA licensed home health agency and is Medicare certified by CMS, (v) Debtor Home Care Resources is an AHCA registered clinical laboratory and is Medicare and CLIA certified by CMS, (vi) NDOE Anchor is an AHCA registered home health agency and clinical laboratory and is Medicare and CLIA certified by CMS, and (vii) NDOE Magnet is an AHCA licensed home health agency and registered clinical laboratory and is Medicare and CLIA certified by CMS.

obligations to ensure compliance with various laws, rules, and regulations dedicated to the protection of patient privacy and security of patient information.[7]  Moreover, many of the Payer Contracts obligate the Debtors to similarly comply with the Patient Privacy and Security Regulations, and even absent such external obligations, the Debtors have always prioritized patient privacy and confidential information security.  The Debtors have never faced any regulatory action nor received any formal complaints from a governing agency directly relating to the quality of patient care, compliance with the Patient Privacy and Security Regulations, or otherwise regarding patient privacy and confidentiality.

18.     Finally, it is my opinion that the interests of the Debtors, Payers, and patients are aligned both with respect to these Chapter 11 Cases and otherwise.  The Debtors wish to continue to operate in the ordinary course of business, shed anomalous liabilities and onerous litigation, and emerge from bankruptcy poised to continue their excellent patient care and stellar relationships with their Payers.  There is little risk that the interests of the Debtors, the Payers, and patients would come into tension during the pendency of the Chapter 11 Cases, as these cases were largely initiated to preserve the Debtors' status quo.

19.     I have been advised by the proposed counsel to the Debtors that in certain health care business bankruptcies, courts may appoint a patient care ombudsman to monitor the quality

---

[7] The purpose of the *Business Associate Agreement* "is to is to comply with the requirements of (i) the Florida Information Protection Act of 2014 ("FIPA"); (ii) the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the associated regulations, as may be amended; (iii) the HIPAA Privacy Rule codified at, 45 C.F.R. Parts 160 and 164, Subparts A and E, as may be amended; (iv) the HIPAA Security Rule codified at 45 C.F.R. Part 160 and 164, Subpart C, as may be amended; (v) the Breach Notification Rule, codified at 45 C.F.R. Part 164, Subpart D, as may be amended; (vi) the Enforcement Rule codified at 45 C.F.R. Part 160, Subparts C and D, as may be amended; (vii) the Health Information Technology for Economic and Clinical Health Act, Title XIII of the American Recovery and Reinvestment Act of 2009 (the "HITECH Act"); and (viii) the HIPAA Omnibus Final Rule published in the Federal Register at 78 Fed. Reg. 5,566 (Jan. 25, 2013), and effective on March 26, 2013. The HITECH Act provides further protection for the privacy and security of PHI used and disclosed through health information technology."  Each of the preceding items (i) through (viii) shall be referred to herein as the "Patient Privacy and Security Regulations," collectively.

of patient care and to represent the interests of the patients. *See* 11 U.S.C. § 333(a). While the Debtors believe they may qualify as a "health care business" as specifically defined in the Bankruptcy Code, in light of the above presentation regarding the Debtors' patient care and practices, such a patient care ombudsman is not necessary. The costs of a patient care ombudsman (both in terms of direct fees and additional administrative burden)[8] greatly outweigh the benefits where, as here, patient care is well-protected and the Debtors' reasons for filing these Chapter 11 Cases have nothing to do with a degradation in patient care (and, indeed, will help ensure patient care continues uninterrupted).

## III.     Prepetition Capital Structure.

20.     The Debtors' capital structure is relatively straightforward and consists of secured debt, unsecured debt (much of which is contingent and/or disputed), and equity.

### A.  The Debtors' Secured Debt.

21.     The Debtors' and NDOEs' secured debt consists of various term loans and revolving lines of credit with INB, National Association (the "Prepetition Lender" or "INB") in the amounts specified below.

| Debtor(s)/ Borrower(s) | Amount and Type of Loan | Collateral |
|---|---|---|
| Home Care Resources Home Health Agency, LLC | $132,532.50 term loan, with a balance of approximately $125,775.15. | All assets of the Borrower |
| Healthcare Holdings of Florida LLC | $433,903.00 term loan, with a balance of approximately $301,370.42. | All assets of the Borrower |

---

[8]  Proposed counsel to the Debtors have also advised me that in certain cases, bankruptcy courts allow patient care ombudsmen to hire additional professionals, including their own management companies and counsel. Without conceding the propriety of any such ombudsman professionals under the Bankruptcy Code, the additional costs, in addition to the fees of the ombudsman themselves and the increased Debtor professional fees, would directly reduce creditor recovery in these Chapter 11 Cases and not be in the best interest of the Debtors' estates.

| Healthcare Holdings of Florida LLC | $4,200,000 line of credit, with a balance of approximately $764,850.00. | All assets of the Borrower, plus all accounts receivable of each of the following Debtors and non-Debtor operating entities: Able Palms Home & Health Care Services, Inc.; Anchor Health Homecare Services LLC; HHMA LLC; Home Care Resources Home Health Agency, Inc.; and Magnet Home Health Care Services, LLC. |
|---|---|---|
| CWGL Holdings, LLC; Senior Nannies Holdings LLC | $4,000,000 line of credit, with a balance of approximately $2,445,811.78. | All assets of the Borrowers |
| Able Palms Home and Health Care Services, Inc. | $356,028.00 term loan, with a balance of approximately $298,835.94. | Borrower's Home Health Agency License (LICENSE #20073096 CERTIFICATE #59675) |
| Anchor Health Homecare Services, LLC | $95,551.00 term loan, with a balance of approximately $81,031.06. | Borrower's Home Health Agency License (LICENSE #299995621 CERTIFICATE #60063) |
| HHMA LLC | $204,096.00 term loan, with a balance of approximately $171,309.88. | Borrower's Home Health Agency License (LICENSE #299995323 CERTIFICATE #61986) |

In the aggregate, the total principal amount of the term loans (the "Term Facilities") outstanding was ultimately approximately $1,722,110, with a balance due of approximately $978,322.45 after payment reductions by the Debtors as of the Petition Date.  With respect to the revolving credit (the "Revolving Facilities," and together with the Term Facilities, the "Prepetition Secured Facilities"), the Prepetition Lender extended up to $8,200,000, with a balance of $3,050,661.78 as of the Petition Date.  The Term Facilities are secured by all assets of HHF and Home Care Resources and the regulatory licenses and certificates of each of Able Palms, Anchor and HHMA. The Revolving Facilities are secured by all assets of HHF, CWGL, and Senior Nannies Holdings, and the accounts receivable of each of HHMA, Able Palms, Home Care Resources, Anchor and

12

Magnet.  The Prepetition Secured Facilities have a variety of maturity dates, each as governed by their respective prepetition facility documents, between May 10, 2025 and August 19, 2027.

22.     Additionally, the assets of NDOEs Anchor and Magnet are encumbered by, respectively, Healthcare Holdings 9 and HHF pursuant to each of the Anchor Purchase Agreement and the Magnet Purchase Agreement, respectively.

**B.  The Debtors' Unsecured Debt.**

**a.   General Payables and Disputed Litigation Claims**

23.     The Debtors' unsecured debt primarily consists of vendor payables and certain disputed litigation claims described in Section V *infra* (which, for the avoidance of doubt, the Debtors do not concede to the existence, validity, or degree of any such claims, and simply refer to the same herein for informational purposes for the benefit of the Court and other parties in interest).

**b.  "PPP" Loan from the SBA**

24.     On July 15, 2024, the Debtor CWGL submitted a disclosure to the SBA Office of General Counsel indicating that CWGL has become aware that the SBA may determine that it was ineligible for the entire PPP loan amount it received. Specifically, CWGL included in its loan amount calculations compensation paid to workers who received Form 1099-MISC in addition to workers who received Form W-2s.

25.     Debtor CWGL calculated its eligible loan amount in good faith based on its understanding of the PPP guidance at the time and based on consultation with its lender, First Horizon Bank ("First Horizon"). CWGL's PPP loan application and supporting documents provided to First Horizon demonstrated how CWGL calculated its PPP loan amount, including the

submission of 2019 quarterly Form 941s and 2019 Form 1096 for Senior Nannies, which indicate that a percentage of Senior Nannies' payroll went to 1099-Misc employees.

26.     As disclosed in CWGL's PPP loan application, CWGL applied for a single loan based on the payroll of its three (co-Debtor) affiliates: Senior Nannies Management Services LLC; SN Home Healthcare LLC; and Senior Nannies Home Care Services LLC.  These Debtors, as set forth herein, provide home care services in Florida and used the PPP loan to pay staff (W2 and 1099 workers) during the COVID-19 pandemic.  As indicated on CWGL's PPP forgiveness application, payroll during the forgiveness period was more than double its PPP loan amount. CWGL did not apply for a second-draw loan in 2021.  CWGL's discussions with its lender regarding the 1099 workers—and the lender's and SBA's subsequent approvals of the loan amount as well as loan forgiveness application—led CWGL to believe it had properly included 1099 employees in its loan amount.   CWGL has not received any outreach from the SBA in response to the July 15, 2024 disclosure.

### c.  Outstanding Lease Obligations.

27.     Additionally, the Debtors lease various premises throughout the state of Florida. While the Debtors are current with respect to nearly all of their lease obligations, the following table is included nevertheless in the interest of completeness.

|  | **Debtor** | **Address** | **Leased or Owned** |
|---|---|---|---|
| 1. | Senior Nannies Home Care Services, LLC | 3343 W Commercial Blvd, Suite 103, Fort Lauderdale, Florida 33309 | Leased |
| 2. | CWGL Holdings, LLC | 3313 W Commercial Blvd, Suite 130, Fort Lauderdale, Florida 33309 | Leased |
| 3. | Senior Nannies Home Care Services, LLC | 6638 W. Atlantic Ave., Delray Beach, Florida 33446 | Leased |
| 4. | Senior Nannies Home Care Services, LLC | 677 N. Washington Blvd, Suite 28, Sarasota, Florida 34236 | Leased |

| 5. | Senior Nannies Home Care Services, LLC | 3632 Land O'Lakes, Suite 105, Land O'Lakes, Florida 34639 | Leased |
|---|---|---|---|
| 6. | Senior Nannies Home Care Services, LLC | The Preserve at Palm-Aire<br>3701 W McNab Rd, Pompano Beach, Florida 33069 | Leased |
| 7. | Senior Nannies Home Care Services, LLC | 1900 S Harbor City Blvd, Suite 204, Melbourne, Florida 32901 | Leased |
| 8. | Senior Nannies Home Care Services, LLC | 1637 SE Port St Lucie Blvd, Port St Lucie, Florida 34952 | Leased |
| 9. | Senior Nannies Home Care Services, LLC | D & H PROPERTIES, LLC<br>5085 Commercial Way, Spring Hill, Florida 34606 | Leased |
| 10. | Senior Nannies Home Care Services, LLC | 4651 Salisbury Road, Suite 400, Jacksonville, Florida 32256 | Leased |
| 11. | Senior Nannies Home Care Services, LLC | 9815 South Ocean Dr, Unit 3-B, Jensen Beach, Florida 34957 | Leased |
| 12. | SN Home Healthcare, LLC | 8500 Royal Palm Blvd, C131, Coral Springs, Florida 33065 | Leased |
| 13. | Senior Nannies Home Care Services, LLC | 279 NW California Blvd, Port St. Lucie, Florida 34986 | Leased |
| 14. | Able Palms Home and Health Care Services, Inc. | 300 Lake Avenue Northeast, Room 123, Largo, Florida 33771 | Leased |
| 15. | Anchor Health Homecare Services LLC | 7700 Congress Avenue, Suite 1108, Boca Raton, Florida 33487 | Leased |
| 16. | SN Home Healthcare, LLC | 2480 North Park Road, Suite #3, Hollywood, Florida 33021 | Leased |
| 17. | Senior Nannies Home Care Services, LLC | 7000 W. Palmetto Park Road, Suite 210, Boca Raton, Florida 33433 | Leased |
| 18. | Home Care Resources Home Health Agency, LLC | 5979 NW 151st Street, Suite 109, Miami Lakes, Florida 33014 | Leased |
| 19. | HHMA LLC | 3030 NE 188th St, Apt 709, Aventura, Florida 33180 | Leased |
| 20. | Senior Advantages Assisted Living Placement Services, LLC | 901 Seminole Blvd, Apt 421, Largo, Florida 33770 | Leased |
| 21. | SN Home Healthcare, LLC and Senior Nannies Holdings, LLC | 7758 Wallace Road, Suite F, Orlando, Florida 32819 | Leased |
| 22. | Magnet Home Health Care Services, LLC | 6911 Pistol Range Rd, Ste 101B, Tampa, Florida 33635-6371 | Leased |
| 23. | Senior Nannies Home Care Services, LLC | 6911 Pistol Range Rd Ste 101C Tampa, Florida 33635-6371 | Leased |
| 24. | SN Home Healthcare, LLC | 6911 Pistol Range Rd Ste 101D Tampa, Florida 33635-6371 | Leased |

15

**C. Equity Interests in the Debtors.**

28.    The Debtors' equity consists of those membership interests described in each Debtor's Chapter 11 Petition [Docket No. 1], the Debtors' Corporate Ownership Statement filed contemporaneously herewith, and the Debtors' List of Equity Security Holders filed contemporaneously herewith.

**IV.   The Debtors' Assets.**

29.    The Debtors' principal balance sheet assets are their accounts receivable, together with cash and prepayments to various parties including landlords, AHCA, and insurance providers.

30.    The Debtors' primary operational assets are their network of caregivers and assorted licenses, each as described in greater detail in the sections above.

31.    I am also currently reviewing, among other things, the Debtors' books and records as they exist, certain documents, and various other information in coordination with the Debtors' proposed professionals to ascertain whether the Debtors have any claims or causes of action against third parties that the Debtors intend to pursue in the exercise of their reasonable business judgment, as informed by the advice of such proposed professionals.  I anticipate that my review will continue after the filing of these Chapter 11 Cases to ensure that potential assets of the Debtors' estates are preserved and maximized for stakeholders.

**V.    Key Events Leading to the Chapter 11 Cases.**

**A. The Receipt of Defective Gloves from a Malaysian Wholesaler and Attendant Litigation.**

32.    In or around 2020, concomitant with the onset of the COVID-19 pandemic, the Debtors explored the opportunity to use their status as a provider of health related services, as described elsewhere herein, to expand into the medical supplies market and begin selling medical supplies to the community during those fraught and unsure times.  To that end, a subsidiary of

16

Senior Nannies Holdings, SN DME, LLC ("DME") in or around January 2021 began entering into purchase contracts to obtain medical supplies from various sellers, including a Malaysian entity known as Amazing Glove SDN.BHD ("Amazing Glove"), a wholesaler of personal protective equipment.

33.     Specifically, with respect to Amazing Glove, DME entered into three (3) contracts pursuant to which (collectively) DME would purchase from Amazing Glove more than 30,000 boxes of 100% nitrile, FDA-approved gloves ("AG Gloves") and four (4) containers of CleanGuard 100% nitrile, FDA-approved gloves ("CG Gloves"), for which DME wired some $1,740,000 in earnest money deposits.  Notwithstanding the large sums of money transmitted to Amazing Glove from DME, Amazing Glove did not deliver any container of AG Gloves and released only two (2) containers of CG Gloves.  What is worse, all of the gloves at issue between DME and Amazing Glove were not manufactured with applicable U.S. Food and Drug Administration certifications and requirements.  Ultimately, due to the non-delivery of the contracted gloves, the inability of DME to use the improperly manufactured gloves, and the lack of interest in the market for the resale of the improperly manufactured gloves, DME was regrettably unable to successfully enter the medical supplies market and was forced to shutter its business.

34.     In or around June 2022, after costly litigation with Amazing Glove, Debtor Senior Nannies Holdings, as owner of DME and in the exercise of its sound business judgment, determined that a formal cessation of DME was necessary to orderly terminate its business and I, on behalf of DME, petitioned the Circuit Court in and for the Seventeenth Judicial Circuit in and for Broward County, Florida (the "Circuit Court") for an assignment for the benefit of creditors, naming Mark C. Healy as assignee (the "Assignee").

17

35.     Not content to see DME's business close and even not content to see DME file an insolvency proceeding, Amazing Glove entered into a settlement agreement with the Assignee, liquidating its claim to $18,304,400.00 (which the Debtors maintain is uncollectible in light of DME's cessation of business as a result of Amazing Glove's breaches with DME) and purchasing all claims of DME.

36.     Thinking the matter done and the DME chapter as an unfortunate attempt to enter a new business line that was stymied by unreliable vendors who were bad faith actors, the Debtors continued operating their care-based business to great success, providing quality care to their patients, excellent relationships with their vendors and contract counterparties, and overall orderly operations.  On August 11, 2023, however, Amazing Glove initiated another suit in the Circuit Court (the "Amazing Glove Suit"), this time against Debtors CWGL, Senior Nannies Holdings, Senior Nannies Home Care, and Senior Nannies Management, alleging, *inter alia*, claims for actual fraudulent transfers, constructive fraudulent transfers, veil piercing, and alter ego.  The primary subject of the Amazing Glove Suit was some sixty-one (61) transfers from DME in the approximate aggregate amount of $6,932,899.48.  Notwithstanding the allegations of alter ego, none of the individual shareholders of any of the Debtors were named as Defendants in the Amazing Glove Suit.

37.     In the course of the Amazing Glove Suit, the Debtors retained KapilaMukamal, LLP as financial experts to perform two separate analyses of Amazing Glove's claims.  The experts analyzed the sixty-one (61) transfers under the rubric of what qualifies as a fraudulent transfer and determined that less than one third of the alleged fraudulent transfers could even *speculatively* be considered subject to a claw back by DME.  The financial experts also performed an insolvency

analysis of DME at the time of the relevant transfers. Amazing Glove is in possession of the analysis.

38.     Each of KapilaMukamal, LLP's analyses, together with Quickbooks records, back-ups thereof, financial records, bank records, contracts, tax returns for years 2020 through 2022, and all other information relied upon by experts were provided to Amazing Glove, and attempts at a formal mediation resulted in an impasse.  Amazing Glove has twice deposed corporate representatives of the Debtors.  No motions for summary judgment were filed or scheduled to be heard in the Amazing Glove Suit.  The trial is scheduled for the three-week period commencing January 13, 2025.

39.     While the Debtors have duly defended the Amazing Glove Suit and believe that the claims asserted therein are unmeritorious, the Debtors have determined in the exercise of their reasonable business judgment (and given the record of Amazing Glove) that nothing short of a wholesale chapter 11 reorganization of the Debtors' corporate family, together with an eventual attendant discharge and injunction, will end Amazing Glove's crusade for collection on a judgment I do not believe they should ever have had to begin with.  Accordingly, the Debtors have filed these Chapter 11 Cases to shed this anomalous (and wholly disputed) liability from a non-Debtor subsidiary that shuttered years ago.

**B.  Litigation Commenced by Junior Members of Debtor CWGL.**

40.     In or around 2012 and 2013, respectively, Debtor CWGL hired Brett Feldman and Bryan Solomon to serve as account executives. Each of Mr. Feldman and Mr. Solomon worked in such capacity until May 2017.  At such time, each of CWGL, the members of CWGL, and Mr. Feldman and Mr. Solomon entered into a *Second Amended and Restated Operating Agreement of CWGL Holdings, LLC* (the "CWGL OA"), pursuant to which each of Mr. Feldman and Mr. Solomon (the "Class B Members") became a 2.5% Class B Member with a mechanism by which

19

such Class B Member interest could increase from time to time.[9]  Additionally, each of the Class B Members became titled as "vice presidents" of CWGL and received five-year employment agreements (the "Employment Agreements").

41.     The Employment Agreements contained various restrictive and affirmative covenants, including but not limited to and subject to the limitations set forth in the Employment Agreements, a requirement to keep confidential certain trade secrets, a non-competition agreement for the initial term of the Employment Agreements, non-interference and non-solicitation agreements, and a non-disparagement agreement (collectively, the "Breached Covenants").  While still employed by CWGL, in or around April 2020 through June 2020, the Class B Members formed a series of entities to directly compete with CWGL and its subsidiaries.  Each of the Class B Members continued thereafter to engage in efforts to poach clients of CWGL and its affiliates and disparage CWGL, its affiliates, its employees, and its quality of care, all in violation of the Breached Covenants.[10]  Mr. Solomon's Employment Agreement was not renewed and lapsed on April 30, 2022, and Mr. Feldman was terminated for cause on December 27, 2022.

42.     On June 7, 2022, CWGL made a written demand on the Class B Members advising them they were in violation of the Breached Covenants and demanding they engage in pre-suit mediation.  Notwithstanding the above-described bad acts and the mediation demand, the Class B Members filed suit against CWGL, Claudia Wechter, and Gary R. Loffredo on September 16, 2022 in the Circuit Court (the "Class B Members Suit"), alleging breaches of the Employment

---

[9] For the avoidance of doubt, Class B Members pursuant to the CWGL OA are not entitled to any management rights of CWGL and their consent is not required for any "Major Decisions" (as defined in the CWGL OA), including but not limited to the filing of these Chapter 11 Cases.  The Debtors continue to review their books and records, as well as the claims and defenses in the Class B Member Suit, including but not limited to with respect to the degree of any and all Class B membership interests in Debtor CWGL.

[10] All as alleged in greater detail in CWGL's *Answer, Affirmative Defenses, and Counterclaim*, filed on December 27, 2022 in the Class B Members Suit (as defined herein).

Agreements and breaches of the fiduciary duties imposes by the CWGL OA. CWGL counterclaimed for breaches of such Employment Agreements, including but not limited to the Breached Covenants, and breaches of fiduciary duty. No motions for summary judgment were filed or scheduled to be heard in the Class B Members Suit. The trial is scheduled for the four-week period commencing August 4, 2025.

### C.  Next Steps and the Commencement of the Chapter 11 Cases.

43.     I am firmly of the belief that the Debtors' best chance of maximizing value for their various constituencies are these chapter 11 proceedings, through which the Debtors' plan is to (a) secure postpetition financing as needed that will enable the Debtors to continue their history of sterling patient care, continue employment and independent contractor relationships with their caregivers, and generally poise the Debtors' estates for success, and (b) prepare the Debtors' business for an expeditious and orderly sale and/or reorganization process that maximizes the singular, continued, and uninterrupted one goal of the Debtors: excellence in compassionate full life care for all.

44.     In preparing for these Chapter 11 Cases, I discussed various reorganization options with various key stakeholders of the Debtors and the Debtors' proposed restructuring counsel. In so doing, one of my chief priorities was ensuring the going concern value of the Debtors is maintained for the benefit of their patients, caregivers, creditors, and all parties in interest. In consideration of the Debtors' secured creditor obligations and the ongoing litigation, positioned against the Debtors' successful business model and opportunity to continue giving quality care, the Debtors are considering, in the exercise of their reasonable business judgment, whether a sale of the Debtors' business (while maintaining caregivers, licenses, patients, and other key business facilities without disruption) is in the best interest of all parties in interest.  In order to ensure an

orderly prospective sale and/or reorganization process together with compliance with the various regulatory obligations of the Debtors, the Debtors retained prepetition (and shall apply for approval of retention postpetition) the law firm of Gunster, Yoakley & Stewart, P.A. to serve as special Medicare and regulatory counsel to the Debtors.

45.    Additionally, to build consensus with the Debtors' Prepetition Lender, INB, and ensure its interests are protected throughout these Chapter 11 Cases and any proposed sale and/or reorganization process, the Debtors have sought postpetition debtor-in-possession financing (the "DIP Financing") from INB on substantially the same terms as existed prepetition.  The DIP Financing will ensure the Debtors have additional working capital to ensure they can meet their financial obligations, both to the Prepetition Lender and otherwise, related to these Chapter 11 Cases and continued operation, and enable the consensual use of the Prepetition Lender's Cash Collateral (as defined in the DIP and Cash Collateral Motion filed contemporaneously herewith). The agreements between the Debtors and INB, in its capacity as Prepetition Lender and proposed DIP lender, are a testament to the Debtors' dedication to achieving a successful and orderly reorganization, and such consensus will ultimately benefit all parties in interest due to the excellence of the outcome and the reduction of administrative expense costs.

46.    With the above-described plan in place, I am confident that the Chapter 11 Cases will provide the best venue to monetize the Debtors' patient- and caregiver-driven business and provide the maximum recovery to the Debtors' stakeholders in an efficient and orderly process, and to shed the anchor of vexatious litigation once and for all.

**The Debtors' First Day Pleadings**

47.    The First Day Pleadings seek relief to allow the Debtors to meet necessary obligations and fulfill their duties as debtors in possession.  I have been advised of the relief

requested in the First Day Pleadings and believe that the relief sought in each First Day Pleading (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value and (b) best serves the Debtors' estates and the interests of their creditors, patients, and other parties in interest.   The facts set forth in each First Day Pleading are incorporated herein by reference.   The First Day Pleadings, each of which the Debtors respectfully request be considered on an emergency or *ex parte* basis, as the case may be, include the following:

a. *Debtors' Emergency* Ex Parte *Motion for Joint Administration of Bankruptcy Estates, Intra-District Transfer, as Applicable, and Request for Expedited Consideration* (the "Joint Administration Motion");

b. *Debtors'* Ex Parte *Motion for Authorization to File Consolidated Chapter 11 Case Management Summary* (the "Consolidated Case Management Motion");

c. *Debtors' Motion for Entry of an Order (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Providers Adequately Assured of Future Performance, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Granting Related Relief* (the "Utilities Motion");

d. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, but not Directing, the Debtors to (A) Continue Honoring Their Obligations Under Insurance Policies Entered Into Prepetition and Satisfy Prepetition Obligations Thereto and (B) Renew, Supplement, Modify, or Purchase Coverage, and (II) Granting Related Relief* (the "Insurance Motion");

e. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Existing Business Forms, and (II) Granting Related Relief* (the "Cash Management Motion");

f. *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Debtors to (I) Maintain and Administer Prepetition Refund Programs, and (II) Pay and Honor Related Prepetition Obligations, and (B) Granting Related Relief* (the "Refund Programs Motion");

g. *Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to (I) Pay Prepetition Worker Wages, Salaries, and Other Compensation, and (II) Continue Worker Benefits Programs, and (B) Granting Related Relief* (the "Worker Wages and Salary Motion");

h. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (II) Granting Adequate Protection Pursuant to Sections 361, 363, and 364 of the Bankruptcy Code, (III) Authorizing the Debtors to Obtain Postpetition Financing Pursuant to Sections 105(a), 362, and 364(c) and 364(d) of the Bankruptcy Code, (IV) Granting Super Priority Claims to the DIP Lender Pursuant to Section 364(c) of the Bankruptcy Code, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* (the "<u>DIP and Cash Collateral Motion</u>");

i. *Debtors' Motion Seeking Entry of an Order Authorizing the Debtors to Retain and Compensate Certain Professionals Utilized in the Ordinary Course of Business Effective as of October 30, 2024* (the "<u>Ordinary Course Professionals Motion</u>"); and

j. *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated Creditor Matrix and Consolidated List of the Top Thirty Unsecured Creditors, and (II) Establishing Notice Procedures* (the "<u>Consolidated Creditor List and Notices Motion</u>").

48.     Furthermore, the Debtors have submitted or will imminently submit the following pleadings that the Debtors believe are of vital importance, but do not necessarily require emergency consideration:

a. *Debtors in Possession's Application for Employment of Pack Law as Counsel, Effective as of October 30, 2024* (the "<u>Pack Law Retention Application</u>");

b. *Debtors in Possession's Application for Employment of Gunster, Yoakley & Stewart, P.A. as Special Medicare and Regulatory Counsel, Effective as of October 30, 2024* (the "<u>Gunster Retention Application</u>");

c. *Debtors' Motion for an Order Determining that Appointment of a Patient Care Ombudsman is not Necessary and Waiving the Requirements of Section 333 of the Bankruptcy Code, if Applicable, or in the Alternative* (the "<u>Patient Care Ombudsman Motion</u>"); and

d. *Debtors' Motion to (I) Assume Agreement to Purchase Equity of Magnet Home Care Services, LLC, and (II) Approve Use of the Debtors' Property Outside the Ordinary Course of Business Pursuant to the Same* (the "<u>Magnet Assumption Motion</u>").

49.     I believe all relief sought in the First Day Pleadings and these subsequent pleadings to-come are critical to the continued success of the Debtors during the Chapter 11 Cases and ultimately, are of benefit to all stakeholders.  Moreover, some of the above-referenced pleadings

either do or will request authority to pay certain prepetition claims against the Debtors. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have and shall narrowly tailor their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. The Debtors will defer seeking other relief to subsequent hearings before the Court.

50.     The above describes the Debtors' business and capital structure, the factors that precipitated the commencement of the Chapter 11 Cases, and the critical need for the Debtors to obtain the relief sought in the First Day Pleadings.

[*Remainder of Page Intentionally Left Blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: October 30, 2024

By: _/s/ Gary R. Loffredo_
Name: Gary R. Loffredo
Title: Manager and CEO of Healthcare Holdings of Florida, LLC; CWGL, LLC; and their Debtor Affiliates
3313 West Commercial Boulevard
Suite 130
Fort Lauderdale, Florida 33309

**Exhibit A**
**Organizational Chart**



*Unless otherwise indicated, solid lines represent 100% equity ownership. Dashed lines represent non-owner managerial relationships, as set forth in the First Day Declaration.