**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
www.flsb.uscourts.gov

_____

In re:

Healthcare Holdings of Florida LLC, *et al.*[1]

Debtors.

_____

)
)
)  Chapter 11
)
)  Case No. 24-21355-SMG
)
)  (Jointly Administered)
)

---

**COMBINED DISCLOSURE STATEMENT FOR (I) JOINT PLAN OF HEALTHCARE HOLDINGS OF FLORIDA, LLC AND ITS DEBTOR SUBSIDIARIES, AND (II) JOINT PLAN OF CWGL HOLDINGS, LLC AND ITS DEBTOR SUBSIDIARIES, EACH PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

**PACK LAW**
51 NE 24th Street, Suite 108
Miami, Florida 33137

Joseph A. Pack
Email:  joe@packlaw.com
Florida Bar No. 117882

Jessey J. Krehl
Email: jessey@packlaw.com
Florida Bar No. 1025848

*Counsel to the Debtors and Debtors-in-Possession*

Dated: April 16, 2025

---

[1] The Debtors and last four digits of their tax identification numbers are: (i) Healthcare Holdings of Florida LLC (6887); (ii) Healthcare Holdings 9 LLC (3633); (iii) HHMA Holdings LLC (3691); (iv) HHMA LLC (3901); (v) Able Palms Holdings, LLC (9363); (vi) Able Palms Home and Health Care Services, Inc. (3931); (vii) Home Care Resources Holdings, LLC (1385); (viii) Home Care Resources Home Health Agency, LLC (0617); (ix) CWGL Holdings, LLC (1945), (x) Senior Nannies Holdings, LLC (5172), (xi) Senior Nannies Management Services, LLC (5336); (xii) SN Home Healthcare, LLC (9996); (xiii) Senior Nannies Home Care Services, LLC (8991); and (xiv) Senior Advantages Assisted Living Placement Services, LLC (1293).  The mailing address of the Debtors is 3313 West Commercial Boulevard, Suite 130, Fort Lauderdale, Florida 33309.

THE ABOVE-CAPTIONED DEBTORS AND DEBTORS IN POSSESSION (COLLECTIVELY, THE "**DEBTORS**" OR THE "**PLAN PROPONENTS**") PROVIDE THE INFORMATION IN THIS DISCLOSURE STATEMENT (THE "**DISCLOSURE STATEMENT**") IN CONNECTION WITH THEIR RESPECTIVE JOINT PLANS PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE (THE "**PLANS**") TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLANS. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLANS.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE," OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS. ANY DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, BASED UPON INFORMATION CURRENTLY AVAILABLE TO THE DEBTORS.

AS TO CONTESTED MATTERS, EXISTING LITIGATION INVOLVING, OR POSSIBLE ADDITIONAL LITIGATION TO BE BROUGHT BY, OR AGAINST, THE DEBTORS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION, OR A WAIVER, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER BY ANY PERSON, PARTY OR ENTITY. AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS OR MAY CONTAIN, AMONG OTHER THINGS, SUMMARIES OF THE PLANS, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THESE CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLANS THAT MAY BE ATTACHED HERETO AND/OR INCORPORATED HEREIN BY REFERENCE. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND

ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLANS OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLANS OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTORS' MANAGEMENT AND LEGAL COUNSEL HAVE REVIEWED THE FINANCIAL INFORMATION PROVIDED HEREIN.  ALTHOUGH THE DEBTORS USED REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED. THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, FACTS HEREIN HAVE NOT CHANGED SINCE THE DISCLOSURE STATEMENT WAS FILED.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING ANY DEBTOR OR THE VALUE OF THE DEBTORS' PROPERTY OTHER THAN AS SET FORTH HEREIN.

**PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLANS, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS, ALTERNATIVES TO CONFIRMATION, AND CONSUMMATION OF THE PLAN, ALL DESCRIBED IN GREATER DETAIL HEREIN.**

**TABLE OF CONTENTS**

I.    INTRODUCTION AND SUMMARY.................................................................................1
      A. Overview of Chapter 11 .......................................................................................1
      B. Rules of Interpretation and Construction.............................................................1
      C. Recommendation .................................................................................................2
II.   BACKGROUND INFORMATION ...............................................................................2
      A. The Bankruptcy Cases .........................................................................................2
      B. Debtors' Operations.............................................................................................2
      C. Litigation that Precipitated the Filing .................................................................3
          1.    The Amazing Glove Lawsuit..................................................................3
          2.    The Minority Shareholder Lawsuit........................................................3
      D. Unsecured Claims in the Chapter 11 Cases .........................................................4
          1.    Unsecured Claims..................................................................................4
          2.    Secured Claims .....................................................................................4
      E. The Chapter 11 Cases and Negotiation of Consensual Plan Transactions...........5
III.  SUMMARY OF THE PLAN .......................................................................................5
      A. Treatment of Claims and Interests under the Plan ...............................................5
          1.    Classification and Treatment of Claims and Interests ...........................5
          2.    Treatment of Unclassified Claims under the Plans.................................7
          a.    Administrative Expense Claims..............................................................7
          b.    Professional Claims ...............................................................................8
          c.    Priority Tax Claims................................................................................8
          3.    Treatment of Classified Claims and Interests under the HHF Plan .......8
          1.    Class 1 – Other Secured Claims.............................................................8
          2.    Class 2 – Priority Non-Tax Claims........................................................9
          3.    Class 3-A – INB Term Loan Claims.......................................................9
          4.    Class 3-B – INB Revolving Loan Claims .............................................10
          5.    Class 4 – General Unsecured Claims....................................................10
          6.    Class 5 – Existing HHF Equity Interests .............................................11
          7.    Class 6 – Existing Subsidiary Equity Interests ....................................11
          4.    Treatment of Classified Claims and Interests under the CWGL Plan ...11
          1.    Class 1 – Other Secured Claims...........................................................11
          2.    Class 2 – Priority Non-Tax Claims......................................................12
          3.    Class 3 – INB Secured Claims.............................................................12
          4.    Class 4 – General Unsecured Claims....................................................13
          5.    Class 5 – Amazing Glove Claims .........................................................13
          6.    Class 6 – Disco Claims .......................................................................14
          7.    Class 7 – Class B Shareholder Claims..................................................14
          8.    Class 8 – Class A Shareholder Claims..................................................15
          9.    Class 9 – Intercompany Interests .........................................................15
          10.   Class 10 – Existing Equity Interests ...................................................15
      B. Voting Procedures and Requirements.................................................................15
          1.    Vote Required for Acceptance by a Class ............................................16
          2.    Impaired Classes of Claims and Interests Entitled to Vote..................16
          3.    Claims and Interests Not Entitled to Vote ...........................................16
          4.    Voting Procedures...............................................................................16
          5.    Cramdown............................................................................................17
      C. Separate Plans ...................................................................................................17
      D. Implementation of the Plan................................................................................17
      E. Distributions under the Plan...............................................................................18
          1.    Sources of Distributions Under the Plans ............................................18
          2.    Distribution Record Date ....................................................................18
          3.    Setoffs ................................................................................................19
      F. Procedures for Disputed Claims and Interests....................................................19

i

|  |  |  |
|---|---|---|
| 1. | Disputed Claims Process | 19 |
| 2. | Claims Administration Responsibilities | 19 |
| 4. | Single Satisfaction of Claims | 20 |
| 5. | Disallowance of Claims and Interests | 20 |

G. Executory Contracts and Unexpired Leases ........................................................... 20
H. Conditions Precedent to Effective Date ................................................................ 20

|  |  |  |
|---|---|---|
| 1. | Conditions Precedent | 20 |
| 2. | Waiver of Conditions | 21 |
| 3. | Effect of Non-Occurrence of Conditions to Consummation | 21 |

I. Effect of Confirmation .......................................................................................... 21

|  |  |  |
|---|---|---|
| 1. | Binding Effect | 21 |
| 2. | Discharge of Claims and Termination of Interests | 21 |
| 3. | Releases by the Debtors | 22 |
| 4. | Releases by Holders of Claims and Interests | 22 |
| 5. | Injunction | 23 |
| 6. | Exculpation | 23 |
| 7. | Release of Liens | 24 |

J. Retention of Jurisdiction ........................................................................................ 24
K. Miscellaneous Provisions of the Plan ................................................................... 26

|  |  |  |
|---|---|---|
| 1. | Payment of Statutory Fees | 26 |
| 2. | Transfer Taxes | 26 |
| 3. | Modifications to Plan and Plan Supplement | 26 |
| 4. | Other Amendments | 26 |
| 5. | Revocation or Withdrawal of the Plans | 26 |
| 6. | Governing Law | 26 |
| 7. | Time | 27 |
| 8. | Binding Effect of Plan | 27 |
| 9. | Entire Agreement | 27 |
| 10. | Section 1125(e) Good Faith Compliance | 27 |
| 11. | Notices | 27 |

IV. RISKS AND CONSIDERATIONS ............................................................................... 28
  A. Bankruptcy Considerations .................................................................................... 28
  B. Tax Consequences ................................................................................................. 28
  C. No Duty to Update Disclosures .............................................................................. 29
  D. Representations Outside this Disclosure Statement ................................................ 29
  E. No Admission ........................................................................................................ 29
V.  PLAN CONFIRMATION AND CONSUMMATION ..................................................... 29
  A. Plan Confirmation Hearing .................................................................................... 29
  B. Plan Confirmation Requirements under the Bankruptcy Code ................................ 30
  C. Plan Consummation .............................................................................................. 30
  D. Best Interests of Creditors Test ............................................................................. 30
  E. Liquidation Analysis ............................................................................................. 31
  F. Feasibility ............................................................................................................. 32
  G. Acceptance by Impaired Classes ........................................................................... 32
  H. Section 1129(b) .................................................................................................... 32

|  |  |  |
|---|---|---|
| 1. | No Unfair Discrimination | 32 |
| 2. | Fair and Equitable | 32 |
| 3. | Fair and Equitable | 33 |

VI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN .... 34
  A. Chapter 7 Liquidation ........................................................................................... 34
  B. Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code ........................... 34
  C. Dismissal of the Debtor's Chapter 11 Case ............................................................ 34
VII. RECOMMENDATION AND CONCLUSION ............................................................. 35

I.       INTRODUCTION AND SUMMARY

You are receiving this package because you hold a Claim against one or more of the Debtors and are entitled to vote on one or more of the enclosed Plans.  You are encouraged to read the remaining sections of this Disclosure Statement, providing important information regarding both the Plans and the bankruptcy process itself.  For the reasons set forth below, the Debtors strongly recommend that you vote to **ACCEPT** the Plans.  Copies of each of the Plans are attached hereto and are incorporated by reference as **Exhibit A** and **Exhibit B**, respectively, for each of (i) Healthcare Holdings of Florida, LLC and its Debtor subsidiaries and  (ii) CWGL Holdings, LLC and its Debtor subsidiaries.

**PURSUANT TO THE BANKRUPTCY CODE, ONLY CREDITORS WHO ACTUALLY VOTE ON THE RESPECTIVE PLANS WILL BE COUNTED FOR PURPOSES OF DETERMINING WHETHER THE REQUIRED NUMBER OF ACCEPTANCES HAS BEEN OBTAINED WITH RESPECT TO SUCH PLAN.  FAILURE TO FILE WITH THE COURT A PROPERLY COMPLETED BALLOT BY THE VOTING DEADLINE WILL RESULT IN AN ABSTENTION AND, CONSEQUENTLY, THE VOTE MAY NOT BE COUNTED AS EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN.**

A.       **Overview of Chapter 11**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, Chapter 11 provides a mechanism for businesses to liquidate their assets in a way that promotes equality of treatment for similarly situated holders of claims and equity interests, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the commencement of the chapter 11 case.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a Chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any entity acquiring property under the plan, any holder of a claim or equity interest in a debtor and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code, to the terms and conditions of the confirmed plan.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan provides for the treatment of claims and equity interests in accordance with the terms of the confirmed plan.

Prior to soliciting acceptances of a proposed chapter 11 plan, Section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the chapter 11 plan.  This Disclosure Statement is being submitted in accordance with the requirements of Section 1125 of the Bankruptcy Code, and the Debtors shall seek final approval of this Disclosure Statement concomitantly with confirmation of the Plans.

B.       **Rules of Interpretation and Construction**

Unless otherwise specified, all section or exhibit references in the Disclosure Statement are to the respective section in, or exhibit to, the Disclosure Statement, as the same may be amended, waived, or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Disclosure Statement as a whole and not to any particular section, subsection, or clause contained therein. The rules of construction contained in Section 1102 of the Bankruptcy Code shall

apply to the Disclosure Statement. The headings in this Disclosure Statement are for convenience of reference only and shall not limit or otherwise affect the interpretation of the Disclosure Statement. Unless otherwise provided, any reference in this Disclosure Statement to an existing document, exhibit or schedule means such document, exhibit or schedule as it may have been amended, restated, revised, supplemented or otherwise modified. Further, where appropriate from a contextual reading of a term, each term includes the singular and plural form of the term regardless of how the term is stated and each stated pronoun is gender neutral. In computing any period of time set forth in the Disclosure Statement, the provisions of Bankruptcy Rule 9006(a) shall apply.

### C.     Recommendation

The Debtors believe that the Plans will maximize the value of Debtors' Estates and accomplish the objectives of chapter 11 of the Bankruptcy Code and that acceptance of each of the Plans is in the best interests of the Debtors, their creditors, their Estates, and all parties in interest.  Accordingly, they urge creditors to vote to accept the Plans.

## II.     BACKGROUND INFORMATION

### A.     The Bankruptcy Cases

On October 30, 2024 (the "Petition Date"), each of the Debtors commenced the above-captioned bankruptcy cases (the "Bankruptcy Cases" or "Cases") by filing a voluntary petition (the "Petition") under Chapter 11 of the Bankruptcy Code.  The Debtors' Bankruptcy Cases are being jointly administered under Case No. 24-21355-SMG.  The Debtors remain in possession of their property and continue to manage their businesses and affairs as a debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed.  No official committee of unsecured creditors has been appointed in the Case.

### B.     Debtors' Operations

The Debtors' current business began in 2009 exclusively as a private care, private payer business under the "Senior Nannies" brand, operated by Claudia Wechter (the Debtors' current President and ultimate approximately 50% owner).  Today, the "Senior Nannies," "CWGL," or "Private Payer" arm of the Debtors' business is comprised of six (6) Debtor entities, comprised of CWGL Holdings, LLC and its Debtor subsidiaries, that not only manage the private care aspects of the Debtors' business, but also the management, sales, operations, and senior placement services provided by the Debtors.  These Debtors (and the last four digits of their tax identification numbers) are: (i) CWGL Holdings, LLC (1945), (ii) Senior Nannies Holdings, LLC (5172), (iii) Senior Nannies Management Services, LLC (5336); (iv) SN Home Healthcare, LLC (9996); (v) Senior Nannies Home Care Services, LLC (8991); and (vi) Senior Advantages Assisted Living Placement Services, LLC.  In 2023, the Debtors' business expanded to accommodate not only private care, private payer services, but also to provide Medicare services throughout the State of Florida.  The Debtors' Medicare services, provided by the "Healthcare Holdings" or "Medicare" arm of the Debtors' business, is maintained by eight (8) Debtor entities and two (2) two unaffiliated non-Debtor operating entities (referred to herein as the "Non-Debtor Operating Entities" or "NDOEs").  These Debtors (and the last four digits of their tax identification numbers) are: (i) Healthcare Holdings of Florida LLC (6887); (ii) Healthcare Holdings 9 LLC (3633); (iii) HHMA Holdings LLC (3691); (iv) HHMA LLC (3901); (v) Able Palms Holdings, LLC (9363); (vi) Able Palms Home and Health Care Services, Inc. (3931); (vii) Home Care Resources Holdings, LLC (1385); (viii) Home Care Resources Home Health

2

Agency, LLC (0617); and the NDOEs are Anchor Health Homecare Services, LLC and Magnet Home Health Care Services, LLC.[1]

The Debtors' business and patient protection measures help guaranty top-of-the-line care to the Debtors' patients, thanks ultimately to the Debtors' competent network of caregivers. The Debtors provide a full suite of patient care services, with a special emphasis on quality home care, particularly for senior and worker's compensation patients. The Debtors' care is focused on home health care and operates through a series of "private-pay," "long-term care" (i.e., LTC) insurance, Medicaid LTC and workers' compensation programs on the "Senior Nannies" side; and on "Healthcare Holdings" side, Medicare contracts, with the various operating Debtors and NDOEs serving different counties in Florida. The Debtors' business provides both skilled services (primarily through registered nurses, licensed practical nurses, and various therapists including physical therapists) and unskilled services (primarily through certified nursing assistants and home health aides) to patients at their homes pursuant to the terms of the Payer Contracts. The Debtors' highest priority always has been, will be throughout the pendency of these Chapter 11 Cases, and will be after emerging from chapter 11, the highest standard of patient care and the highest degree of welfare and security for the Debtors' caregivers.

### C.      Litigation that Precipitated the Filing

#### 1.      The Amazing Glove Lawsuit

On August 11, 2023, Amazing Glove SDN.BHD ("Amazing Glove") initiated suit in the Circuit Court in and for the Seventeenth Judicial Circuit of Broward County, Florida (the "Circuit Court") against Debtors CWGL, Senior Nannies Holdings, Senior Nannies Home Care, and Senior Nannies Management (the "Amazing Glove Suit"), alleging, *inter alia*, claims for actual fraudulent transfers, constructive fraudulent transfers, veil piercing, and alter ego, all based on claims acquired by Amazing Glove in the assignment for the benefit of creditors of a defunct entity related to the Debtors called SN DME, LLC ("DME"). The primary subject of the Amazing Glove Suit was some sixty-one (61) transfers from DME in the approximate aggregate amount of $6,932,899.48. Amazing Glove submitted proofs of claim in the Chapter 11 Cases based on the Amazing Glove Suite in the aggregate amount of $7,860,750.00.

#### 2.      The Minority Shareholder Lawsuit

In or around 2012 and 2013, respectively, Debtor CWGL hired Brett Feldman and Bryan Solomon to serve as account executives, and in May 2017, pursuant to the *Second Amended and Restated Operating Agreement of CWGL Holdings, LLC* (the "CWGL OA"), each of Mr. Feldman and Mr. Solomon (the "Class B Members") became a 2.5% Class B Member with a mechanism by which such Class B Member interest could increase from time to time in accordance therewith. They also entered into certain employment agreements that contained various restrictive and affirmative covenants, including but not limited to, a requirement to keep confidential certain trade secrets, a non-competition agreement for the initial term of the Employment Agreements, non-interference and non-solicitation agreements, and a non-disparagement agreement (collectively, the "Breached Covenants"). While still employed by CWGL, in or around April 2020 through June 2020, the Class B Members formed a series of entities the Debtors allege were formed to directly compete with CWGL and its subsidiaries. The Debtors asset that each of the Class B Members continued thereafter to engage in efforts to poach clients of CWGL and its affiliates and disparage CWGL, its affiliates, its employees, and its quality of care, all in violation of the Breached Covenants.

---

[1] While the NDOEs are not Debtors, they are operated and managed by Debtor entities pursuant to the *Exclusive Management Services Agreement*, dated as of November 7, 2023 (for NDOE Magnet Home Health Care Services, LLC) and the *Management Services Agreement*, dated as of August 14, 2023 (for NDOE Anchor Health Homecare Services, LLC).

On June 7, 2022, CWGL made a written demand on the Class B Members advising them they were in violation of the Breached Covenants and demanding they engage in pre-suit mediation. Thereafter, the Class B Members filed suit against Debtor CWGL Holdings, LLC, Claudia Wechter, and Gary R. Loffredo on September 16, 2022 in the Circuit Court (the "Class B Members Suit"), alleging breaches of their employment agreements and breaches of the fiduciary duties imposes by the CWGL OA. Mr. Feldman and Mr. Solomon submitted proofs of claim against Debtors Healthcare Holdings of Florida, LLC for "compensatory damages," seemingly based on the Class B Members Suit, in the amounts of $1,500,000 and $1,600,000, respectively. For the avoidance of doubt, the Debtors collectively contest any liability to either Mr. Feldman or Mr. Solomon, but in particular Debtor Healthcare Holdings of Florida, LLC was not a party to the Class B Members Suit and had no interaction whatsoever with either of the Class B Members.

The Debtors removed their counterclaims in the Class B Members Suit, and they remain pending before the Bankruptcy Court.

### D. Unsecured Claims in the Chapter 11 Cases

#### 1. Unsecured Claims

That certain *Notice of Chapter 11 Bankruptcy* Case [Docket No. 30] was entered on November 4, 2024, setting forth the deadline for filing Proofs of Claim against each of the Debtors. Accordingly, January 8, 2025 was the deadline for each person or entity (including without limitation, each individual, partnership, joint venture, corporation, estate, or trust) other than a governmental unit (as defined in section 101(27) of the Bankruptcy Code) (a "Governmental Unit") to file a Proof of Claim in respect of a prepetition Claim against any of the Debtors (the "General Bar Date"). Additionally, April 28, 2025 is the deadline for Governmental Units to file a Proof of Claim in respect of a prepetition Claim against any of the Debtors (together with the General Bar Date, the "Bar Dates").

As of the date hereof, the Debtors estimate asserted unsecured claims of approximately $34,902.15 for Able Palms Home and Health Care Services, Inc.; $4,902.45 for Healthcare Holdings 9 LLC; $73,151.03 for Healthcare Holdings of Florida LLC;[2] $3,611.76 for HHMA LLC; $5,327,310.26 for CWGL Holdings, LLC;[3] $25,163.20 for Senior Nannies Management, LLC; $6,958,947.97 for Senior Nannies Home Care Services, LLC;[4] and $111,000.00 for SN Home Healthcare, LLC.

#### 2. Secured Claims

The Debtors' sole secured claimholder is INB, N.A. INB's claims consist of two revolving lines of credit, to Healthcare Holdings of Florida, LLC in the maximum amount of $4,200,000.00 and CWGL Holdings, LLC and Senior Nannies Holdings, LLC in the maximum amount of $4,000,000.00, each subject to a borrowing base calculated based on accounts receivable. As of the Petition Date, the lines of credit were outstanding in the amount of, respectively $604,850.00 and $2,445,811.78. INB's claims also include a series of term loans to various HHF Entities and NDOEs, outstanding as of the date hereof in the approximate amount, respectively, of $301,370.00 to Magnet Home Health Care Services, LLC; $90,348.00

---

[2] This estimate assumes, without conceding the validity or priority of any claim, that the $1,600,000 asserted claim of Bryan Solomon and $1,500,000 asserted claim of Brett Feldman will be asserted against Debtor CWGL Holdings, LLC instead of Healthcare Holdings of Florida, LLC. For the avoidance of doubt, the Debtors contest these claims *in toto*, irrespective of the debtor against which they are asserted.

[3] *See* note 2 *infra*.

[4] Please note this estimate is exclusive of three grants, in the aggregate amount of $2,296,494.63 which the Debtors scheduled as "contingent" and which the Debtors are not liable for payment.

to Anchor Healthcare Services, LLC; $191,087.00 to HHMA, LLC; $132,533.00 to Home Care Resources Home Health Agency, LLC; and $333,336.00 to Able Palms Home & Healthcare, LLC.

**All parties in interest should also be aware that INB is the Debtors' debtor in possession lender on a postpetition basis, pursuant to which the INB claims continue to exist, properly perfected, on a postpetition basis.  Parties in interest should consult the filings in the Chapter 11 Cases, in particular the *Final Order (I) Authorizing Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (II) Granting Adequate Protection Pursuant to Sections 361, 363 and 364 of the Bankruptcy Code, (III) Authorizing the Debtors to Obtain Postpetition Financing Pursuant to Sections 105(a), 362, 364(c) and 364(d) of the Bankruptcy Code, (IV) Granting Super Priority Claims to the DIP Lender Pursuant to Section 364(c)(1) of the Bankruptcy Code, and (V) Modifying the Automatic Stay* [Docket No. 115], with respect to the treatment of the INB claims and security interests.**

**E.       The Chapter 11 Cases and Negotiation of Consensual Plan Transactions**

The Debtors filed the Chapter 11 Cases on October 30, 2024 and sought joint administration of their cases under the lead case of Debtor Healthcare Holdings of Florida, LLC, Case No. 24-21355-SMG. The Debtors worked expeditiously to negotiate workable terms with their prepetition secured lender, INB, N.A. ("INB") for the provision of debtor in possession financing, and received final approval of such postpetition financing on December 30, 2024 pursuant to the *Final Order (I) Authorizing Use of Cash Collateral Pursuant to Section 363 Of the Bankruptcy Code, (II) Granting Adequate Protection Pursuant to Sections 361, 363 and 364 of the Bankruptcy Code, (III) Authorizing the Debtors to Obtain Postpetition Financing Pursuant to Sections 105(a), 362, 364(c) and 364(d) of the Bankruptcy Code, (IV) Granting Super Priority Claims to the DIP Lender Pursuant to Section 364(c)(1) of the Bankruptcy Code, and (V) Modifying the Automatic Stay* [Docket No. 115] (the "Final DIP Order").  Pursuant to the Final DIP Order, INB extended the lines of credit existing prepetition on a postpetition basis, providing much-needed liquidity to fund the Debtors' operations during the Chapter 11 Cases.

The Debtors worked with key stakeholders to develop one or more consensual chapter 11 plans. These efforts culminated in a series of settlement agreements with key parties in interest, key terms of which form the basis of this Disclosure Statement and the Plans.  Material terms of these agreements are reflected in the treatment of various classes in the Plans.  For a complete review of these settlement agreements, please consult the *Debtors' Motion to Approve Settlement and Restructuring Support Agreement Pursuant to Bankruptcy Rule 9019 Between the Debtors and Amazing Glove SDN.BHD* [Docket No. 178] (the "Amazing Glove Settlement") and the *Notice of Filing of Settlement Agreement Between and Among the Debtors; Gary R. Loffredo; Claudia Wechter; Disco Volante Ventures, LLC; Grumble Holdings, LLC; Amity Healthcare Holdings, LLC; and Andrew Shook* [Docket No. 181] (the "HHF Plan Sponsor Parties Settlement").  Moreover, these settlements provide the framework for the restructurings set forth in the Plans including, *inter alia*, the HHF Plan Sponsor Contribution in the amount of approximately $2.5 million and CWGL New Equity Contributions in the aggregate amount of $25,000.

**III.      SUMMARY OF THE PLAN**

**A.       Treatment of Claims and Interests under the Plan**

**1.        Classification and Treatment of Claims and Interests**

The following table designates the Classes of Claims against and Interests in the Debtors' Estates, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with Section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan. A Claim or Interest is classified in a particular Class only to the extent that

5

the Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, settled or otherwise satisfied prior to the Effective Date.

| Class | Description | Treatment | Entitled to Vote | Estimated Plan Recovery |
|---|---|---|---|---|
|  | Claims Uniformly Treated Under the Plans |||||
| --- | Administrative Expense Claims | Payment in full or consent to other treatment | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full or consent to other treatment | No | 100% |
| --- | Priority Tax Claims | Payment in full or consent to other treatment | No | 100% |
| --- | United States Trustee Fees | Payment in full or consent to other treatment | No | 100% |
| 1 | Other Secured Claims | Unimpaired | No (Deemed to Accept) | 100% |
| 2 | Priority Non-Tax Claims | Unimpaired | No (Deemed to Accept) | 100% |
|  | Classes of Claims and Interests under the HHF Plan |||||
| 3-A | INB Term Loan Claims | Unimpaired | No (Deemed to Accept) | 100% |
| 3-B | INB Revolving Loan Claims | Impaired | Yes | ~100%[5] |
| 4 | General Unsecured Claims | Unimpaired | No (Deemed to Accept) | 100% |
| 5 | Existing HHF Equity Interests | Unimpaired | No (Deemed to Accept)[6] | N/A (Reinstated) |
| 6 | Existing Subsidiary Equity Interests | Unimpaired | No (Deemed to Accept) | N/A (Reinstated) |
|  | Classes of Claims and Interests under the CWGL Plan |||||
| 3 | INB Secured Claims | Impaired | Yes | ~100%[7] |
| 4 | General Unsecured Claims | Impaired | Yes | ~1.5% to ~18.8%[8] |

[5]  The INB Revolving Loan Claims are impaired as a result of various non-economic modifications to the terms thereof, as set forth in the treatment section below.

[6]  The Debtors maintain that Class 5 Existing HHF Equity Interests are Unimpaired under the HHF Plan and not entitled to vote.  Nevertheless, because the value of Existing HHF Equity Interests will be impacted by the Restructuring Transactions set forth in the HHF Plan, the Holders of Class 5 Existing HHF Equity Interests will be provided provisional ballots to vote on the HHF Plan.

[7]  The INB Secured Claims are impaired as a result of various non-economic modifications to the terms thereof, as set forth in the treatment section below.

[8]  The ultimate recovery of Holders of Class 4 General Unsecured Claims under the CWGL Plan will depend, in large part, on the claim pool of Class 4 General Unsecured Claims.  Of particular note, the Debtors believe the Class 7 Class B Shareholder Claims will be either, as applicable, Disallowed *in toto*, subordinated pursuant to section 510(b) of the Bankruptcy Code, or subordinated pursuant to section 510(c) of the Bankruptcy Code and be entitled to no distribution from the GUC Pool.  In the unlikely event a Class 7 Class B Shareholder Claim is Allowed (in whole or in part) and is not subordinated, such Allowed Class 7 Class B Shareholder Claim shall be entitled to its Pro Rata share of the GUC Pool and the range reflected hereby accounts for such unlikely event.  For the avoidance of doubt, the Debtors maintain their position that all Class 7 Class B Shareholder Claims should be Disallowed and any Allowed portion thereof should be subordinated.  In the event all Class 7 Class B Shareholder Claims are Disallowed or subordinated in their entirety, the Debtors estimate Holders of Class 4 General Unsecured Claims will receive an approximate 18.8% Distribution.

6

| 5 | Amazing Glove Claims | Impaired | Yes | ~17.8% to 28%[9] |
|---|---|---|---|---|
| 6 | Disco Claims | Impaired | Yes | ~12.5% |
| 7 | Class B Shareholder Claims | Impaired | No (Disputed Claims)[10] | Varies (See Below)[11] |
| 8 | Class A Shareholder Claims | Impaired | No (Deemed to Reject) | 0% |
| 9 | Intercompany Claims | Impaired | No (Deemed to Reject) | 0% |
| 10 | Existing Equity Interests | Impaired | No (Deemed to Reject) | N/A (Cancelled) |

### 2. Treatment of Unclassified Claims under the Plans

### a. Administrative Expense Claims

On the Effective Date or as soon thereafter as such Allowed Administrative Expense Claims become due and payable according to their terms, unless otherwise agreed to by the holder of an Allowed Administrative Expense Claim and the Debtors or the Reorganized Debtors, as applicable, each holder of an Allowed Administrative Expense Claim (other than holders of Professional Claims and Priority Tax Claims) will receive in full and final satisfaction, settlement, release, and discharge of, and, in exchange for, such holder's Administrative Expense Claim (i) an amount of Cash equal to the unpaid amount of such Allowed Administrative Expense Claim, or (ii) receive treatment as is consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

The Debtors have been paying debts in the ordinary course since the Petition Date and therefore expect that Administrative Expense Claims should be minimal. Accordingly, the Debtors estimate a total of approximately $130,000.00 in Administrative Expense Claims, other than Professional Claims, which would include approximately $130,000.00 in fees to the United States Trustee. Holders of Administrative Expense Claims are not entitled to vote on the Plans, as they are deemed to have accepted the Plan.

---

[9]  The Amazing Glove claims are asserted in the aggregate amount of approximately $7,860,750.00 and are settled pursuant to the Amazing Glove Settlement to a sum certain $5,000,000.00. The range in recoveries set forth herein takes into account the difference between the asserted claim amount and settled claim amount.

[10]  Section 1126(a) of the Bankruptcy Code states that only "allowed" claim or interest holders may accept or reject a plan. The Class B Shareholders failed to properly file proofs of claim against Debtor CWGL Holdings, LLC, and such Debtor scheduled their claims as disputed, such that the Class B Shareholder Claims are not allowed. Moreover, while the Class B Shareholders submitted proofs of claim against Debtor Healthcare Holdings of Florida, LLC, those claims are subject to an objection by the Debtors and is thus not allowed, pursuant to section 502(a) of the Bankruptcy Code. Nevertheless, the Debtors shall issue provisional ballots to the Holders of Class B Shareholder Claims, but those ballots shall not count toward confirmation of the Plans unless the Bankruptcy Court orders otherwise.

[11]  Please consult the *Treatment* section of Class 7 Class B Shareholder Claims below. In the event a Class 7 Class B Shareholder Claim is entitled to any Distribution under the CWGL Plan, such Distribution shall be consistent with Distributions to Class 4 General Unsecured Claims; in all other circumstances, Holders of Class 7 Class B Shareholder Claims will not be entitled to receive a Distribution under the CWGL Plan.

**b.** **Professional Claims**

All Professionals or other Entities requesting compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b), or section 1103 of the Bankruptcy Code for services rendered before the Effective Date (including any compensation requested by any Professional or any other Entity for making a substantial contribution in the Chapter 11 Cases) shall file and serve final requests for payment of Professional Claims no later than the date that is fourteen (14) days before the date of the Confirmation Hearing.  Objections to any Professional Claim must be filed and served on the Debtors and the applicable Professional before the day that is two (2) Business Days before the hearing that is set with respect to such Professional Claim.

From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

**c.** **Priority Tax Claims**

On the Effective Date, except to the extent that a holder of an Allowed Priority Tax Claim and the Debtors or the Reorganized Debtors, as applicable, agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

The Debtors estimate a total of approximately $0.00 in tax liability due and owing under the Plan. Holders of Priority Tax Claims are not entitled to vote on the Plan, as they are deemed to have accepted the Plan.

**3.** **Treatment of Classified Claims and Interests under the HHF Plan**

1. Class 1 – Other Secured Claims

    a. *Classification*: Class 1 consists of any Other Secured Claims against the HHF Debtors.

    b. *Treatment*: Each holder of an Allowed Other Secured Claim, as determined by the HHF Debtors or the Reorganized HHF Debtors, as applicable, shall receive:

        (i) Reinstatement of its Allowed Other Secured Claim;

        (ii) payment in full in Cash in an amount equal to its Allowed Other Secured Claim, including postpetition interest, if any, on such Allowed Other Secured Claim required to be paid pursuant to section 506 of the Bankruptcy Code, as determined by a Final Order of the Bankruptcy Court;

        (iii) the collateral securing its Allowed Other Secured Claim free and clear of Liens, claims, and encumbrances, if and only if such collateral, as of the

8

day prior to the Effective Date, was property of the Estates of the HHF Debtors; or

(iv)    such other treatment agreed to by the holder of such Allowed Other Secured Claim and the HHF Debtors or the Reorganized HHF Debtors.

c.    *Voting*: Class 1 is Unimpaired under the Plan. Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.    Class 2 – Priority Non-Tax Claims

a.    *Classification*: Class 2 consists of any Priority Non-Tax Claims against the HHF Debtors.

b.    *Treatment*: Each Holder of an Allowed Priority Non-Tax Claim, as determined by the HHF Debtors or the Reorganized HHF Debtors, as applicable, shall receive:

(i)    Reinstatement of its Allowed Priority Non-Tax Claim; or

(ii)    such other treatment on account of such Allowed Priority Non-Tax Claim as determined by the HHF Debtors or the Reorganized HHF Debtors, as applicable, as agreed to in writing by such holder of such Allowed Priority Non-Tax Claim.

c.    *Voting*: Class 2 is Unimpaired under the Plan. Holders of Allowed Priority Non-Tax Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan.

3.    Class 3-A – INB Term Loan Claims

a.    *Classification*: Class 3-A consists of INB Term Loan Claims.

b.    *Treatment*: Each Holder of an Allowed INB Term Loan Claim shall receive, on the Effective Date:

(i)    payment in full in Cash in an amount equal to its Allowed INB Term Loan Claims, including postpetition interest, if any, on such Allowed INB Term Loan Claims required to be paid pursuant to section 506 of the Bankruptcy Code, as determined by a Final Order of the Bankruptcy Court;

(ii)    such other treatment agreed to by the holder of such Allowed INB Term Loan Claims and the Debtors or the Reorganized Debtors.

c.    *Voting*: Class 3-A is Unimpaired under the Plan. As to Class 3-A, and provided such loans are paid in full as of the Effective Dae, INB as the Holder of the Allowed INB Term Loan Claims is conclusively presumed to have accepted the Plan under

section 1126(f) of the Bankruptcy Code.  Holders of Allowed INB Term Loan Claims are not entitled to vote to accept or reject the Plan.

4.   Class 3-B – INB Revolving Loan Claims

a.   *Classification*: Class 3-B consists of INB Revolving Loan Claims.

b.   *Treatment*: The HHF Debtors shall execute and deliver to INB promissory notes and collateral documents satisfactory to INB that will provide for a loan to in the maximum principal amount of $4,700,000 which shall be a revolving line of credit for working capital and shall replace HHF's existing working capital line of credit. The interest rate shall be the Secured Overnight Financing Rate (SOFR) plus 3.000%, adjusting monthly, with a floor rate (minimum rate) not less than 5.000%. Interest shall be payable monthly.  The term of the new loan shall be one year, subject to possible renewal at the sole discretion of INB.  The HHF Debtors shall pay an origination fee of $22,000.   The INB promissory notes shall be collateralized by first priority blanket liens on all of the assets of the HHF Debtors, including, without limitation, all Medicare licenses held or acquired by the HHF Debtors, all accounts receivable, deposit accounts, inventory, equipment, fixtures, instruments, contract rights and general intangibles.  Further, all existing security interests of INB in the HHF Debtors' assets, including all pre-petition and post-petition liens, shall continue in effect and shall secure the new loan.  The loan shall be subject to a Borrowing Base Covenant, a Liquidity Covenant, a Debt Service Coverage Ratio Covenant and a Deposit Account Covenant, among other covenants.  The guarantors of the loan shall be the HHF Plan Sponsor Parties and all Holders of Subsidiary Equity Interests as of the Effective Date.  The loan shall replace HHF's existing line of credit and any equity holders of HHF who will not have Subsidiary Equity Interests as a Reorganized Debtor shall be released.  The loan is subject to numerous conditions, not set forth in the summary provided here, including the execution of loan and security agreements and guaranties acceptable to INB, which shall be executed on or before the Effective Date and all of which shall be included in a supplement to the Plan.   On the Effective Date, the outstanding balance of the existing line of credit shall be determined by INB and, together with INB's attorney's fees and costs incurred in connection with the Debtors' bankruptcy cases, in an amount not exceeding $100,000, shall become the outstanding balance under the new line of credit, and the availability under the Borrowing Base Covenant for the new line of credit shall be adjusted based upon an evaluation by INB of the qualified accounts receivable outstanding on the Effective Date and the amount determined to be outstanding as of the Effective Date.

c.   *Voting*: Class 3-B is Impaired under the Plan.  As to Class 3-B, which is impaired, INB, as the Holder of the Class 3-B Claim, is entitled to vote on the Plan.

5.   Class 4 – General Unsecured Claims

a.   *Classification*: Class 4 consists of any General Unsecured Claims against the HHF Debtors.

b.   *Treatment*: Each holder of an Allowed General Unsecured Claim shall receive Cash in an amount equal to such Allowed General Unsecured Claim on the later

of: (a) the Effective Date; or (b) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim.

    c.    *Voting*: Class 4 is Unimpaired under the Plan. Holders of Allowed General Unsecured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed General Unsecured Claims are not entitled to vote to accept or reject the Plan.

6.    Class 5 – Existing HHF Equity Interests

    a.    *Classification*: Class 5 consists of any HHF Equity Interests.

    b.    *Treatment*: All HHF Equity Interests shall be Reinstated.

    c.    *Voting*: Class 5 is Unimpaired under the Plan. Holders of HHF Equity Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of HHF Equity Interests are not entitled to vote to accept or reject the Plan.

7.    Class 6 – Existing Subsidiary Equity Interests

    a.    *Classification*: Class 6 consists of any Subsidiary Equity Interests.

    b.    *Treatment*: All Subsidiary Equity Interests shall be Reinstated.

    c.    *Voting*: Class 6 is Unimpaired under the Plan. Holders of Subsidiary Equity Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Subsidiary Equity Interests are not entitled to vote to accept or reject the Plan.

**4.    Treatment of Classified Claims and Interests under the CWGL Plan**

1.    Class 1 – Other Secured Claims

    a.    *Classification*: Class 1 consists of any Other Secured Claims against the CWGL Debtors.

    b.    *Treatment*: Each holder of an Allowed Other Secured Claim, as determined by the CWGL Debtors or the Reorganized CWGL Debtors, as applicable, shall receive:

        (i)    Reinstatement of its Allowed Other Secured Claim;

        (ii)    payment in full in Cash in an amount equal to its Allowed Other Secured Claim, including postpetition interest, if any, on such Allowed Other Secured Claim required to be paid pursuant to section 506 of the Bankruptcy Code, as determined by a Final Order of the Bankruptcy Court;

(iii)    the collateral securing its Allowed Other Secured Claim free and clear of Liens, claims, and encumbrances, if and only if such collateral, as of the day prior to the Effective Date, was property of the Estates of the CWGL Debtors; or

(iv)    such other treatment agreed to by the holder of such Allowed Other Secured Claim and the CWGL Debtors or the Reorganized CWGL Debtors.

c.    *Voting*: Class 1 is Unimpaired under the Plan. Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.    Class 2 – Priority Non-Tax Claims

a.    *Classification*: Class 2 consists of any Priority Non-Tax Claims against the Debtors.

b.    *Treatment*: Each Holder of an Allowed Priority Non-Tax Claim, as determined by the CWGL Debtors or the Reorganized CWGL Debtors, as applicable, shall receive:

(i)    Reinstatement of its Allowed Priority Non-Tax Claim; or

(ii)    such other treatment on account of such Allowed Priority Non-Tax Claim as determined by the CWGL Debtors or the Reorganized CWGL Debtors, as applicable, as agreed to in writing by such holder of such Allowed Priority Non-Tax Claim.

c.    *Voting*: Class 2 is Unimpaired under the Plan. Holders of Allowed Priority Non-Tax Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan.

3.    Class 3 – INB Secured Claims

a.    *Classification*: Class 3 consists of the Allowed INB Secured Claims against the CWGL Debtors.

b.    *Treatment*: The CWGL Debtors shall execute and deliver to INB promissory notes and security documents satisfactory to INB that will provide for a loan to CWGL in the maximum principal amount of $4,000,000 which shall be a revolving line of credit for working capital and shall replace CWGL's existing working capital line of credit. The interest rate shall be the Secured Overnight Financing Rate (SOFR) plus 2.000%, adjusting monthly, with a floor rate (minimum rate) not less than 6.000%. Interest shall be payable monthly. The term of the new loan shall be one year, subject to possible renewal at the sole discretion of INB. The CWGL Debtors shall pay an origination fee of $20,000. The loan shall be collateralized by first liens upon all of the assets of the CWGL Debtors, including, without limitation, all

accounts receivable, deposit accounts, inventory, equipment, fixtures, instruments, and general intangibles, and contract rights of the CWGL Debtors.  All present security interests of INB, including all pre-petition and post-petition liens, shall continue in effect.  The loan shall be subject to a Borrowing Base Covenant, a Liquidity Covenant, a Debt Service Coverage Ratio Covenant and a Deposit Account Covenant, among other affirmative and negative covenants required by INB.  The guarantors of the loan shall be Gary Loffredo, Claudia Wechter, and all other equity holders in the Reorganized CWGL Debtors.  The new loan is subject to numerous conditions, not set forth in the summary here, including the execution of loan and security agreements and guaranties acceptable to INB, which shall be executed on or before the Effective Date.  On the Effective Date, the outstanding balance of the existing line of credit shall be determined by INB and, together with INB's attorney's fees and costs incurred in connection with the Debtors' bankruptcy cases, in an amount not exceeding $100,000, shall become the outstanding balance under the new line of credit, and the availability under the Borrowing Base Covenant for the new line of credit shall be adjusted based upon an evaluation by INB of the qualified accounts receivable outstanding on the Effective Date and the amount determined to be outstanding as of the Effective Date.

c.  *Voting*: Class 3 is Impaired under the Plan.  INB, as Holder of the Allowed INB Secured Claims, is entitled to vote to accept or reject the Plan.

4.  Class 4 – General Unsecured Claims

a.  *Classification*: Class 4 consists of any General Unsecured Claims against the CWGL Debtors.

b.  *Treatment*: Each Holder of an Allowed General Unsecured Claim shall receive Cash in an amount equal to its Pro Rata share of the Cash held in the GUC Pool as set forth in Article IV of the CWGL Plan.

c.  *Voting*: Class 4 is Impaired under the Plan.  Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

5.  Class 5 – Amazing Glove Claims

a.  *Classification*: Class 5 consists of the Amazing Glove Claim.

b.  *Treatment*: The Holder of the Allowed Amazing Glove Claim shall receive the Amazing Glove Note in the amount of $1,400,000.00, to be paid in twelve equal monthly installments, accruing simple interest at a rate of 8% per annum; *provided, however*, that the Amazing Glove Note may be prepaid, in whole or in part, and there shall be no penalty, premium, yield maintenance fee, or similar such imposition on account of any such prepayment with all such *prepayments* first being applied to principal.  Payment on the Amazing Glove Note shall commence on the sooner of (i) the effective date of the CWGL Plan or (ii) seventy-five (75) days from the effective date of the Amazing Glove Settlement Agreement.  In the event of a default of the treatment of the Amazing Glove Claim under the CWGL Plan, which default is not cured within ten (10) days of written notice thereof, each of the CWGL Entities shall consent to entry of a judgment against each thereof in

13

the amount of $5,000,000.00, less any principal payments received by Amazing Glove made before the date thereof.

c.   *Voting*: Class 5 is Impaired under the Plan.  The Holder of the Allowed Amazing Glove Claim is entitled to vote to accept or reject the Plan.

6.   Class 6 – Disco Claims

a.   *Classification*: Class 6 consists of the Disco Claims.

b.   *Treatment*: The Holder of the Allowed Disco Claims will receive on the Effective Date payment in the full amount of the delinquent real estate taxes assessed against Disco for the 2023 and 2024 tax years, and the Lease between CWGL Holdings, LLC and Disco shall be terminated and neither party will have any further obligations.

c.   *Voting*: Class 6 is Impaired under the Plan. The Holder of the Allowed Disco Claim is entitled to vote to accept or reject the Plan.

7.   Class 7 – Class B Shareholder Claims

a.   *Classification*: Class 7 consists of any Allowed Class B Shareholder Claims against the CWGL Debtors.

b.   *Treatment*: The Holder of each Allowed Class B Shareholder Claim shall receive:

(i)   to the extent such Allowed Class B Shareholder Claim is subordinated pursuant to section 510(b) of the Bankruptcy Code, the Holder thereof shall be entitled to treatment of their Allowed Class B Shareholder Claim consistent with the treatment of Class 10 Existing Equity Interests;

(ii)   to the extent such Allowed Class B Shareholder Claim is subordinated pursuant to section 510(c) of the Bankruptcy Code, such Allowed Class B Shareholder Claim will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each Holder of such Allowed Class B Shareholder Claim will not receive any distribution on account of such Allowed Class B Shareholder Claim;

(iii)   to the extent such Allowed Class B Shareholder Claim is not subordinated, the Holder thereof shall be entitled to treatment of their Allowed Class B Shareholder Claim consistent with the treatment of Class 4 General Unsecured Claims.

c.   *Voting*: Class 7 is Impaired under the Plan.  If there are no Allowed Class 7 Class B Shareholder Claims as of the date of solicitation of the CWGL Plan, Holders of any Class B Shareholder Claims shall receive a provisional ballot, which provisional ballot shall not count toward confirmation of the CWGL Plan unless the Bankruptcy Court orders otherwise.

14

8.      Class 8 – Class A Shareholder Claims

   a.    *Classification*: Class 8 consists of all Class A Shareholder Claims.

   b.    *Treatment*: Class 8 Class A Shareholder Claims will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each Holder of a Class 8 Class A Shareholder Claim will not receive any distribution on account of such Class 8 Class A Shareholder Claim.

   c.    *Voting*: Class 8 is Impaired. Each Holder of a Class 8 Class A Shareholder Claim is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject the Plan.

9.      Class 9 – Intercompany Interests

   a.    *Classification*: Class 9 consists of all Intercompany Claims.

   b.    *Treatment*: Class 9 Intercompany Claims will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each Holder of a Class 9 Intercompany Claim will not receive any distribution on account of such Class 9 Intercompany Claim.

   c.    *Voting*: Class 9 is Impaired. Each Holder of a Class 9 Intercompany Claim is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject the Plan.

10.     Class 10 – Existing Equity Interests

   a.    *Classification*: Class 10 consists of all Interests in the CWGL Debtors.

   b.    *Treatment*: Class 10 Existing Equity Interests will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each Holder of a Class 10 Existing Equity Interest will not receive any distribution on account of such Class 10 Existing Equity Interest.

   c.    *Voting*: Class 10 is Impaired. Each Holder of a Class 10 Existing Equity Interest is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject the Plan.

**B.      Voting Procedures and Requirements**

Only Impaired Classes of Claims are entitled to vote to accept or reject the Plans.  Please refer to the estimated recovery for Impaired Classes.  If the Claim or Claims you hold are not in one of those Impaired Classes, you are not entitled to vote on the Plans and thus you will not receive a ballot.  Holders of Claims that are entitled to vote should read the ballot and follow the accompanying instructions carefully.

15

1.      **Vote Required for Acceptance by a Class**

A Class of Claims entitled to vote to accept or reject a Plan shall be deemed to accept such Plan if the Holders of Claims in such voting Class that hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Claims that vote in such Class vote to accept such Plan.

2.      **Impaired Classes of Claims and Interests Entitled to Vote**

Pursuant to Section 1126 of the Bankruptcy Code, each Impaired Class of Claims or Interests that will receive a Distribution pursuant to a Plan may vote separately to accept or reject such Plan.  Each Holder of an Allowed Claim in an Impaired Class as of the Voting Record Date shall receive a ballot and may cast a vote to accept or reject the Plans.

All Classes under the HHF Plan other than Class 3-B are unimpaired and are accordingly conclusively presumed to accept the HHF Plan and are not entitled to vote thereon.  As set forth more fully in Note 6 *supra*, Holders of Class 5 Existing HHF Equity Interests shall receive provisional Ballots to the extent solicitation thereof is determined necessary for Confirmation of the HHF Plan.  Class 3-B of the HHF Plan and Classes 3, 4, 5, 6, and 7 of the CWGL Plan are impaired and entitled to vote on, respectively, the HHF Plan and the CWGL Plan.  The Holders of Claims and Interests in Classes 8, 9, and 10 of the CWGL Plan shall have such Claims or Interests cancelled, and are accordingly deemed to have rejected the CWGL Plan in accordance with Section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

3.      **Claims and Interests Not Entitled to Vote**

Holders of Claims are not entitled to vote if, as of the Voting Record Date, the Claim (a) has been disallowed; (b) is the subject of a pending objection, whether adversary proceeding, contested matter, or similar proceeding, unless such proceeding is being settled with the Plan; or, (c) (i) was not listed on Debtors' Schedules or was listed on Debtors' Schedules as unliquidated, contingent or disputed, and (ii) a Proof of Claim was not filed or was filed for an unliquidated, contingent or disputed Claim, unless on or before the Voting Record Date the Bankruptcy Court enters a Final Order directing otherwise.  However, if a Claim is disallowed or Disputed in part, the Holder shall be entitled to vote the Allowed portion of the Claim.  Insiders are entitled to vote on the Plan subject to and in accordance with the provisions of the Plan and the Bankruptcy Code.

4.      **Voting Procedures**

The Debtors' general bankruptcy counsel, Pack Law, shall serve as the "Solicitation Agent" and will facilitate the solicitation and voting process.  If you have any questions regarding voting procedures or your eligibility to vote to accept or reject the Plan, or if you need additional copies of documents included in the Solicitation Package, please contact the Solicitation Agent, attention Joseph Pack, Esq. –  (i) by first class mail at 51 Northeast 24th Street, Suite 108, Miami, Florida 33137; (ii) by email at joe@packlaw.com and jessey@packlaw.com (please reference "HHF" or "CWGL" in the subject line of your email); or (iii) by phone at (305) 916-4500.

Ballots must submitted to the Bankruptcy Court, consistent with Local Rule 3018-1, either electronically by registered users or conventionally at:

16

**CLERK OF UNITED STATES BANKRUPTCY COURT**
**299 EAST BROWARD BLVD., ROOM 112**
**FT. LAUDERDALE, FL 33301**

**BALLOTS CAST BY HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLANS MUST BE <u>ACTUALLY</u> RECEIVED BY THE BANKRUPTCY COURT AT THE ABOVE ADDRESS (OR ELECTRONICALLY BY REGISTERED USERS) BY THE VOTING DEADLINE.**

Please note that if the instructions on your ballot require you to return the ballot to your agent, financial institution, broker, or other nominee, or to their agent, you must deliver your ballot to the relevant party in sufficient time for the designated party to process the ballot and deliver it to the Bankruptcy Court before the Voting Deadline. If a ballot is damaged or lost, you may contact the Solicitation Agent to request another ballot. Any ballot received by the Bankruptcy Court which does not indicate an acceptance or rejection of the Plan will not be counted.

### 5.       Cramdown

In the event that any Impaired Class of Claims does not accept the Plans, the Bankruptcy Court may still confirm the Plans at the request of the Debtors if, as to each such Impaired Class or Classes, such Plans "does not discriminate unfairly" and is "fair and equitable." The Debtors intend to invoke the cramdown provisions of Section 1129(b) of the Bankruptcy Code as to any Impaired Class that does not accept one of the Plan. In the event one or more Classes does not accept a Plan, the Bankruptcy Court will determine at the Plan Confirmation Hearing whether such Plan is fair and equitable and does not discriminate unfairly against any such Impaired Classes of Claims.

### C.       Separate Plans

Subject in all respects to the terms of the Plans and the Confirmation Order(s), (1) the Plans shall be deemed to constitute a separate sub-plan for each of the Debtors and each Class of Claims against or Interests in the Debtors shall be deemed to constitute separate sub-Classes of Claims against and Interests in each of the Debtors, as applicable, (2) the confirmation requirements of section 1129 of the Bankruptcy Code must be satisfied separately with respect to each sub-plan, to the extent the same is determined to be so required by the Bankruptcy Code, (3) any Claim against any of the Debtors shall be treated as a Claim only against the applicable Debtor, as applicable, for purposes of voting and Confirmation, (4) such Claims shall be administered as provided in the Plan, (5) the portion of the GUC Pool available for distributions to Holders of General Unsecured Claims against each Debtor shall be equal to the proportion that the Allowed General Unsecured Claims against each Debtor bears to the aggregate amount of Allowed General Unsecured Claims against all of the Debtors; and (6) the Debtors shall not, nor shall they be required to, separately solicit votes with respect to the each sub-plan, as a vote in favor of the Plan shall be deemed a vote in favor of each sub-plan to the extent any Holder is entitled to vote on more than one sub-plan.

Nothing provided in the Plans shall affect the obligation of each and every Debtor to pay all fees and charges assessed under section 1930 of chapter 123 of title 28 of the United States Code until such time as a particular Chapter 11 Case is closed, dismissed, or converted.

### D.       Implementation of the Plan

The Debtors shall take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of the Plans. The Confirmation Order(s) shall contain appropriate provisions, consistent with Section 1142 of the Bankruptcy Code, directing Debtors and any other necessary party to perform any act,

17

including the satisfaction of any lien, or the avoidance, subordination, or recharacterization of any Claim or Lien, that is necessary for the consummation of the Plans.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plans shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plans. The entry of the Confirmation Order(s) shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final.

Except as otherwise provided in the Plan or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in the Estates, all Causes of Action, and any property acquired by the Debtors pursuant to the Plans shall vest in the Reorganized Debtors, free and clear of all liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plans, the Reorganized Debtors may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. On the Effective Date, the Reorganized CWGL Debtors shall issue the CWGL New Equity to the contributors of the CWGL New Equity Contributions in equal share. On the Effective Date, the Reorganized Debtor Healthcare Holdings of Florida, LLC shall cause all Interests it owns in any and all Reorganized HHF Debtor to be transferred to the HHF Plan Sponsor.

Moreover, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all of the Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.

The Debtors estimate that Holders of Allowed General Unsecured Claims against the CWGL Debtors, shall receive distributions in the amount of approximately 1.5% to 18.8% of such Allowed Claims, depending on a variety of factors including, but not limited to, (i) the resolution of any litigation against Holders of Claims and Interests against a Debtor, (ii) the Debtors' or Reorganized Debtors' successful objection to any Claims such that such Claim is deemed Disallowed under the Plan, and (iii) against which Debtor the Holder of an Allowed General Unsecured Claim asserts such Claim.

E.    Distributions under the Plan

1.    Sources of Distributions Under the Plans

Distributions under the HHF Plan shall be made pursuant to the HHF Plan Sponsor Contribution and, as applicable, Cash generated by the Reorganized HHF Debtors in the ordinary course of their reorganized business. Distributions under the CWGL Plan shall be made pursuant to, as applicable, the GUC Pool, the CWGL New Equity Contributions, and Cash generated by the Reorganized CWGL Debtors in the ordinary course of their reorganized business.

2.    Distribution Record Date

On the Distribution Record Date, the Claims Register shall be closed and the Reorganized Debtors shall be authorized and entitled to recognize only those record Holders, if any, listed on the Claims Register

18

as of the close of business on the Distribution Record Date. Notwithstanding the foregoing, if a Claim or Interest is transferred and the Debtors have been notified in writing of such transfer less than ten (10) days before the Effective Date, the Reorganized Debtors shall make distributions to the transferee (rather than the transferor) only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

### 3.    Setoffs

Except as otherwise expressly provided for herein, the Reorganized Debtors, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plans on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that the Debtors or Reorganized Debtors, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plans or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Reorganized Debtors of any such claims, rights, and Causes of Action that the Reorganized Debtors may possess against such Holder. In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors (as applicable), unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

### F.    Procedures for Disputed Claims and Interests

### 1.    Disputed Claims Process

Except as otherwise provided herein, if a party files a Proof of Claim and the Debtors or the Reorganized Debtors, as applicable, do not determine, and without the need for notice to or action, order, or approval of the Bankruptcy Court, that the Claim subject to such Proof of Claim is Allowed, such Claim shall be Disputed unless Allowed or disallowed by a Final Order or as otherwise set forth in Article VII of the Plan. For the avoidance of doubt, there is no requirement to file a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan.

### 2.    Claims Administration Responsibilities

Except as otherwise specifically provided in the Plans, after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to file, withdraw, or litigate to judgment objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein and the Amazing Glove Settlement and the HHF Plan Sponsor Parties Settlement, from and after the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses the Debtors had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant the Plans.

19

### 3. Adjustment to Claims Without Objection

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 4. Single Satisfaction of Claims

Holders of Allowed Claims may assert such Claims against the Debtors obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against the Debtors based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus applicable interest, if any.

### 5. Disallowance of Claims and Interests

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

### G. Executory Contracts and Unexpired Leases

Unless otherwise set forth in the Plans, as of the Effective Date, all executory contracts and unexpired leases not assumed by the Debtors shall be assumed.

### H. Conditions Precedent to Effective Date

### 1. Conditions Precedent

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX of the CWGL Plan and HHF Plan:

> i. the Bankruptcy Court shall have entered the Confirmation Order(s), confirming each of the CWGL Plan and the HHF Plan, in form and substance acceptable to the Debtors and reasonably acceptable to INB (as to both such Plans) and reasonably acceptable to HHF Plan Sponsor (as to the HHF Plan);
>
> ii. the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;
>
> iii. the HHF Plan Sponsor Contribution (with respect to the HHF Plan) and the CWGL New Equity Contributions (with respect to the CWGL Plans) shall have been made;

iv.    the final version of the Plan Supplement(s), if any, and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Plans and shall be in form and substance reasonably acceptable to INB.

### 2.    Waiver of Conditions

The Debtors may waive any of the conditions to the Effective Date set forth in Article IX of the Plans, with the consent of INB, at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan.

### 3.    Effect of Non-Occurrence of Conditions to Consummation

If prior to Consummation, the Confirmation Order(s) is (are) vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order(s), the Plans will be null and void in all respects, and nothing contained in the Plans or Disclosure Statement shall: (a) constitute a waiver or release of any Claims, Interests, or Causes of Action; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors or any other Entity.

## I.    Effect of Confirmation

### 1.    Binding Effect

On the Effective Date, and effective as of the Effective Date, the Plans shall be binding upon Debtor, the Reorganized Debtors, the Debtors, and all present and former Holders of Claims against and Interests in Debtor, and their respective Related Persons, regardless of whether any such Holder of a Claim or Interest has voted or failed to vote to accept or reject the Plans and regardless of whether any such Holder of a Claim or Interest is entitled to receive any Distribution under the Plans.

### 2.    Discharge of Claims and Termination of Interests

**Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plans or in any contract, instrument, or other agreement or document created, adopted, or approved pursuant to the Plans, the distributions, rights, and treatment that are provided in the Plans shall be in exchange for and in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in, the Debtor or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plans on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a**

**judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.**

> **3.      Releases by the Debtors**

**Notwithstanding anything contained in this Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party, Disco Volante Ventures, LLC, Grumble Holdings, LLC, Andrew Shook, Amity Healthcare Holdings, LLC, NXPATH, LLC, and Amazing Glove SDN.BHD is deemed released and discharged by the Debtors, the Reorganized Debtors, their Estates, and their Releasing Parties from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, the Debtors or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, the Chapter 11 Cases, the Disclosure Statement, the Plans, the Restructuring Transaction,   release, or other Plan Transaction Document, agreement, or document created or entered into in connection with the Disclosure Statement, or the Plans, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plans, or the distribution of property under the Plans or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a Final Order to have constituted actual fraud or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plans, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement(s)) Reinstated with respect to, or executed to implement, the Plans.**

> **4.      Releases by Holders of Claims and Interests**

**Notwithstanding anything contained in this Plan to the contrary, and in all respects subject to the Amazing Glove Settlement and HHF Plan Sponsor Parties Settlement, as of the Effective Date, for good and valuable consideration, each Releasing Party is deemed to have released and discharged each Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, the Chapter 11 Cases, the Disclosure Statement, the Plans, or the Restructuring Transaction, contract, instrument, release, or other Plan Transaction Document, agreement, or document created or entered into in connection with the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plans, or the distribution of property under the Plans or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a Final Order to have constituted actual fraud or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any Person or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) Reinstated with respect to, or executed to implement the Plan.**

22

**Notwithstanding anything to the contrary contained herein, other than the releases set forth in the Amazing Glove Settlement and HHF Plan Sponsor Parties Settlement, nothing in this Plan shall release, waive or otherwise limit the rights of all Persons and Entities who have held, hold, or may hold direct, independent Claims against any non-Debtor party.**

## 5. Injunction

**Except as otherwise expressly provided in the Plans or for obligations issued or required to be paid pursuant to the Plans or the Confirmation Order(s), all Entities who have held, hold, or may hold claims or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plans. *Provided, however,* and for the avoidance of doubt, nothing in the Plans shall in any way hinder, delay, or affect the rights of any party to any of the Amazing Glove Settlement and HHF Plan Sponsor Parties Settlement or for INB to enforce its rights under any of the loan documents issued in connection with the Plans, to the extent not inconsistent with the Plans.**

## 6. Exculpation

**The Exculpated Parties shall neither have, nor incur any liability to any Entity for any postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Consummation of the Plans, the Disclosure Statement, or any contract, instrument, release or other agreement or document created or entered into in connection with the Plans or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; *provided*, *however*, that the foregoing "Exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; *provided*, *further*, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan; *provided*, *further*, that the HHF Plan Sponsors and CWGL Plan Sponsors shall not be exculpated from such party's obligations under the Amazing Glove Settlement, the HHF Plan Sponsor Parties Settlement, the Plan, or any related documents or orders of the Bankruptcy Court. Notwithstanding anything herein to the contrary, nothing in the Plan or the Confirmation Order shall release, eliminate, exculpate, discharge or limit the rights and remedies that any Holder of a Claim or Interest may have against any non-Debtor person or entity for any act, omission, matter or thing that occurred prior to the Petition Date.**

23

**7.** **Release of Liens**

Except (a) with respect to the Liens securing Other Secured Claims (depending on the treatment of such Claims) and INB Secured Loan Claims (with respect to the CWGL Plan) and INB Revolving Loan Claims (with respect to the HHF Plan), or (b) as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plans, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and the Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.

**J.** **Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plans pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

i. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Claim or Interest and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests, including with respect to the amount necessary to Reinstate any and all Claims under section 1124 of the Bankruptcy Code;

ii. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plans;

iii. resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which the Debtors are a party or with respect to which the Debtors may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

iv. ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plans and adjudicate any and all disputes arising from or relating to distributions under the Plans;

v. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

vi. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plans, the Confirmation Order(s), and contracts,

24

instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

vii. enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

viii. grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

ix. issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plans;

x. hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Case, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VI of the Plans; (b) with respect to the releases, injunctions, and other provisions contained in Article X of the Plans, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan; (d) related to section 1141 of the Bankruptcy Code; or (e) without limiting the foregoing, any suits, adversary proceedings, or Causes of Action by the Debtors or the Reorganized Debtors, as applicable, against the Holders of the Class B Shareholder Claims, and each of their respective Affiliates;

xi. enter and implement such orders as are necessary or appropriate if the Confirmation Order(s) is (are) for any reason modified, stayed, reversed, revoked, or vacated;

xii. consider any modifications of the Plans, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order(s);

xiii. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

xiv. enter an order or Final Decree concluding or closing the Chapter 11 Cases;

xv. enforce all orders previously entered by the Bankruptcy Court; and

xvi. hear any other matter not inconsistent with the Bankruptcy Code.

25

**K.      Miscellaneous Provisions of the Plan**

**1.      Payment of Statutory Fees**

All fees payable pursuant to 28 U.S.C. § 1930(a) shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

**2.      Transfer Taxes**

Pursuant to section 1146 of the Bankruptcy Code, the issuance, transfer, or exchange of any security and the making or delivery of any instrument of transfer in connection with or in furtherance of the Plans shall be exempt and shall not be subject to tax under any law imposing a stamp tax, real estate Transfer Tax, mortgage recording tax or similar tax, and, to the extent provided by section 1146 of the Bankruptcy Code, if any, shall not be subject to any state, local or federal law imposing sales tax; (b) Pursuant to section 1142(b) of the Bankruptcy Code, the Confirmation Order(s) shall direct the register's office to record any recordable document executed in connection with the consummation of the Plans, without the payment of Transfer Taxes.

**3.      Modifications to Plan and Plan Supplement**

The Plans and/or the Plan Supplement(s) may be amended, modified, or supplemented by the Debtors in the manner provided for by Section 1127 of the Bankruptcy Code, or as otherwise permitted by law, without additional disclosure pursuant to Section 1125 of the Bankruptcy Code, provided that notice and an opportunity to object shall be provided with respect to any material post-confirmation modifications to the Plans.  In addition, after the Confirmation Date, the Debtors may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plans, the Plan Supplement(s), or the Confirmation Order(s) with respect to such matters as may be necessary to carry out the purposes and effects of the Plans.

**4.      Other Amendments**

The Debtors may make appropriate technical adjustments and modifications to the Plans or the Plan Supplement(s) prior to the Effective Date without further order or approval of the Bankruptcy Court.

**5.      Revocation or Withdrawal of the Plans**

The Debtors reserve the right to revoke or withdraw the Plans prior to the Effective Date.  If the Debtors take such action, the Plans shall be deemed null and void.  In such event, nothing contained herein shall constitute or be deemed to be a waiver or release of any claims by or against the Debtors, their Estates, or any other Person or to prejudice in any manner the rights of the Debtors, or any Person in further proceedings involving the Debtors.

**6.      Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Florida, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plans, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plans (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided, however, that corporate governance matters relating to the

Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation of the Debtors or Reorganized Debtors, as applicable.

### 7. Time

Bankruptcy Rule 9006 shall apply to all computations of time periods prescribed or allowed by the Plan, unless otherwise set forth herein or provided by the Bankruptcy Court.

### 8. Binding Effect of Plan

Upon the occurrence of the Effective Date, the terms of the Plans and the Plan Supplement(s) shall be immediately effective and enforceable and deemed binding on the Debtors, Reorganized Debtors, and any and all Holders of Claims and Interests (irrespective of whether any such Holders of Claims and Interests voted to accept or reject the Plans or are deemed to accept or reject the Plan), all Persons or Entities that are parties to or are subject to any settlements, compromises, releases, exculpations, discharges, or injunctions described in the Plans, each Person or Entity acquiring or retaining property under the Plans, and any and all non-Debtor parties to executory contracts or unexpired leases with the Debtors.

### 9. Entire Agreement

On the Effective Date, the Plans and the Plan Supplement(s) supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plans.

### 10. Section 1125(e) Good Faith Compliance

The Debtors and their Related Persons shall be deemed to have acted in good faith under Section 1125(e) of the Bankruptcy Code.

### 11. Notices

All notices, requests, and demands in the Chapter 11 Case shall be in writing and, unless otherwise provided herein, shall be deemed to have been duly given or made when actually delivered or, if by facsimile transmission, when received and telephonically confirmed to the below recipients:

| | |
|---|---|
| **The Debtors or Reorganized Debtors** | **Healthcare Holdings of Florida, LLC,** *et al.*<br>3313 West Commercial Boulevard<br>Suite 130<br>Fort Lauderdale, Florida 33309<br>Attn.: Claudia Wechter and Gary Loffredo |
| **Counsel to the Debtors or Reorganized Debtors** | **Pack Law**<br>51 NE 24th Street<br>Suite 108<br>Miami, FL 33137<br>Attn.: Joseph Pack, Esq. and Jessey Krehl, Esq.<br>Email: joe@packlaw.com; jessey@packlaw.com |

27

| | |
|---|---|
| **United States Trustee** | **Office of the United States Trustee**<br>**for the Southern District of Florida**<br>51 SW First Avenue<br>Room 1204<br>Miami, FL 33130<br>Attn.: Martin P. Ochs, Esq.<br>Email: Martin.P.Ochs@usdoj.gov |

Notice shall be given to the above parties and their successors.  Any Person may change the address to which notices are to be sent for purposes of the Plan by sending written notice pursuant to this provision to the Debtors.

## IV.   RISKS AND CONSIDERATIONS

### A.   Bankruptcy Considerations

Although the Debtors believe that the Plans will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will confirm the Plans as proposed.  Moreover, there can be no assurance that modifications of the Plans will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

In addition, the occurrence of the Effective Date is conditioned on the satisfaction (or waiver) of the conditions precedent set forth in the Plan, and there can be no assurance that such conditions will be satisfied or waived.  In the event the conditions precedent described in the Plans have not been satisfied or waived (to the extent possible) by the Debtors (as provided for in the Plans), then the Confirmation Order(s) will be vacated, no Distributions will be made pursuant to the Plan, and the Debtors and all Holders of Claims and Interests will be restored to the *status quo ante* as of the day immediately preceding the Plan Confirmation Date as though the Plan Confirmation Date had never occurred.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plans complies with the requirements set forth in the Bankruptcy Code because each Class created encompasses Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Plans provide for no Distribution to certain Classes.  The Bankruptcy Code conclusively deems these Classes to have rejected the Plan. Pursuant to Section 1129(a)(10) of the Bankruptcy Code, notwithstanding the fact that these Classes are deemed to have rejected the Plan, the Bankruptcy Court may confirm the Plan if at least one Impaired Class votes to accept the Plan (with such acceptance being determined without including the vote of any "insider" in such class).  As to each Impaired Class that has not accepted the Plan, the Plan may be confirmed if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to these Classes.  The Debtors believe that the Plan satisfies these requirements.

### B.   Tax Consequences

Creditors should consult with their own tax advisor concerning any tax related implications and: (i) any deductions which may be applicable to them as bad debt deductions, or (ii) income tax implications based upon forgiveness of debt, if applicable, based upon the provisions of the Plans.

Pursuant to IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, Holders of Claims or Interests are hereby notified that: (i) any discussion of U.S. federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by Holders of Claims or Interests for the purpose of avoiding penalties that may be imposed on them under the United States Tax Code; (ii) such discussion is written in connection with the promotion or marketing by the Debtors, on behalf of the Debtors' Estates, of the transactions or matters addressed herein; and (iii) Holders of Claims or Interests should seek advice based upon their particular circumstances from an independent tax advisor.

## C.     No Duty to Update Disclosures

The Debtors have no duty to update the information contained in this Disclosure Statement as of the date hereof, unless otherwise specified in the Plans, or unless the Debtors are required to do so pursuant to an order of the Bankruptcy Court.  Delivery of the Disclosure Statement after the date hereof does not imply that the information contained herein has remained unchanged.

## D.     Representations Outside this Disclosure Statement

This Disclosure Statement contains representations concerning or related to the Plans that are authorized by the Bankruptcy Code and the Bankruptcy Court.  Please be advised that any representations or inducements outside this Disclosure Statement and any related documents which are intended to secure your acceptance or rejection of the Plan should not be relied upon by Holders of Claims or Interests that are entitled to vote to accept or reject the Plan.

## E.     No Admission

The information and representations contained in the Plans shall not be construed to constitute an admission of, or be deemed evidence of, any legal effect of the Plans on the Debtors or Holders of Claims and Interests.

## V.     PLAN CONFIRMATION AND CONSUMMATION[12]

## A.     Plan Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan.  On, or as promptly as practicable after the filing of the Plan and this Disclosure Statement, the Debtors will request pursuant to the requirements of the Bankruptcy Code and the Bankruptcy Rules, that the Bankruptcy Court schedule the Plan Confirmation Hearing.  Notice of the Plan Confirmation Hearing will be provided to all known creditors, equity holders, or their representatives.  The Plan Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Plan Confirmation Hearing or any subsequent adjourned Plan Confirmation Hearing.

Pursuant to section 1128(b) of the Bankruptcy Code, any party in interest may object to confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors, the basis for the objection and the specific grounds of

---

[12]  As used in this section, the term "Plan" refers to *each* of the CWGL Plan and the HHF Plan, and *each* such Plan must comply with the requirements set forth herein for such plan to be, as applicable, confirmed or consummated.

the objection, and must be filed with the Bankruptcy Court, with a copy to Chambers, together with proof of service thereof, and served upon (i) counsel for the Debtors (Joseph Pack, Esq. and Jessey J. Krehl, Esq., Pack Law, 51 Northeast 24th Street, Suite 108, Miami, Florida 33137); (ii) the U.S. Trustee, and (iii) such other parties as the Bankruptcy Court may order.

Bankruptcy Rule 9014 governs objections to confirmation of the Plan.

**UNLESS AN OBJECTION TO CONFIRMATION OF THE PLAN IS TIMELY SERVED UPON THE PARTIES LISTED ABOVE AND FILED WITH THE BANKRUPTCY COURT, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT IN DETERMINING WHETHER TO CONFIRM THE PLAN.**

### B.      Plan Confirmation Requirements under the Bankruptcy Code

At the Plan Confirmation Hearing, the Bankruptcy Court will consider the terms of the Plan and determine whether the Plan terms satisfy the requirements set out in Section 1129 of the Bankruptcy Code. The Debtors believe that the Plan satisfies or will satisfy the following requirements of Section 1129, certain of which are discussed in more detail below:

- The Plan complies with the applicable provisions of the Bankruptcy Code.
- The Debtors have complied with the applicable provisions of the Bankruptcy Code.
- The Plan is proposed in good faith and not by any means forbidden by law.
- Any payment made or promised by the Debtors under the Plan for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases has been disclosed to the Bankruptcy Court, and any such payment: (i) if made before the confirmation of the Plan, is reasonable; or (ii) if such payment is to be fixed after confirmation of the Plan, is subject to the approval of the Bankruptcy Court as reasonable.
- Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Allowed Administrative Expense Claims, Allowed Professional Claims, Allowed Priority Tax Claims, and United States Trustee Fees will all be paid in full.

### C.      Plan Consummation

Upon confirmation of the Plan by the Bankruptcy Court, the Plan will be deemed consummated on the Effective Date.  Distributions to Holders of Claims or Interests receiving a Distribution pursuant to the terms of the Plan will follow consummation of the Plan.

### D.      Best Interests of Creditors Test

The Bankruptcy Code requires that, with respect to an impaired class of claims or interests, each holder of an impaired claim or interest in such class either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount (value) such holder would receive or retain if Debtors were liquidated under chapter 7 of the Bankruptcy Code on the effective date.

Debtors' costs of a chapter 7 liquidation would necessarily include fees payable to a trustee in bankruptcy, as well as fees likely to be payable to attorneys, advisors, and other professionals that such a chapter 7 trustee may engage to carry out its duties under the Bankruptcy Code.  Other costs of liquidating

the Debtors' Estates would include the expenses incurred during the bankruptcy case and allowed by the Bankruptcy Court in the chapter 7 case, such as reimbursable compensation for Debtors' professionals, including, but not limited to, attorneys, financial advisors, appraisers, accountants.

The foregoing types of claims, costs, expenses, and fees that may arise in a chapter 7 liquidation case would be paid in full before payments would be made towards pre-chapter 11 priority and unsecured claims. The Debtors believe that in a chapter 7 liquidation, Holders of Claims and Interests would receive less distribution that such Holders would receive under the Plan.

### E. Liquidation Analysis

As noted above, the Debtors believe that the proposed terms of the Plan provide all Holders of Impaired Claims and Interests property with a value not less than the value such Holders would receive in a chapter 7 liquidation of Debtors' assets. The Debtors believe the net effect of a conversion of this case to chapter 7 would increase the administrative expenses of the Estates, and decrease the proceeds available for distribution to Holders of Impaired Claims and Interests. The Debtors' belief is based primarily on (a) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a chapter 7 trustee, as well as the fees and expenses of the trustee's professional advisors, (b) the discounted value of the Debtors' assets attributable to the chapter 7 process and the expeditious liquidation and forced sale atmosphere attendant to chapter 7 liquidations, as set forth in a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors and submitted herewith as **Exhibit C**. As the Liquidation Analysis shows, no creditors or Interest Holders would receive a distribution in a chapter 7 case that is greater than the distribution they may be entitled to under the Plan.[13]

The liquidation values in the Liquidation Analysis assume the Property would be liquidated in the context of a chapter 7 case and assumes the present value of such liquidation values. While the Debtors believe that the assumptions utilized in the Liquidation Analysis are reasonable, any liquidation analysis is speculative and is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors. Thus, there can be no assurance as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a Bankruptcy Court would accept the Debtors' conclusions or concur with such assumptions in making its determinations under Section 1129(a)(7) of the Bankruptcy Code.

For example, the Liquidation Analysis contains estimates of the amount of Claims which will ultimately become Allowed Claims, and such estimates may ultimately be overinclusive or underinclusive. Moreover, no order or finding has been entered by the Bankruptcy Court or any other court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis. The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including any determination of the value of any Distribution to be made on account of Allowed Claims under the Plan.

The Liquidation Analysis is being provided solely to disclose to Holders of Claims the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein. The Disclosure Statement Supplement will include an updated Liquidation Analysis, which updated Liquidation Analysis will include comparisons of the estimated Distributions under the Plan to Distributions in a hypothetical Chapter 7 liquidation.

---

[13] With respect to the HHF Plan, because all Classes of unsecured creditors are Unimpaired and accordingly presumed to accept the Plan, the Plan satisfies the "Best Interest of Creditors Test" set forth herein without the need for a liquidation analysis. The Liquidation Analysis, accordingly, only concerns the CWGL Debtors.

31

### F.  Feasibility

Pursuant to § 1129(a)(11) of the Bankruptcy Code, a plan proponent must demonstrate that a bankruptcy court's confirmation of a plan is not likely to be followed by the liquidation or need for further financial reorganization of the debtor or its successor under the plan, unless such liquidation or reorganization is proposed under the plan.  Here, that requirement is inapplicable, as the Plan does in fact provide for liquidation of Debtors' assets.

### G.  Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described below, each class of claims or equity interests that is impaired under a plan accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  As a general matter under the Bankruptcy Code, a class is "impaired," unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such claim or equity interest; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds (2/3) in amount and a majority in number actually voting cast their ballots in favor of acceptance.  A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

### H.  Section 1129(b)

Section 1129(b) of the Bankruptcy Code provides that the Bankruptcy Court may confirm a plan even if a class of impaired claims or interests votes to reject the plan if the plan does not unfairly discriminate and is fair and equitable with respect to each impaired class of claims or interests that has not accepted the plan.

#### 1.    No Unfair Discrimination

The "no unfair discrimination" test requires that the plan not provide for unfair treatment with respect to classes of claims or interests that are of equal priority, but are receiving different treatment under the plan.  Here, the Plan does not discriminate.  With respect to the CWGL Plan accords treatment to a Claim or Interest with the priority of such Claim or Interest, unless the Holder of Such Claim or Interest has agreed to lesser treatment.

#### 2.    Fair and Equitable

The fair and equitable requirement applies to classes of claims of different priority and status, such as secured versus unsecured.  The Plan satisfies the fair and equitable requirement if no Class of Claims receives more than 100% of the allowed amount of the Claims in such Class.  Further, if a Class of Claims is considered a dissenting Class ("Dissenting Class"), i.e., a Class of Claims that is deemed to reject the

Plan because the required majorities in amount and number of votes is not received from the Class, the following requirements apply:

### a.    Class of Secured Claims

Each holder of an impaired secured Claim either (i) retains its liens on the subject property, to the extent of the allowed amount of its secured Claim and receives deferred cash payments having a value, as of the effective date of the plan of at least the allowed amount of such Claim, (ii) has the right to credit bid the amount of its Claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof), or (iii) receives the "indubitable equivalent" of its allowed secured Claim.

### b.    Class of Unsecured Creditors

Either (i) each holder of an impaired unsecured Claim receives or retains under the plan property of a value equal to the amount of its allowed Claim or (ii) the Holders of Claims and Interests that are junior to the Claims of the Dissenting Class will not receive any property under the Plan. Here, no junior Claim Holders will receive more than any Class of unsecured Creditors, and each such Creditor shall receive (with respect to the CWGL Plan) their Pro Rata Share of the Distributions from the appropriate GUC Pool and all senior Allowed Claims are paid in full or otherwise by agreement.

### c.    Class of Interests

Either (i) each interest holder will receive or retain under the plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of interests that are junior to the interests of the Dissenting Class will not receive any property under the plan. Here, the Plan satisfies this final requirement as well because, under the Plan, there is no more junior class than the Interest Holders that will receive a Distribution of property.

### 3.    Fair and Equitable

The fair and equitable requirement applies to classes of claims of different priority and status, such as secured versus unsecured. The plan satisfies the fair and equitable requirement if no Class of Claims receives more than 100% of the allowed amount of the Claims in such Class. Further, if a Class of Claims is considered a dissenting Class ("Dissenting Class"), i.e., a Class of Claims that is deemed to reject the Plan because the required majorities in amount and number of votes is not received from the Class, the following requirements apply:

### a.    Class of Secured Claims

Each Holder of an Impaired Secured Claim either retains the liens securing its claims, receives the indubitable equivalent of its secured claim, or shall vote in favor of the Plan.

### b.    Class of Unsecured Creditors

The Holders of General Unsecured Claims and Asserted Construction Lien Claims will also receive their Pro Rata Share of Distributions from the appropriate Distribution Reserve Account after all senior Allowed Claims are paid in full, pursuant to the Bankruptcy Code's priority scheme. No junior Claim Holders will receive more than the General Unsecured Creditors.

33

### c.  Class of Interests

Either (i) each interest holder will receive or retain under the plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of interests that are junior to the interests of the Dissenting Class will not receive any property under the plan.

## VI.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe the Plans are in the best interests of creditors and should accordingly be accepted and confirmed.  If the Plans as proposed, however, are not confirmed, the following alternatives may be available to Debtors: (i) a liquidation of the Debtors' assets pursuant to chapter 7 of the Bankruptcy Code; (ii) an alternative chapter 11 plan may be proposed and confirmed; or (iii) the Debtors' Chapter 11 Cases may be dismissed.

### A.  Chapter 7 Liquidation

If a plan pursuant to chapter 11 of the Bankruptcy Code is not confirmed by the Bankruptcy Court, the Chapter 11 Cases may be converted to a liquidation case under chapter 7 of the Bankruptcy Code, in which a trustee would be elected or appointed pursuant to applicable provisions of chapter 7 of the Bankruptcy Code to liquidate the assets of Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that such a liquidation would result in smaller distributions being made to the creditors than those provided for in the Plan because (i) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals, and (ii) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation.

### B.  Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code

If the Plans are not confirmed, the Debtors, or any party in interest may propose a different plan. Such a plan might involve an alternative means for the liquidation of the Debtors' assets in a chapter 11 bankruptcy proceeding.  However, in light of the extensive involvement and negotiations with the key parties in the Chapter 11 Cases, the Debtors believe that the terms of the Plans provide for an orderly and efficient liquidation of the Debtors' assets and will result in the realization of the most value for Holders of Claims and Interests against the Debtors' Estates.

### C.  Dismissal of the Debtor's Chapter 11 Case

Dismissal of all of the Debtors' Chapter 11 Cases would have the effect of restoring (or attempting to restore) all parties to the *status quo ante*.  Upon dismissal of the Chapter 11 Cases, the Debtors would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time-consuming process of negotiation with the various creditors of Debtors, and possibly resulting in costly and protracted litigation in various jurisdictions.  Dismissal will also permit unpaid unsecured creditors to obtain and enforce judgments against the Debtors.  The Debtors believe that these actions could lead ultimately to the liquidation of the Debtors under chapter 7 of the Bankruptcy Code.  Therefore, the Debtors believe that dismissal of the Debtors' Chapter 11 Cases is not a preferable alternative to the Plan.

## VII.    RECOMMENDATION AND CONCLUSION

The Debtors believe the Plans are in the best interests of all creditors and the Estates.  The Plans are plans of reorganization and, consistent with section 1141(d) of the Bankruptcy Code, confirmation of the Plans will result in a discharge of debts, as provided in the Plans, Disclosure Statement, and Confirmation Order(s).  Nevertheless, the Debtors urge the Holders of Impaired Claims entitled to vote to accept the Plan and to evidence such acceptance by properly voting and timely returning their ballots.


Dated:  April 16, 2025

                                        Respectfully submitted,

                                        **Healthcare Holdings of Florida,** *et al.*

                                        By: */s/ Gary R. Loffredo*
                                        Name:    Gary R. Loffredo
                                        Title:    Chief Executive Officer

**Exhibit A**

**The HHF Plan**

**[FILED BY SEPARATE DOCKET ENTRY]**

**Exhibit B**

**The CWGL Plan**


**[FILED BY SEPARATE DOCKET ENTRY]**

**Exhibit C**

**Hypothetical Chapter 7 Liquidation of CWGL Debtors**

Introduction

The following page contains a hypothetical chapter 7 liquidation of the CWGL Debtors, with a date effective as of February 28, 2025.  Please note that the following materials are provided for informational purposes only to aid Holders of Claims in the Voting Class in casting their vote to accept or reject the Plan, and are not intended as a guaranty of any particular outcome or any associated recovery.  **Nothing contained in these materials shall be an admission of fact or liability on the part of the Debtors.**

As stated above, these materials are provided for demonstration purposes only, and are in no way an admission of fact or liability on the part of the Debtors or a statement of the Debtors' position on any particular issue.  Please carefully review the Disclosure Statement (including Article IV regarding risks and considerations) in reviewing these materials.  While the numbers provided herein are intended to give Holders of Claims entitled to vote on the CWGL Plan an idea of the possible Distributions and associated recoveries under a chapter 7 liquidation, these materials cannot account for all variables and the underlying assumptions may be subject to further review or be the result of estimations that ultimately prove to overestimate or underestimate the listed Distributions and recoveries.

**CWGL Holdings, LLC**

**Hypothetical Liquidation Analysis**

| | | Book Value 2/28/2025 (US$) | Adjustments | Liquidation Value 2/28/2025 (US$) | Recovery |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| **Current Assets** | | | | | |
| | Cash & Marketable Securities | $ 99,493 | | | |
| | less: outstanding checks | (94,307) | | | |
| | | 5,186 | - | 5,186 | |
| | Accounts Receivable | 4,231,345 | | | |
| | less: customer deposits | (1,338,493) | | | |
| [1] | Accounts Receivable, net | 2,892,852 | (1,012,498) | 1,880,354 | |
| [2] | Prepaid Expenses | 337,198 | (337,198) | - | |
| | **Total Current Assets** | 3,235,235 | (1,349,696) | 1,885,539 | |
| | **Fixed Assets** | 187,135 | (167,135) | 20,000 | |
| | **Other Assets** | | | | |
| | Security Deposits | 22,138 | (22,138) | - | |
| [3] | Manufacturer Deposits | 2,516,400 | (2,516,400) | - | |
| [4] | Loan to Healthcare Holding | 1,460,557 | (1,460,557) | - | |
| [5] | Related Party Loans | 2,278,746 | (2,278,746) | - | |
| | **Total Other Assets** | 6,277,841 | (6,277,841) | - | |
| | **Total Assets** | $ 9,700,211 | $ (7,794,672) | $ 1,905,539 | |
| | **less: Chapter 7 costs** | | | | |
| | Chatper 7 trustee fee per 11 USC §326(a) | | $ 81,766 | $ 81,766 | 100% |
| | Chatper 7 trustee professional fees | | 100,000 | 100,000 | 100% |
| | **less: secured claims** | | | | |
| | INB Loan - AR LOC | $ 2,595,812 | (872,039) | 1,723,773 | 66% |
| | **Amount available to administrative and prepetition unsecured creditors** | | | - | |
| | **less: administrative claims** | | | | |
| | Payroll Liabilities | 1,208,940 | | 1,208,940 | 0% |
| | Employee Liability Payable | (20,532) | | (20,532) | 0% |
| | Accounts Payable | 50,000 | | 50,000 | 0% |
| | Premium Financing | 172,861 | | 172,861 | 0% |
| | Credit Card Liabilities | 70,137 | | 70,137 | 0% |
| | **Amount available to prepetition unsecured creditors** | | | - | |
| | **General Unsecured Creditors per Balance Sheet** | | | | |
| | INB Deficiency Claim | | 1,723,773 | 1,723,773 | 0% |
| | Accounts Payable | 336,903 | | 336,903 | 0% |
| [6] | Grants Payable | 2,296,495 | (2,296,495) | - | 0% |
| [7] | Accrued Expenses | 1,308,163 | | 1,308,163 | 0% |
| | Loan Payable Salvatore Loffredo | 46,000 | | 46,000 | 0% |
| | **General Unsecured Creditors - Contingent Liabilities** | | | | |
| [8] | Amazing Glove Liability | - | 7,860,750 | 7,860,750 | 0% |
| | **Total General Unsecured Claims** | 3,987,561 | 7,288,029 | 11,275,589 | |
| | **Net Recovery for** | | | | |
| | **General Unsecured Creditors** | | | $ - | 0% |
| | **Total Claims** | $ 8,064,778 | $ 6,415,990 | $ 14,480,768 | |

**Notes:**

[1] A/R is reduced by customer deposits.  65% of net A/R is assumed to be collected by an outside collection agency skilled in medicaid and other health insurance billing.

[2] Prepaid expenses are comprised of insurance and rent.  No realizable value expected by a refund.

[3] Manufacturing Deposits are related to SN-DME and have no value,

[4] Intercompany loans forgiven as part of sale of HHF.

[5] Costs and expenses concomitant with collection risk yields a very remote chance of any recovery.

[6] Grants payable are healthcare provider relief grants, which are expected to be fully forgiven.

[7] Accrued liabilities includes $1,162,310 Disco lease liability

[8] Source: Amazing Glove Proof of Claim

**Exhibit D**

**Schedules Setting Forth the Valuation of the CWGL Debtors**

**Introduction**

The following pages contain schedules that set forth the valuation of the CWGL Debtors, with a valuation date effective as of December 31, 2024.  Please note that the following materials are provided for informational purposes only to aid Holders of Claims in the Voting Class in casting their vote to accept or reject the Plan, and are not intended as a guaranty of any particular outcome or any associated recovery. **Nothing contained in these materials shall be an admission of fact or liability on the part of the Debtors.**

As stated above, these materials are provided for demonstration purposes only, and are in no way an admission of fact or liability on the part of the Debtors or a statement of the Debtors' position on any particular issue.  Please carefully review the Disclosure Statement (including Article IV regarding risks and considerations) in reviewing these materials.  While the numbers provided herein are intended to give Holders of Claims entitled to vote on the CWGL Plan an idea of the business enterprise value of the CWGL Debtors under the CWGL Plan, these materials cannot account for all variables and the underlying assumptions may be subject to further review or be the result of estimations that ultimately prove to overestimate or underestimate the ultimate value of the CWGL Debtors.

**CWGL Holdings, LLC**
**Valuation Schedules**
**Valuation Date - December 31, 2024**

# CWGL Holdings, LLC

## Index of Schedules

| Schedule Number | Description |
|---|---|
| Schedule 1.0 | Summary of Values |
| Schedule 2.0 | Discounted Cash Flow Analysis |
| Schedule 2.1 | Projected Income Statements |
| Schedule 2.2 | Projected Industry Growth Rates |
| Schedule 3.0 | Estimated Weighted Average Cost of Capital ("WACC") |
| Schedule 4.0 | Historical Income Statements |
| Schedule 4.1 | Adjusted Historical Income Statements |
| Schedule 5.0 | Historical Balance Sheets |
| Schedule 5.1 | Debt Free Net Working Capital (DFNWC) Analysis |
| Schedule 6.0 | Guideline Public Company Method |
| Schedule 6.1 | Guideline Public Company Descriptions |
| Schedule 6.2 | Guideline Public Company Rankings |
| Schedule 7.0 | Guideline Transaction Method |
| Schedule 7.1 | Guideline Transaction Target Business Descriptions |

**CWGL Holdings, LLC**                                                                                   **Schedule 1.0**

**Summary of Values**

| | | | As of December 31, 2024 | | | |
|---|---|---|---|---|---|---|
| | | | **Business Enterprise Value** | **Weighting[1]** | **Concluded Value** | |
| Discounted Cash Flow Method | Schedule 2.0 | $ | 6,574,000 | 50.0% | | |
| Guideline Public Company Method | Schedule 6.0 | | 6,244,000 | 25.0% | | |
| Guideline Transaction Method | Schedule 7.0 | | 5,410,000 | 25.0% | | |
| **Concluded Business Enterprise Value (BEV), Rounded** | | | | 100.0% | $ 6,201,000 | |
| Plus: Cash and Equivalents | Schedule 5.0 | | | | 1,385,488 | |
| Less: Insufficient Cash Free Net Working Capital | Schedule 5.1 | | | | (3,476,548) | |
| Total Adjustment | | | | | $ (2,091,060) | |
| **Market Value of Invested Capital (MVIC), Rounded** | | | | | $ 4,110,000 | $ 4,110,000 |
| Less: Debt on the 12/31/2024 Balance Sheet | Schedule 5.0 | | | | (2,541,812) | (2,541,812) |
| [2] Less: Amazing Glove Settlement Debt | | | | | (1,400,000) or | (5,000,000) |
| [3] Less: Settled Disco Lease Property Tax Liability | | | | | (145,187) | (145,187) |
| Total Debt and Debt Like Liabilities | | | | | $ (4,086,998) | $ (7,686,998) |
| **FMV of Total Equity, Rounded** | | | | | $ 23,000 or | NIL |

| Implied BEV Multiples | 2024 |
|---|---|
| **BEV/EBITDA** | 7.86 x |

**Notes:**

[1]  Weighting is estimated based on availability of data and relative strength of each method.

[2]  Source: Draft Settlement Agreement -- SWM Comments -- 2.12.25.DOCX, Amazing Glove $1.4 million settlement note payable will be paid in 12 equal monthly installments, accruing simple interest at a rate of 8% annually. If the Company defaults the $1.4 million loan, the contingent liability would be $5 million.

[3]  Source: HHF - ECF 181 - NOF HHF Agreement, para. 8.

**CWGL Holdings, LLC**  Schedule 2.0

**Income Approach, Discounted Cash Flow Analysis**
**As of December 31, 2024**

| Description | Actual 2024[1] (US$) | Projected[2] | | | | | Terminal Value (US$) |
|---|---|---|---|---|---|---|---|
| | | 2025 (US$) | 2026 (US$) | 2027 (US$) | 2028 (US$) | 2029 (US$) | |
| Revenue Growth Rate | | 8.2% | 5.0% | 5.8% | 6.8% | 3.8% | 3.0% |
| Revenue | $ 45,460,709 | $ 49,208,483 | $ 51,656,285 | $ 54,663,407 | $ 58,402,930 | $ 60,612,661 | $ 62,431,041 |
| Cost of Goods Sold | 33,461,779 | 36,027,689 | 37,843,630 | 40,021,478 | 42,759,347 | 44,377,188 | 45,708,504 |
| Gross Profit | 11,998,930 | 13,180,794 | 13,812,655 | 14,641,929 | 15,643,583 | 16,235,473 | 16,722,537 |
| Gross Profit% | 26.4% | 26.8% | 26.8% | 26.8% | 26.8% | 26.8% | 26.8% |
| | | | | | | | |
| EBITDA | 789,121 | 1,031,808 | 1,120,665 | 1,311,922 | 1,401,670 | 1,454,704 | 1,498,345 |
| EBITDA% | 1.7% | 2.1% | 2.2% | 2.4% | 2.4% | 2.4% | 2.4% |
| | | | | | | | |
| [3] Depreciation and Amortization | 20,819 | 23,569 | 24,742 | 26,182 | 27,973 | 29,031 | 29,902 |
| | | | | | | | |
| EBIT | 768,301 | 1,008,239 | 1,095,923 | 1,285,740 | 1,373,697 | 1,425,673 | 1,468,443 |
| EBIT% | 1.7% | 2.0% | 2.1% | 2.4% | 2.4% | 2.4% | 2.4% |
| | | | | | | | |
| Less: Estimated Income Taxes | | (257,529) | (279,926) | (328,410) | (350,877) | (364,152) | (375,077) |
| [3] Plus: Depreciation | | 23,569 | 24,742 | 26,182 | 27,973 | 29,031 | 29,902 |
| [3] Less: Capital Expenditure | | (23,569) | (24,742) | (26,182) | (27,973) | (29,031) | (29,902) |
| [4] Less: Change in Working Capital | | (187,389) | (122,390) | (150,356) | (186,976) | (110,487) | (90,919) |
| Debt-Free Free Cash Flow | | 563,321 | 693,607 | 806,974 | 835,845 | 951,034 | $ 1,002,447 |
| | | | | | | | |
| Partial Period Adjustment | | 100% | | | | | |
| | | | | | | | |
| Cash Flow Remaining through EOY | | 563,321 | 693,607 | 806,974 | 835,845 | 951,034 | 1,002,447 |
| | | | | | | | |
| [5] Reciprocal of Capitalization Rate | | | | | | | 7.69 |
| | | | | | | | 7,711,129 |
| [6] Discount Period | | 0.50 | 1.50 | 2.50 | 3.50 | 4.50 | 4.50 |
| Present Value Factor | | 0.928 | 0.800 | 0.690 | 0.595 | 0.513 | 0.513 |
| Present Value of Free Cash Flow | | 523,030 | 555,171 | 556,819 | 497,190 | 487,680 | 3,954,185 |

| | | |
|---|---|---|
| Sum of Present Value During Discreet Period | 2,619,891 | 39.9% |
| Terminal Value | 3,954,185 | 60.1% |
| **Business Enterprise Value (BEV), Rounded** | **$ 6,574,000** | **100.0%** |

**Summary of Assumptions**

| | | |
|---|---|---|
| | Valuation Date | 12/31/24 |
| [7] | Estimated Income Tax Rate | 25.5% |
| [7] | Discount Rate | 16.0% |
| [8] | Perpetuity Growth Rate | 3.0% |
| [7] | Capitalization Rate | 13.0% |
| [4] | DFNWC (Excldg Cash) | 5.0% |

**Notes:**

[1]  See Schedule 4.1 .

[2]  See Schedule 2.0 for projected 2025 and 2026, after 2026 it is assumed that the Company would grow at the industry level, as presented in Schedule 2.2. Gross profit margins in projected 2027-2029 are assumed to be the same as in 2026. Projected 2027-2029 EBITDA margins are assumed to increase 2% from 2026.

[3]  Depreciation and capex are projected to equal in all periods.

[4]  See Schedule 5.1 for details.

[5]  Reciprocal of Capitalization Rate = 1/(WACC-Perpetuity Growth Rate)

[6]  The mid-year convention is applied.

[7]  See Schedule 3.0 for details.

[8]  A long term growth rate of 3% is assumed considering inflation, industry and Company growth outlook.

**CWGL Holdings, LLC**                                                                              **Schedule 2.1**
**Projected Income Statements**

| | Actual | | | Projected | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2024 | [1] | | 2025 | [2] | | 2026 | [2] |
| | (US$) | % | | (US$) | % | | (US$) | % |
| *Year to Year Change in Revenue* | | | | 8.2% | | | 5.0% | |
| **Revenue** | | | | | | | | |
| Private Duty Division | $ 20,632,958 | 45.4% | $ | 21,982,303 | 44.7% | $ | 23,103,400 | 44.7% |
| Workers' Comp Division | 3,690,445 | 8.1% | | 3,607,592 | 7.3% | | 3,643,667 | 7.1% |
| Medicaid | 20,128,083 | 44.3% | | 22,295,516 | 45.3% | | 23,559,671 | 45.6% |
| SNHH Revenue | 333,974 | 0.7% | | 378,208 | 0.8% | | 404,683 | 0.8% |
| Senior Living Communities | 218,060 | 0.5% | | 344,864 | 0.7% | | 344,864 | 0.7% |
| Senior Advantages | 457,189 | 1.0% | | 600,000 | 1.2% | | 600,000 | 1.2% |
| **Total Revenue** | 45,460,709 | 100.0% | | 49,208,483 | 100.0% | | 51,656,285 | 100.0% |
| **Cost of Goods Sold** | | | | | | | | |
| Private Duty Division | 14,736,343 | 32.4% | | 15,826,257 | 32.2% | | 16,655,043 | 32.2% |
| Workers' Comp Division | 2,711,671 | 6.0% | | 2,639,692 | 5.4% | | 2,666,089 | 5.2% |
| Medicaid | 15,373,122 | 33.8% | | 16,944,592 | 34.4% | | 17,905,350 | 34.7% |
| SNHH | 248,464 | 0.5% | | 286,500 | 0.6% | | 286,500 | 0.6% |
| Senior Living Communities | 220,900 | 0.5% | | 258,648 | 0.5% | | 258,648 | 0.5% |
| Service Revenue - SA Commission | 98,122 | 0.2% | | - | 0.0% | | - | 0.0% |
| Payroll Processing Fees | 73,158 | 0.2% | | 72,000 | 0.1% | | 72,000 | 0.1% |
| **Total Cost of Goods Sold** | 33,461,779 | 73.6% | | 36,027,689 | 73.2% | | 37,843,630 | 73.3% |
| **Gross Profit** | 11,998,930 | 26.4% | | 13,180,794 | 26.8% | | 13,812,655 | 26.7% |
| **Operating Expenses** | | | | | | | | |
| Payroll Expense | 7,912,056 | 17.4% | | 8,765,348 | 17.8% | | 9,136,710 | 17.7% |
| Marketing Expenses | 622,641 | 1.4% | | 644,814 | 1.3% | | 666,270 | 1.3% |
| General and Administrative Expenses | 840,257 | 1.8% | | 707,305 | 1.4% | | 757,007 | 1.5% |
| Professional Fees | 510,677 | 1.1% | | 423,510 | 0.9% | | 444,577 | 0.9% |
| Computers, Software & Internet | 398,946 | 0.9% | | 472,117 | 1.0% | | 494,826 | 1.0% |
| Office Expenses | 925,231 | 2.0% | | 1,135,892 | 2.3% | | 1,192,600 | 2.3% |
| **Total Operating Expenses** | 11,209,809 | 24.7% | | 12,148,986 | 24.7% | | 12,691,990 | 24.6% |
| **Net Ordinary Income** | 789,121 | 1.7% | $ | 1,031,808 | 2.1% | $ | 1,120,665 | 2.2% |

**Notes:**

[1] See Schedule 4.0.
[2] Projections provided by Company management.

**CWGL Holdings, LLC**                                                                    **Schedule 2.2**

**Projected Industry Growth Rates**

### Home Care Providers in the US

| Year | IBISWorld Industry Revenue ($Millions) | Estimated Real Industry Growth Rate | Actual / Projected Inflation Rate | Estimated Nominal Industry Growth Rate |
|---|---|---|---|---|
| | [1] | [2]<br>A | [3]<br>B | [4]<br>C=(1+A)*(1+B)-1 |
| 2024 | $       137,157 | | | |
| 2025 | 143,120 | 4.3% | 2.0% | 6.43% |
| 2026 | 148,527 | 3.8% | 2.1% | 5.96% |
| 2027 | 153,940 | 3.6% | 2.1% | 5.82% |
| 2028 | 161,089 | 4.6% | 2.1% | 6.84% |
| 2029 | 163,745 | 1.6% | 2.1% | 3.78% |

**Notes:**

[1]   Source: IBISWorld NAICS 62161 Home Care Providers in the US, January 2025.

[2]   Annual real industry growth rate is calculated based upon IBISWorld industry revenue data.

[3]   Projected U.S. inflation rate for 2025-2029 obtained from International Monetary Fund (IMF).

[4]   Estimated nominal industry growth rate.

**CWGL Holdings, LLC**                                                    **Schedule 3.0**

**Estimated Weighted Average Cost of Capital ("WACC")**

| BR Estimated WACC (Build-up Method) |
|:---:|

**1. Cost of Equity**

| | | |
|---|---|---:|
| [1] | Risk-Free Rate | 4.86% |
| [2] | Equity Risk Premium | 5.00% |
| [3] | Industry Premium | -1.05% |
| [4] | Size Premium | 4.47% |
| [5] | Company Specific Premium | 5.00% |
| | | **18.28%** |

**2. After Tax Cost of Debt:**

| | | |
|---|---|---:|
| [6] | Borrowing Rate | 7.10% |
| [7] | Tax Rate | 25.54% |
| | | **5.29%** |

**3. Weighted Average Cost of Capital (WACC)**

| | Company Capital Structure [8] | Cost | Weighted Cost |
|---|:---:|:---:|---:|
| Debt | 20.0% | 5.29% | 1.06% |
| Equity | 80.0% | 18.28% | 14.62% |
| | | | **15.68%** |

| **WACC or Discount Rate (rounded)** | **16.00%** |
|---|:---:|

**Notes:**

[1]   Based on 20 year U.S. treasury bond rate as of Valuation Date.

[2]   The market equity risk premium is estimated based on consideration of historical realized returns on equity investments over a risk-free rate as represented by 20-year government bonds and forward-looking equity risk premium estimates. Data sources reviewed generated a range of equity risk premium indications.  However, a 5.0% equity risk premium was considered to reasonably represent a consensus viewpoint of the market equity risk premium per Kroll Cost of Capital Navigator.

[3]   Kroll Cost of Capital Navigator, Industry Premia Estimates based upon an average of GICS 35102015 Health Care Services.

[4]   Additional risk premium for size in excess of large company stocks. Kroll Cost of Capital Navigator, Decile 10 for companies with market cap between $1.11 million and $304.48 million.

[5]   B. Riley estimates to reflect the distress situation faced by the Company as of the Valuation Date, as well as the uncertainty on margins impacted by changes in future reimbursement policies and rates.

[6]   Based on Health Care Services industry cost of debt as of the Valuation Date per Kroll Cost of Capital Navigator.

[7]   Estimated effective tax rate for the Company which reflects the combined effects of federal and state income tax payments.

[8]   Estimated optimal capital structure based on Health Care Services industry data per Kroll Cost of Capital Navigator.

**CWGL Holdings, LLC**                                      **Schedule 4.0**

**Historical Income Statements**

| | | For the Years Ending December 31, | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **2021** | [1] | | **2022** | [1] | | **2023** | [1] | **2024** | [1] |
| | | (US$) | % | | (US$) | % | | (US$) | % | (US$) | % |
| *Year to Year Change in Revenue* | | | | | 15.7% | | | 54.6% | | 20.5% | |
| **Revenue** | | | | | | | | | | | |
| Income - DME | $ | 2,729,393 | 12.9% | $ | 51,579 | 0.2% | $ | - | 0.0% | $ - | 0.0% |
| Private Duty Division | | 9,734,806 | 46.1% | | 10,215,405 | 41.9% | | 16,049,528 | 42.6% | 20,632,958 | 45.4% |
| Workers' Comp Division | | 2,658,969 | 12.6% | | 3,290,336 | 13.5% | | 3,791,048 | 10.1% | 3,690,445 | 8.1% |
| Medicaid | | 4,566,157 | 21.6% | | 10,081,185 | 41.3% | | 16,873,812 | 44.7% | 20,128,083 | 44.3% |
| SNHH Revenue | | 469,733 | 2.2% | | 356,639 | 1.5% | | 322,050 | 0.9% | 333,974 | 0.7% |
| Senior Living Communities | | 17,612 | 0.1% | | 95,867 | 0.4% | | 93,014 | 0.2% | 218,060 | 0.5% |
| Palm Beach Revenue | | 756,641 | 3.6% | | 116,399 | 0.5% | | - | 0.0% | - | 0.0% |
| Senior Advantages | | 46,710 | 0.2% | | 153,540 | 0.6% | | 582,097 | 1.5% | 457,189 | 1.0% |
| Other Revenue | | 115,074 | 0.5% | | 39,705 | 0.2% | | - | 0.0% | - | 0.0% |
| **Total Revenue** | | 21,095,095 | 100.0% | | 24,400,654 | 100.0% | | 37,711,549 | 100.0% | 45,460,709 | 100.0% |
| **Cost of Goods Sold** | | | | | | | | | | | |
| COGS - Gloves, Gowns, Covid-19 Tests | | 2,754,170 | 13.1% | | 54,044 | 0.2% | | - | 0.0% | - | 0.0% |
| Private Duty Division | | 6,852,090 | 32.5% | | 7,458,242 | 30.6% | | 11,782,927 | 31.2% | 14,736,343 | 32.4% |
| Workers' Comp Division | | 1,889,630 | 9.0% | | 2,262,041 | 9.3% | | 2,741,071 | 7.3% | 2,711,671 | 6.0% |
| Medicaid | | 3,091,159 | 14.7% | | 7,282,888 | 29.8% | | 12,639,065 | 33.5% | 15,373,122 | 33.8% |
| SNHH and SN Management | | 320,061 | 1.5% | | 259,619 | 1.1% | | 237,084 | 0.6% | 248,464 | 0.5% |
| Senior Living Communities | | 11,363 | 0.1% | | 63,502 | 0.3% | | 107,179 | 0.3% | 220,900 | 0.5% |
| Palm Beach - Contract | | 458,784 | 2.2% | | 78,936 | 0.3% | | - | 0.0% | - | 0.0% |
| Clearcare | | 35,015 | 0.2% | | - | 0.0% | | - | 0.0% | - | 0.0% |
| Manual Checks | | - | 0.0% | | 12,760 | 0.1% | | - | 0.0% | - | 0.0% |
| Service Revenue - SA Commission | | 21,458 | 0.1% | | 41,228 | 0.2% | | 151,182 | 0.4% | 98,122 | 0.2% |
| Payroll Processing Fees | | 34,652 | 0.2% | | 38,233 | 0.2% | | 57,209 | 0.2% | 73,158 | 0.2% |
| **Total Cost of Goods Sold** | | 15,468,381 | 73.3% | | 17,551,493 | 71.9% | | 27,715,717 | 73.5% | 33,461,779 | 73.6% |
| **Gross Profit** | | 5,626,714 | 26.7% | | 6,849,161 | 28.1% | | 9,995,833 | 26.5% | 11,998,930 | 26.4% |

**CWGL Holdings, LLC**                                                                                    **Schedule 4.0**

**Historical Income Statements**

| | For the Years Ending December 31, | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2021** | **[1]** | | **2022** | **[1]** | | **2023** | **[1]** | | **2024** | **[1]** |
| | **(US$)** | **%** | | **(US$)** | **%** | | **(US$)** | **%** | | **(US$)** | **%** |
| **Operating Expenses** | | | | | | | | | | | |
| Inventory Write-Down | 336,029 | 1.6% | | 7,013 | 0.0% | | - | 0.0% | | - | 0.0% |
| Miscellaneous/Other Expenses | 8,587 | 0.0% | | 23,376 | 0.1% | | - | 0.0% | | - | 0.0% |
| Gain/Loss Fixed Asset Disposal | - | 0.0% | | 3,637 | 0.0% | | - | 0.0% | | - | 0.0% |
| Interest Expense | 34,995 | 0.2% | | (48,978) | -0.2% | | - | 0.0% | | - | 0.0% |
| Payroll Expense | 3,354,543 | 15.9% | | 4,843,788 | 19.9% | | 6,997,572 | 18.6% | | 7,912,056 | 17.4% |
| Marketing and Selling Expenses | 1,313,061 | 6.2% | | 666,286 | 2.7% | | 555,267 | 1.5% | | 622,641 | 1.4% |
| General and Administrative Expenses | 471,999 | 2.2% | | 460,802 | 1.9% | | 791,717 | 2.1% | | 840,257 | 1.8% |
| Professional Fees | 381,246 | 1.8% | | 533,064 | 2.2% | | 382,416 | 1.0% | | 510,677 | 1.1% |
| Computers, Software & Internet | 130,958 | 0.6% | | 280,346 | 1.1% | | 323,784 | 0.9% | | 398,946 | 0.9% |
| Office Expenses | 348,342 | 1.7% | | 441,815 | 1.8% | | 664,111 | 1.8% | | 925,231 | 2.0% |
| **Total Operating Expenses** | 6,379,761 | 30.2% | | 7,211,149 | 29.6% | | 9,714,868 | 25.8% | | 11,209,809 | 24.7% |
| | | | | | | | | | | | |
| **Operating Income** | (753,047) | -3.6% | | (361,988) | -1.5% | | 280,965 | 0.7% | | 789,121 | 1.7% |
| | | | | | | | | | | | |
| **Other Income (Expense)** | | | | | | | | | | | |
| Interest Income | - | 0.0% | | - | 0.0% | | 24,833 | 0.1% | | 9,990 | 0.0% |
| Gain on Extinguishment of Debt PPP | 2,351,443 | 11.1% | | - | 0.0% | | - | 0.0% | | - | 0.0% |
| Period Non-Recurring Expense | - | 0.0% | | (853,889) | -3.5% | | 310,722 | 0.8% | | 5,562 | 0.0% |
| Depreciation Expense | - | 0.0% | | (9,721) | 0.0% | | (10,494) | 0.0% | | (20,819) | 0.0% |
| Interest Expense | (63,170) | -0.3% | | (57,363) | -0.2% | | (121,015) | -0.3% | | (182,603) | -0.4% |
| Other Income (Expense) | 500 | 0.0% | | - | 0.0% | | - | 0.0% | | (452,201) | -1.0% |
| Legal - Non Recurring | - | 0.0% | | - | 0.0% | | - | 0.0% | | (786,806) | -1.7% |
| **Total Other Income (Expense)** | 2,288,773 | 10.8% | | (920,973) | -3.8% | | 204,046 | 0.5% | | (1,426,878) | -3.1% |
| | | | | | | | | | | | |
| **Net Income** | $    1,535,726 | 7.3% | $ | (1,282,961) | -5.3% | $ | 485,011 | 1.3% | $ | (637,757) | -1.4% |

**Notes:**

[1]  Information obtained from internally prepared financial statements for the periods presented.

# CWGL Holdings, LLC

**Schedule 4.1**

## Adjusted Historical Income Statements

| | For the Years Ending December 31, | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2021** | [1] | | **2022** | [1] | | **2023** | [1] | | **2024** | [1] |
| | (US$) | % | | (US$) | % | | (US$) | % | | (US$) | % |
| *Year to Year Change in Revenue* | | | | *15.7%* | | | *54.6%* | | | *20.5%* | |
| **Total Revenue** | $ 21,095,095 | 100.0% | $ | 24,400,654 | 100.0% | $ | 37,711,549 | 100.0% | $ | 45,460,709 | 100.0% |
| **Net Ordinary Income** | (753,047) | -3.6% | | (361,988) | -1.5% | | 280,965 | 0.7% | | 789,121 | 1.7% |
| **Adjustments** | | | | | | | | | | | |
| Gain/Loss Fixed Asset Disposal | - | 0.0% | | 3,637 | 0.0% | | - | 0.0% | | - | 0.0% |
| Interest Expense | 34,995 | 0.2% | | (48,978) | -0.2% | | - | 0.0% | | - | 0.0% |
| **Total Adjustments** | 34,995 | 0.2% | | (45,341) | -0.2% | | - | 0.0% | | - | 0.0% |
| **Adjusted EBITDA** | (718,052) | -3.4% | | (407,329) | -1.7% | | 280,965 | 0.7% | | 789,121 | 1.7% |
| Depreciation Expense | - | 0.0% | | 9,721 | 0.0% | | 10,494 | 0.0% | | 20,819 | 0.0% |
| **Adjusted EBIT** | (718,052) | -3.4% | | (417,050) | -1.7% | | 270,471 | 0.7% | | 768,301 | 1.7% |

**Notes:**

[1]  See Schedule 4.0.

**CWGL Holdings, LLC**                                                                                    **Schedule 5.0**

**Historical Balance Sheets**

| | For the Years Ended December 31, | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2021 | [1] | | 2022 | [1] | | 2023 | [1] | | 2024 | [1] |
| | (US$) | % | | (US$) | % | | (US$) | % | | (US$) | % |
| **Assets** | | | | | | | | | | | |
| **Current Assets** | | | | | | | | | | | |
| Cash & Marketable Securities | $ 38,910 | 0.6% | $ | 2,058,625 | 23.2% | $ | 1,301,139 | 11.9% | $ | 1,385,488 | 11.7% |
| Accounts Receivable | 2,684,231 | 39.7% | | 2,550,193 | 28.8% | | 3,683,779 | 33.8% | | 3,914,556 | 33.0% |
| Undeposited Funds | 1,343 | 0.0% | | 4,536 | 0.1% | | - | 0.0% | | - | 0.0% |
| Inventory | 11,632 | 0.2% | | - | 0.0% | | - | 0.0% | | - | 0.0% |
| Other Receivable | 1,319 | 0.0% | | - | 0.0% | | 58 | 0.0% | | 10,211 | 0.1% |
| Due to/From DME & SN Mgmt | 1,147 | 0.0% | | - | 0.0% | | - | 0.0% | | - | 0.0% |
| Prepaid Expenses | 164,807 | 2.4% | | 120,259 | 1.4% | | 297,978 | 2.7% | | 212,161 | 1.8% |
| **Total Current Assets** | 2,903,389 | 43.0% | | 4,733,613 | 53.4% | | 5,282,953 | 48.5% | | 5,522,416 | 46.5% |
| **Fixed Assets** | | | | | | | | | | | |
| Furniture and Equipment | 4,386 | 0.1% | | | | | | | | | |
| Fixed Assets | 180,698 | 2.7% | | | | | | | | | |
| Leasehold Improvements | 56,480 | 0.8% | | | | | | | | | |
| Gross Fixed Assets | 241,565 | 3.6% | | | | | | | | | |
| Accumulated Depreciation | (93,469) | -1.4% | | | | | | | | | |
| **Fixed Assets** | 148,096 | 2.2% | | 14,624 | 0.2% | | 61,724 | 0.6% | | 191,098 | 1.6% |
| **Other Assets** | | | | | | | | | | | |
| Security Deposits | 12,791 | 0.2% | | 28,592 | 0.3% | | 37,404 | 0.3% | | 22,068 | 0.2% |
| Manufacturer Deposits | 2,516,400 | 37.2% | | 2,516,400 | 28.4% | | 2,516,400 | 23.1% | | 2,516,400 | 21.2% |
| Due to/from SN & SN Mgmt | - | 0.0% | | - | 0.0% | | - | 0.0% | | 3,583 | 0.0% |
| Due To/From 3313 Exchange | 113,687 | 1.7% | | 113,826 | 1.3% | | - | 0.0% | | - | 0.0% |
| Due to /From SN & SN DME,LLC | - | 0.0% | | 1,150 | 0.0% | | - | 0.0% | | - | 0.0% |
| Due From Shareholders | 1,061,866 | 15.7% | | 1,451,319 | 16.4% | | - | 0.0% | | - | 0.0% |
| Loan to Healthcare Holding | - | 0.0% | | - | 0.0% | | 800,107 | 7.3% | | 1,371,852 | 11.6% |
| Related Party Loans | - | 0.0% | | - | 0.0% | | 2,203,588 | 20.2% | | 2,249,515 | 18.9% |
| **Total Other Assets** | 3,704,744 | 54.8% | | 4,111,287 | 46.4% | | 5,557,499 | 51.0% | | 6,163,417 | 51.9% |
| **Total Assets** | $ 6,756,229 | 100.0% | $ | 8,859,524 | 100.0% | $ | 10,902,175 | 100.0% | $ | 11,876,931 | 100.0% |

**CWGL Holdings, LLC**    **Schedule 5.0**

**Historical Balance Sheets**

| | For the Years Ended December 31, | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2021 | [1] | | 2022 | [1] | | 2023 | [1] | | 2024 | [1] |
| | (US$) | % | | (US$) | % | | (US$) | % | | (US$) | % |
| **Liabilities and Equity** | | | | | | | | | | | |
| **Current Liabilities** | | | | | | | | | | | |
| Accounts Payable | $ 1,179,716 | 17.5% | $ | 579,587 | 6.5% | $ | 512,597 | 4.7% | $ | 244,282 | 2.1% |
| Credit Cards | 94,926 | 1.4% | | 112,629 | 1.3% | | 191,029 | 1.8% | | 98,842 | 0.8% |
| [2] Customer Deposits | 683,525 | 10.1% | | 986,304 | 11.1% | | 1,345,026 | 12.3% | | 1,405,335 | 11.8% |
| Employee Benefits Payable | 2,391 | 0.0% | | 610 | 0.0% | | - | 0.0% | | - | 0.0% |
| [3] Grants Payable | - | 0.0% | | 2,296,495 | 25.9% | | 2,296,495 | 21.1% | | 2,296,495 | 19.3% |
| Payroll Liabilities | - | 0.0% | | 1,365,217 | 15.4% | | 1,986,746 | 18.2% | | 2,305,771 | 19.4% |
| Accrued Expenses | 1,216,114 | 18.0% | | 641,650 | 7.2% | | 206,732 | 1.9% | | 1,286,210 | 10.8% |
| INB Loan - AR LOC | - | 0.0% | | - | 0.0% | | 2,059,203 | 18.9% | | 2,495,812 | 21.0% |
| Uncleared 1099 & Operating Cks | 52,105 | 0.8% | | - | 0.0% | | - | 0.0% | | - | 0.0% |
| Line of Credit Capital Bank | 799,591 | 11.8% | | 707,696 | 8.0% | | - | 0.0% | | - | 0.0% |
| Loan Payable Salvatore Loffredo | 46,000 | 0.7% | | 46,000 | 0.5% | | 46,000 | 0.4% | | 46,000 | 0.4% |
| Other Current Liabilities | 268 | 0.0% | | 2,425 | 0.0% | | 2,425 | 0.0% | | - | 0.0% |
| **Current Liabilities** | 4,074,636 | 60.3% | | 6,738,613 | 76.1% | | 8,646,253 | 79.3% | | 10,178,747 | 85.7% |
| **Long Term Liabilities** | | | | | | | | | | | |
| SBAD Loan | 150,000 | 2.2% | | 350,000 | 4.0% | | - | 0.0% | | - | 0.0% |
| **Total Long Term Liabilities** | 150,000 | 2.2% | | 350,000 | 4.0% | | - | 0.0% | | - | 0.0% |
| **Total Liabilities** | 4,224,636 | 62.5% | | 7,088,613 | 80.0% | | 8,646,253 | 79.3% | | 10,178,747 | 85.7% |
| **Equity** | | | | | | | | | | | |
| Capital Stock | (146,486) | -2.2% | | (146,456) | -1.7% | | (112,908) | -1.0% | | (112,908) | -1.0% |
| Additional Paid-in Capital | 33,548 | 0.5% | | 33,548 | 0.4% | | - | 0.0% | | - | 0.0% |
| Retained Earnings | 1,108,805 | 16.4% | | 3,166,780 | 35.7% | | 1,883,819 | 17.3% | | 2,448,849 | 20.6% |
| Net Income | 1,535,726 | 22.7% | | (1,282,961) | -14.5% | | 485,011 | 4.4% | | (637,757) | -5.4% |
| **Total Equity** | 2,531,594 | 37.5% | | 1,770,911 | 20.0% | | 2,255,923 | 20.7% | | 1,698,184 | 14.3% |
| **Total Liabilities and Equity** | $ 6,756,229 | 100.0% | $ | 8,859,524 | 100.0% | $ | 10,902,175 | 100.0% | $ | 11,876,931 | 100.0% |
| Supplemental Information: | | | | | | | | | | | |
| Total Debt | $ 995,591 | | $ | 1,103,696 | | $ | 2,105,203 | | $ | 2,541,812 | |

**Notes:**

[1]  Information obtained from internally prepared financial statements for the periods presented.

[2]  Customer deposits are security deposits from Private Pay clients, which get refunded to the clients when they are discharged.

[3]  Grants payable are Covid relief grants, which are fully forgiven.

**CWGL Holdings, LLC**                                                                                           **Schedule 5.1**

**Debt Free Net Working Capital (DFNWC) Analysis**

**Guideline Companies DFNWC (Excluding Cash) as a Percent of Net Operating Revenues** [1]

|  |  | 2021 | 2022 | 2023 | 2024 | Average |
|---|---|---|---|---|---|---|
| Addus HomeCare Corporation | NasdaqGS:ADUS | 5.5% | 2.4% | 0.1% | 1.6% | 2.4% |
| Amedisys, Inc. | NasdaqGS:AMED | -0.7% | 1.9% | -1.8% | -5.2% | -1.5% |
| Aveanna Healthcare Holdings Inc. | NasdaqGS:AVAH | 3.1% | 5.2% | 5.2% | 4.6% | 4.5% |
| Enhabit, Inc. | NYSE:EHAB | 5.1% | 8.7% | 7.5% | 5.3% | 6.7% |
| National HealthCare Corporation | NYSEAM:NHC | -6.0% | 0.7% | -0.1% | 1.0% | -1.1% |
| **All Selections** |  |  |  |  |  |  |
| Average |  | 1.4% | 3.8% | 2.2% | 1.5% | 2.2% |
| Median |  | 3.1% | 2.4% | 0.1% | 1.6% | 2.0% |
| **Selected Ones Only (Excluding Outliers with Negative Numbers)** |  |  |  |  |  |  |
| Average |  | 4.6% | 5.4% | 4.3% | 3.8% | 4.5% |
| Median |  | 5.1% | 5.2% | 5.2% | 4.6% | 5.2% |

|  |  | 2021 ($) | 2022 ($) | 2023 ($) | 2024 ($) |
|---|---|---|---|---|---|
| **CWGL Holdings, LLC** | Schedule 5.0 |  |  |  |  |
| Accounts Receivable |  | 2,684,231 | 2,550,193 | 3,683,779 | 3,914,556 |
| Undeposited Funds |  | 1,343 | 4,536 | - | - |
| Inventory |  | 11,632 | - | - | - |
| Manufacturer Deposits |  | - | - | - | - |
| Other Receivable |  | 1,319 | - | 58 | 10,211 |
| Due to/From DME & SN Mgmt |  | 1,147 | - | - | - |
| Prepaid Expenses |  | 164,807 | 120,259 | 297,978 | 212,161 |
| Accounts Payable |  | (1,179,716) | (579,587) | (512,597) | (244,282) |
| Credit Cards |  | (94,926) | (112,629) | (191,029) | (98,842) |
| Customer Deposits |  | (683,525) | (986,304) | (1,345,026) | (1,405,335) |
| Employee Benefits Payable |  | (2,391) | (610) | - | - |
| Payroll Liabilities |  | - | (1,365,217) | (1,986,746) | (2,305,771) |
| Accrued Expenses |  | (1,216,114) | (641,650) | (206,732) | (1,286,210) |
| Uncleared 1099 & Operating Cks |  | (52,105) | - | - | - |
| Other Current Liabilities |  | (268) | (2,425) | (2,425) | - |
| Company DFNWC |  | $ (364,566) | $ (1,013,433) | $ (262,741) | $ (1,203,513) |
| Revenue | Schedule 4.0 | $ 21,095,095 | $ 24,400,654 | $ 37,711,549 | $ 45,460,709 |
| Subject Company DFNWC as % of Revenue |  | -1.7% | -4.2% | -0.7% | -2.6% |

| **Concluded DFNWC (Excluding Cash) as % of Revenues** |  | **5.0%** |
|---|---|---|

**Excess (Deficient) DFNWC at the Valuation Date is estimated as follows:**

|  |  | ($) |
|---|---|---|
| The Company's Latest 12 Months Revenues | Schedule 4.0 | $ 45,460,709 |
| Normal DFNWC (Excluding Cash) as % of Net Revenues |  | 5.0% |
| Normal DFNWC (Excluding Cash) at the Valuation Date |  | 2,273,035 |
| The Company's Actual DFNWC (Excluding Cash) at the Valuation Date | Schedule 5.0 | (1,203,513) |
| Excess (Deficient) DFNWC (Excluding Cash) at the Valuation Date |  | $ (3,476,548) |

[1]  DFNWC is defined as current assets less current liabilities other than the current portion of long-term debt and short-term notes payable as these items are included in total interest-bearing debt.

**CWGL Holdings, LLC**                                                                                               **Schedule 6.0**

**Guideline Public Company Method** [1]

**Valuation Date: 12/31/2024**

| Company Name | Market Cap or Price ($M) | Enterprise Value [2] ($M) | Revenue [TTM] ($M) | EBITDA [TTM] ($M) | EBITDA% | EV / EBITDA [TTM] |
|---|---|---|---|---|---|---|
| **Home Health Care Services** | | | | | | |
| 1 Addus HomeCare Corporation | $ 2,247.79 | $ 2,074.70 | $ 1,133.81 | $ 123.76 | 10.9% | 15.30 x |
| 2 Amedisys, Inc. | 2,973.78 | 3,248.67 | 2,321.06 | 234.15 | 10.1% | 12.03 x |
| 3 Aveanna Healthcare Holdings Inc. | 883.04 | 2,307.65 | 1,983.48 | 138.39 | 7.0% | 13.81 x |
| 4 Enhabit, Inc. | 392.72 | 960.92 | 1,037.20 | 70.20 | 6.8% | 10.55 x |
| 5 National HealthCare Corporation | 1,660.84 | 1,646.05 | 1,223.27 | 107.80 | 8.8% | 10.85 x |
| **All Companies** | | | | | | |
| High | $ 2,973.78 | $ 3,248.67 | $ 2,321.06 | $ 234.15 | 10.9% | 15.30 x |
| 75th Percentile | 2,247.79 | 2,307.65 | 1,983.48 | 138.39 | 10.1% | 13.81 x |
| Mean - Average | 1,631.63 | 2,047.60 | 1,539.76 | 134.86 | 8.7% | 12.51 x |
| Median | 1,660.84 | 2,074.70 | 1,223.27 | 123.76 | 8.8% | 12.03 x |
| 25th Percentile | 883.04 | 1,646.05 | 1,133.81 | 107.80 | 7.0% | 10.85 x |
| Low | 392.72 | 960.92 | 1,037.20 | 70.20 | 6.8% | 10.55 x |

CWGL Holdings, LLC                                                          $ 45.46   $ 0.79   1.7%

| | Adjusted 2024 EBITDA |
|---|---|
| Financial Fundamentals | $ 0.79 |
| Select Market Multiple [3] | 10.55 |
| Size and Qualitative Adjustment [4] | 25% |
| Readjusted Multiple | 7.91 |
| **Business Enterprise Value (BEV)** | **$ 6.24** |

[1]  Source S&P Capital IQ unless otherwise noted.
[2]  Enterprise value is reported as of the Valuation Date.
[3]  Multiple is selected by comparing subject company with guideline comps in terms of profitability, growth and risks.
[4]  Additional discount is applied to reflect the size and qualitative differences between the subject company and guideline public companies.

**CWGL Holdings, LLC**                                                                                                                                   **Schedule 6.1**

**Guideline Public Company Descriptions[1]**

| Company Name | Ticker Symbol | Headquarter Location | Primary Industry | About the Company |
|---|---|---|---|---|
| **Home Health Care Services** | | | | |
| 1  Addus HomeCare Corporation | NasdaqGS:ADUS | Frisco, TX | Health Care Services | Addus HomeCare Corporation, together with its subsidiaries, provides personal care services to elderly, chronically ill, disabled persons, and individuals who are at risk of hospitalization or institutionalization in the United States. It operates through three segments: Personal Care, Hospice, and Home Health. The Personal Care segment provides non-medical assistance with activities of daily living. This segment offers services that include assistance with bathing, grooming, oral care, feeding and dressing, medication reminders, meal planning and preparation, housekeeping, and transportation services. The Hospice segment provides palliative nursing care, social work, spiritual counseling, homemaker, and bereavement counseling services for people who are terminally ill, as well as related services for their families. The Home Health segment offers skilled nursing and physical, occupational, and speech therapy for the individuals who requires assistance during an illness or after hospitalization. The company serves federal, state, and local governmental agencies; managed care organizations; commercial insurers; and private individuals. Addus HomeCare Corporation was founded in 1979 and is headquartered in Frisco, Texas. |
| 2  Amedisys, Inc. | NasdaqGS:AMED | Baton Rouge, LA | Health Care Services | Amedisys, Inc., together with its subsidiaries, provides healthcare services in the United States. It operates through three segments: Home Health, Hospice, and High Acuity Care. The Home Health segment offers a range of services in the homes of individuals for the recovery of patients from surgery, chronic disability, or illness, as well as prevents avoidable hospital readmissions through its skilled nurses; nursing services, rehabilitation therapists specialized in physical, speech, and occupational therapy; and social workers and aides for assisting its patients. The Hospice segment offers services that is designed to provide comfort and support for those who are dealing with a terminal illness, including cancer, heart disease, pulmonary disease, or Alzheimer's. The High Acuity Care offers essential elements of inpatient hospital, skilled nursing facility care, and palliative care to patients in their homes. Amedisys, Inc. was incorporated in 1982 and is headquartered in Baton Rouge, Louisiana. |
| 3  Aveanna Healthcare Holdings Inc. | NasdaqGS:AVAH | Atlanta, GA | Health Care Services | Aveanna Healthcare Holdings Inc., a diversified home care platform company, provides pediatric and adult healthcare services in the United States. Its patient-centered care delivery platform allows patients to remain in their homes and minimizes the overutilization of high-cost care settings, such as hospitals or skilled nursing facilities. The company operates through three segments: Private Duty Services (PDS), Home Health & Hospice (HHH), and Medical Solutions (MS). The PDS segment offers private duty nursing (PDN) services, which include in-home skilled nursing services to medically fragile children and adults; nursing services in school settings in which its caregivers accompany patients to school; services to patients in its pediatric day healthcare centers; and non-clinical care, including support services and personal care services; and in-clinic and home-based therapy services, such as physical, occupational, and speech services. The HHH segment provides home health services, including in-home skilled nursing services; physical, occupational, and speech therapy services; and medical social and aide services, as well as hospice services for patients and their families when a life-limiting illness no longer responds to cure-oriented treatments. The MS segment offers enteral nutrition supplies and other products, including formulas, supplies, and pumps to adults and children delivered on a periodic or as-needed basis. The company was incorporated in 2016 and is headquartered in Atlanta, Georgia. |
| 4  Enhabit, Inc. | NYSE:EHAB | Dallas, TX | Health Care Services | Enhabit, Inc. provides home health and hospice services in the United States. The company's home health services include patient education, pain management, wound care and dressing changes, cardiac rehabilitation, infusion therapy, pharmaceutical administration, and skilled observation and assessment services; practices to treat chronic diseases and conditions, including diabetes, hypertension, arthritis, Alzheimer's disease, low vision, spinal stenosis, Parkinson's disease, osteoporosis, complex wound care and chronic pain, along with disease-specific plans for patients with diabetes, congestive heart failure, post-orthopedic surgery, or injury and respiratory diseases; and physical, occupational and speech therapists provide therapy services. It also provides hospice services, including pain and symptom management, palliative and dietary counseling, social worker visits, spiritual counseling, and bereavement counseling services to meet the individual physical, emotional, spiritual, and psychosocial needs of terminally ill patients and their families. The company was formerly known as Encompass Health Home Health Holdings, Inc. and changed its name to Enhabit, Inc. in March 2022. Enhabit, Inc. was founded in 1998 and is based in Dallas, Texas. |
| 5  National HealthCare Corporation | NYSEAM:NHC | Murfreesboro, TN | Health Care Facilities | National HealthCare Corporation engages in the operation of services to skilled nursing facilities, assisted and independent living facilities, homecare and hospice agencies, and health hospitals. It operates through two segments: Inpatient and Homecare and Hospice Services. The company's skilled nursing facilities offer licensed therapy services, nutrition services, social services, activities, and housekeeping and laundry services, as well as medical services prescribed by physicians; and rehabilitative services, such as physical, speech, respiratory, and occupational therapy for patients recovering from strokes, heart attacks, orthopedic conditions, neurological illnesses, or other illnesses, injuries, or disabilities. It also provides medical specialty units comprise memory care units and sub-acute nursing units that provide specialized care and programs for persons with Alzheimer's or related disorders; and assisted living facilities offer personal care services and assistance with general activities of daily living, such as dressing, bathing, meal preparation, and medication management. Its independent living facilities offers specially designed residential units for the active and ambulatory elderly and provide various ancillary services for residents, including restaurants, activity rooms and social areas; and behavioral health services to both adults and geriatric patients with psychiatric, emotional, and addictive disorders. In addition, the company homecare agencies assist those who wish to stay at home or in assisted living residences but still require some degree of medical care or assistance with daily activities; hospice agencies that provides hospice and palliative care; and operates pharmacies, as well as managed care insurance solutions. Further, the company offers management, accounting, and financial services; and leases its properties to third party operators. The company was founded in 1971 and is based in Murfreesboro, Tennessee. |

[1]   Source S&P Capital IQ unless otherwise noted.

**CWGL Holdings, LLC**  |  **Schedule 6.2**

**Guideline Public Company Rankings** [1]

Valuation Date: December 31, 2024

## SIZE AND GROWTH

| | Revenue [ttm] ($M) | |
|---|---|---|
| 1 | Amedisys, Inc. | $ 2,321.1 |
| 2 | Aveanna Healthcare Holdings Inc. | 1,983.5 |
| 3 | National HealthCare Corporation | 1,223.3 |
| 4 | Addus HomeCare Corporation | 1,133.8 |
| 5 | Enhabit, Inc. | 1,037.2 |
| 6 | CWGL Holdings, LLC | 45.5 |
| | Average | 1,290.7 |
| | Median | 1,178.5 |

| | Revenue Growth (Year-over-Year) | |
|---|---|---|
| 1 | CWGL Holdings, LLC | 20.5% |
| 2 | National HealthCare Corporation | 10.7% |
| 3 | Addus HomeCare Corporation | 10.1% |
| 4 | Aveanna Healthcare Holdings Inc. | 6.2% |
| 5 | Amedisys, Inc. | 4.2% |
| 6 | Enhabit, Inc. | -1.1% |
| | Average | 8.5% |
| | Median | 8.2% |

| | EBITDA [TTM] ($M) | |
|---|---|---|
| 1 | Amedisys, Inc. | $ 234.2 |
| 2 | Aveanna Healthcare Holdings Inc. | 138.4 |
| 3 | Addus HomeCare Corporation | 123.8 |
| 4 | National HealthCare Corporation | 107.8 |
| 5 | Enhabit, Inc. | 70.2 |
| 6 | CWGL Holdings, LLC | 0.8 |
| | Average | 112.5 |
| | Median | 115.8 |

| | EBITDA Growth (Year-over-Year) | |
|---|---|---|
| 1 | CWGL Holdings, LLC | 180.9% |
| 2 | National HealthCare Corporation | 30.0% |
| 3 | Aveanna Healthcare Holdings Inc. | 22.9% |
| 4 | Addus HomeCare Corporation | 21.0% |
| 5 | Amedisys, Inc. | 7.9% |
| 6 | Enhabit, Inc. | -14.2% |
| | Average | 41.4% |
| | Median | 22.0% |

## LIQUIDITY AND LEVERAGE

| | Current Ratio | |
|---|---|---|
| 1 | Addus HomeCare Corporation | 2.1 x |
| 2 | National HealthCare Corporation | 1.8 x |
| 3 | Enhabit, Inc. | 1.5 x |
| 4 | Amedisys, Inc. | 1.2 x |
| 5 | Aveanna Healthcare Holdings Inc. | 0.9 x |
| 6 | CWGL Holdings, LLC | 0.5 x |
| | Average | 1.3 x |
| | Median | 1.3 x |

| | Quick Ratio | |
|---|---|---|
| 1 | Addus HomeCare Corporation | 2.0 x |
| 2 | National HealthCare Corporation | 1.5 x |
| 3 | Enhabit, Inc. | 1.4 x |
| 4 | Amedisys, Inc. | 1.1 x |
| 5 | Aveanna Healthcare Holdings Inc. | 0.9 x |
| 6 | CWGL Holdings, LLC | 0.5 x |
| | Average | 1.2 x |
| | Median | 1.3 x |

| | Total Debt to Equity % | |
|---|---|---|
| 1 | Addus HomeCare Corporation | 5.3% |
| 2 | National HealthCare Corporation | 23.5% |
| 3 | Amedisys, Inc. | 39.0% |
| 4 | Enhabit, Inc. | 97.4% |
| 5 | CWGL Holdings, LLC | 149.7% |
| 6 | Aveanna Healthcare Holdings Inc. | NM |
| | Average | 62.9% |
| | Median | 39.0% |

| | Total Debt to EBITDA | |
|---|---|---|
| 1 | Addus HomeCare Corporation | 0.4 x |
| 2 | National HealthCare Corporation | 1.5 x |
| 3 | Amedisys, Inc. | 1.8 x |
| 4 | CWGL Holdings, LLC | 3.2 x |
| 5 | Enhabit, Inc. | 6.4 x |
| 6 | Aveanna Healthcare Holdings Inc. | 9.0 x |
| | Average | 3.7 x |
| | Median | 2.5 x |

## PROFITABILITY

| | Gross Margin % | |
|---|---|---|
| 1 | Enhabit, Inc. | 48.8% |
| 2 | Amedisys, Inc. | 43.7% |
| 3 | National HealthCare Corporation | 37.6% |
| 4 | Addus HomeCare Corporation | 32.5% |
| 5 | Aveanna Healthcare Holdings Inc. | 30.9% |
| 6 | CWGL Holdings, LLC | 26.4% |
| | Average | 36.6% |
| | Median | 35.1% |

| | EBITDA Margin % | |
|---|---|---|
| 1 | Addus HomeCare Corporation | 10.9% |
| 2 | Amedisys, Inc. | 10.1% |
| 3 | National HealthCare Corporation | 8.8% |
| 4 | Aveanna Healthcare Holdings Inc. | 7.0% |
| 5 | Enhabit, Inc. | 6.8% |
| 6 | CWGL Holdings, LLC | 1.7% |
| | Average | 7.5% |
| | Median | 7.9% |

| | Profit Margin % | |
|---|---|---|
| 1 | National HealthCare Corporation | 10.2% |
| 2 | Addus HomeCare Corporation | 6.5% |
| 3 | Amedisys, Inc. | 3.6% |
| 4 | CWGL Holdings, LLC | -1.4% |
| 5 | Aveanna Healthcare Holdings Inc. | -3.3% |
| 6 | Enhabit, Inc. | -11.2% |
| | Average | 0.7% |
| | Median | 1.1% |

| | Return on Equity % | |
|---|---|---|
| 1 | National HealthCare Corporation | 13.2% |
| 2 | Addus HomeCare Corporation | 9.0% |
| 3 | Amedisys, Inc. | 7.2% |
| 4 | Enhabit, Inc. | -17.5% |
| 5 | CWGL Holdings, LLC | -32.3% |
| 6 | Aveanna Healthcare Holdings Inc. | NM |
| | Average | -4.1% |
| | Median | 7.2% |

[1]  Source S&P Capital IQ unless otherwise noted.

**CWGL Holdings, LLC**                                                                                      **Schedule 7.0**

**Guideline Transaction Method**
**As of December 31, 2024**

| | Close Date | Target Company Name | Historical Financial Fundamentals [1] | | | | | Valuation Multiples [1] | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Enterprise Value ($000s) | % Sought | Revenue [ltm] ($000s) | EBITDA [ltm] ($000s) | EBITDA Margin | EV/ Revenue | EV/ EBITDA |
| | **S&P Capital IQ** | | | | | | | | |
| 1 | 11/30/2021 | Dunn & Berger, Inc. | $ 225,000 | 100.0% | $ 114,800 | | | 1.96 x | |
| 2 | 8/1/2021 | Contessa Health, Inc. | 250,000 | 100.0% | | | | 3.90 x | |
| 3 | 11/18/2020 | Simplura Health Group | 575,000 | 100.0% | 463,100 | 49,600 | 10.7% | 1.24 x | 11.59 x |
| 4 | 10/23/2020 | Five Points Healthcare, LLC | 64,400 | 100.0% | 35,800 | | | 1.80 x | |
| 5 | 8/31/2020 | D&D Services, Inc. | 40,600 | 100.0% | 45,000 | | | 0.90 x | |
| | **DealStats** | | | | | | | | |
| 6 | 7/12/2024 | Not Disclosed | 21,500 | 100.0% | 20,669 | | | 1.04 x | |
| 7 | 7/12/2024 | Not Disclosed | 21,500 | 100.0% | 18,643 | | | 1.15 x | |
| 8 | 7/8/2024 | Not Disclosed | 1,685 | 100.0% | 1,731 | 439 | 25.4% | 0.97 x | 3.84 x |
| 9 | 2/29/2024 | Not Disclosed | 2,300 | 100.0% | 4,045 | 547 | 13.5% | 0.57 x | 4.20 x |
| 10 | 1/4/2024 | Not Disclosed | 1,387 | 100.0% | 1,250 | | | 1.11 x | |
| 11 | 9/29/2023 | Not Disclosed | 1,050 | 100.0% | 696 | | | 1.51 x | |
| 12 | 6/30/2023 | Not Disclosed | 3,000 | 100.0% | 2,780 | | | 1.08 x | |
| 13 | 6/6/2023 | Not Disclosed | 5,000 | 100.0% | 5,051 | | | 0.99 x | |
| 14 | 5/15/2023 | Not Disclosed | 7,000 | 100.0% | 11,551 | | | 0.61 x | |
| 15 | 4/24/2023 | Not Disclosed | 1,307 | 100.0% | 2,306 | | | 0.57 x | |
| 16 | 12/30/2022 | Not Disclosed | 1,250 | 100.0% | 6,517 | (304) | -4.7% | 0.19 x | NM |
| 17 | 7/19/2022 | Not Disclosed | 5,740 | 100.0% | 8,304 | 685 | 8.2% | 0.69 x | 8.38 x |
| 18 | 3/31/2022 | Not Disclosed | 9,200 | 100.0% | 6,368 | 1,297 | 20.4% | 1.44 x | 7.09 x |
| 19 | 2/28/2022 | Not Disclosed | 10,000 | 100.0% | 8,759 | 1,080 | 12.3% | 1.14 x | 9.26 x |
| 20 | 2/21/2022 | Not Disclosed | 1,450 | 100.0% | 3,719 | | | 0.39 x | |
| 21 | 2/21/2022 | Not Disclosed | 1,450 | 100.0% | 3,791 | 470 | 12.4% | 0.38 x | 3.08 x |
| 22 | 2/9/2022 | Not Disclosed | 1,350 | 100.0% | 1,821 | | | 0.74 x | |
| 23 | 10/12/2021 | Not Disclosed | 2,500 | 100.0% | 2,391 | 460 | 19.2% | 1.05 x | 5.44 x |
| 24 | 9/30/2021 | Not Disclosed | 2,200 | 100.0% | 3,682 | | | 0.60 x | |
| 25 | 9/30/2021 | Not Disclosed | 1,400 | 100.0% | 2,208 | | | 0.63 x | |
| 26 | 5/31/2021 | Not Disclosed | 4,238 | 100.0% | 7,291 | 807 | 11.1% | 0.58 x | 5.25 x |
| 27 | 5/24/2021 | Not Disclosed | 1,300 | 100.0% | 812 | | | 1.60 x | |
| 28 | 5/1/2021 | Not Disclosed | 958 | 100.0% | 2,521 | 107 | 4.3% | 0.38 x | 8.94 x |
| 29 | 3/5/2021 | Not Disclosed | 5,015 | 100.0% | 5,002 | | | 1.00 x | |
| 30 | 1/17/2021 | Not Disclosed | 1,250 | 100.0% | 1,944 | 133 | 6.8% | 0.64 x | 9.39 x |
| 31 | 12/31/2020 | Not Disclosed | 1,400 | 100.0% | 1,059 | | | 1.32 x | |
| 32 | 11/18/2020 | AM Holdco, Inc. (d.b.a Simplura Health Group) | 547,681 | 100.0% | 467,212 | 59,912 | 12.8% | 1.17 x | 9.14 x |
| 33 | 10/31/2020 | Not Disclosed | 1,039 | 100.0% | 1,344 | 331 | 24.6% | 0.77 x | 3.14 x |
| 34 | 9/24/2020 | Not Disclosed | 1,045 | 100.0% | 1,017 | 213 | 20.9% | 1.03 x | 4.91 x |
| 35 | 9/16/2020 | Not Disclosed | 1,025 | 100.0% | 1,540 | | | 0.67 x | |
| 36 | 8/12/2020 | Not Disclosed | 15,000 | 100.0% | 13,931 | | | 1.08 x | |
| 37 | 7/1/2020 | Not Disclosed | 12,000 | 100.0% | 10,958 | | | 1.10 x | |
| 38 | 7/1/2020 | A Plus | 11,737 | 100.0% | 9,320 | 897 | 9.6% | 1.26 x | 13.09 x |

**CWGL Holdings, LLC**                                                                                                    **Schedule 7.0**

**Guideline Transaction Method**
**As of December 31, 2024**

| | | Historical Financial Fundamentals [1] | | | | | | Valuation Multiples [1] | |
|---|---|---|---|---|---|---|---|---|---|
| Close Date | Target Company Name | Enterprise Value ($000s) | % Sought | Revenue [ltm] ($000s) | EBITDA [ltm] ($000s) | EBITDA Margin | | EV/ Revenue | EV/ EBITDA |
| **S&P Capital IQ** | | | | | | | | | |
| 1 11/30/2021 | Dunn & Berger, Inc. | $ 225,000 | 100.0% | $ 114,800 | | | | 1.96 x | |
| 2 8/1/2021 | Contessa Health, Inc. | 250,000 | 100.0% | | | | | 3.90 x | |
| **All Transactions** | | | | | | | | | |
| High | | $ 575,000 | 100.0% | $ 467,212 | $ 59,912 | 25.4% | | 3.90 x | 13.09 x |
| 75th Percentile | | 11,934 | 100.0% | 10,958 | 942 | 19.5% | | 1.17 x | 9.20 x |
| Mean - Average | | 48,973 | 100.0% | 35,106 | 7,292 | 13.0% | | 1.03 x | 7.12 x |
| Median | | 2,750 | 100.0% | 4,045 | 509 | 11.7% | | 0.98 x | 7.09 x |
| 25th Percentile | | 1,359 | 100.0% | 1,944 | 301 | 9.3% | | 0.64 x | 4.55 x |
| Low | | 958 | 100.0% | 696 | (304) | -4.7% | | 0.19 x | 3.08 x |
| **Selected Transactions [2]** | | | | | | | | | |
| High | | $ 575,000 | 100.0% | $ 467,212 | $ 59,912 | 12.8% | | 3.90 x | 11.59 x |
| Mean - Average | | 161,789 | 100.0% | 120,166 | 54,756 | 11.8% | | 1.45 x | 10.37 x |
| Median | | 40,600 | 100.0% | 28,235 | 54,756 | 11.8% | | 1.15 x | 10.37 x |
| Low | | 7,000 | 100.0% | 10,958 | 49,600 | 10.7% | | 0.61 x | 9.14 x |
| | | | | | | | | | |
| CWGL Holdings, LLC | | | | $ 45,461 | $ 789 | 1.7% | | | |

| | | |
|---|---|---|
| Financial Fundamentals | | $ 789 |
| Select Market Multiple | [3] | 9.14 x |
| Size and Qualitative Adjustment | [4] | 25% |
| Readjusted Multiple | | 6.86 x |
| **Business Enterprise Value (BEV), Rounded** | | **$ 5,410** |

**Notes:**

[1] Source: S&P Capital IQ and DealStats.

[2] Only revenue higher than $10 million is selected.

[3] Multiple is selected by comparing subject company with guideline comps in terms of profitability and risks.

[4] Additional discount is applied to reflect the size and qualitative differences between the subject company and guideline comps.

**CWGL Holdings, LLC**  Schedule 7.1

**Guideline Transaction Target Business Descriptions**
**As of December 31, 2024**

| | Close Date | Target Primary Industry | Target | Buyer | Target Business Description |
|---|---|---|---|---|---|
| | **S&P Capital IQ** | | | | |
| 1 | 11/30/2021 | Health Care Services | Dunn & Berger, Inc. | Aveanna Healthcare LLC | Dunn & Berger, Inc. doing business as Accredited Nursing Services, provides home health care services. The company was incorporated in 1980 and is based in Woodland Hills, California. As of November 30, 2021, Dunn & Berger, Inc. operates as a subsidiary of Aveanna Healthcare Holdings Inc. |
| 2 | 8/1/2021 | Health Care Services | Contessa Health, Inc. | Amedisys, Inc. (NasdaqGS:AMED) | Contessa Health, Inc. offers home hospitalization programs to manage episodic risk initiatives. The company provides Home Recovery Care, a risk-based model that combines all the elements of inpatient hospital care in the comfort of the patient's home and an informatics platform to facilitate Home Recovery Care; ContessaCare, a solution that enables providers to deliver hospital-level care to patients in their homes; and ContradoClaim, a claims analytics solution that enables partners to administer prospective payments. Additionally, it offers bundled payment-managed services. Contessa Health, Inc. was incorporated in 2015 and is based in Nashville, Tennessee. As of August 1, 2021, Contessa Health, Inc. operates as a subsidiary of Amedisys, Inc. |
| 3 | 11/18/2020 | Health Care Services | Simplura Health Group | Socrates LLC | Simplura Health Group, doing business as All Metro Health Care, provides home health care services to patients. It offers services in the areas of nutritious meals; medication reminders; bath or shower; dressing, personal hygiene, and toileting assistance; support with walking or wheelchair; doctor appointments; day-to-day tasks; skilled nursing and/or rehabilitative care; and temporary help. Simplura Health Group was formerly known as All Metro Aids Inc. and changed its name to Simplura Health Group in February 2018. The company was founded in 1955 and is headquartered in Valley Stream, New York. It has additional locations in New York, New Jersey, and Florida. Simplura Health Group operates as a subsidiary of AM Intermediate Holdco, Inc |
| 4 | 10/23/2020 | Health Care Services | Five Points Healthcare, LLC | Aveanna Healthcare Holdings Inc. (NasdaqGS:AVAH) | Five Points Healthcare, LLC provides home health and hospice services for patients and their families. Its services include physician, nursing care, medical social, spiritual support and counseling, home care aide and homemaker, and trained volunteers for support, as well as physical, occupational, and speech therapies. The company was founded in 2011 and is based in Atlanta, Georgia. Five Points Healthcare, LLC operates as a subsidiary of Aveanna Healthcare Holdings Inc. |
| 5 | 8/31/2020 | Health Care Services | D&D Services, Inc. | Aveanna Healthcare Holdings Inc. (NasdaqGS:AVAH) | D&D Services, Inc., doing business as Preferred Pediatric Home Health Care, operates as a comprehensive provider of home care services for pediatric and adult patients. Its services include skilled home health nursing, clinical respiratory care, durable medical equipment, and supplies sale and rental services. The company was founded in 1989 and is based in Oklahoma City, Oklahoma. As of August 31, 2020, D&D Services, Inc. operates as a subsidiary of Aveanna Healthcare Holdings Inc. |
| | **DealStats** | | | | |
| 6 | 7/12/2024 | Home Health Care Agencies | Not Disclosed | Not Disclosed | Home Health Care Agencies |
| 7 | 7/12/2024 | Home Health Agency | Not Disclosed | Not Disclosed | Home Health Agency |
| 8 | 7/8/2024 | Home Health Nursing Agency | Not Disclosed | Not Disclosed | Home Health Nursing Agency |
| 9 | 2/29/2024 | Home Health Care Agency | Not Disclosed | Not Disclosed | Home Health Care Agency |

**CWGL Holdings, LLC**                                                                                                                           **Schedule 7.1**

**Guideline Transaction Target Business Descriptions**
**As of December 31, 2024**

| | Close Date | Target Primary Industry | Target | Buyer | Target Business Description |
|---|---|---|---|---|---|
| | **S&P Capital IQ** | | | | |
| 1 | 11/30/2021 | Health Care Services | Dunn & Berger, Inc. | Aveanna Healthcare LLC | Dunn & Berger, Inc. doing business as Accredited Nursing Services, provides home health care services. The company was incorporated in 1980 and is based in Woodland Hills, California. As of November 30, 2021, Dunn & Berger, Inc. operates as a subsidiary of Aveanna Healthcare Holdings Inc. |
| 2 | 8/1/2021 | Health Care Services | Contessa Health, Inc. | Amedisys, Inc. (NasdaqGS:AMED) | Contessa Health, Inc. offers home hospitalization programs to manage episodic risk initiatives. The company provides Home Recovery Care, a risk-based model that combines all the elements of inpatient hospital care in the comfort of the patient's home and an informatics platform to facilitate Home Recovery Care; ContessaCare, a solution that enables providers to deliver hospital-level care to patients in their homes; and ContradoClaim, a claims analytics solution that enables partners to administer prospective payments. Additionally, it offers bundled payment-managed services. Contessa Health, Inc. was incorporated in 2015 and is based in Nashville, Tennessee. As of August 1, 2021, Contessa Health, Inc. operates as a subsidiary of Amedisys, Inc. |
| 10 | 1/4/2024 | Home Health Care Services | Not Disclosed | Not Disclosed | Home Health Care Services |
| 11 | 9/29/2023 | Home Health Care Company | Not Disclosed | Not Disclosed | Home Health Care Company |
| 12 | 6/30/2023 | Provides Transportation, Home Care, and Skilled Nursing Care to Medicaid Recipients | Not Disclosed | Not Disclosed | Provides Transportation, Home Care, and Skilled Nursing Care to Medicaid Recipients |
| 13 | 6/6/2023 | Medical Home Care Service | Not Disclosed | Not Disclosed | Medical Home Care Service |
| 14 | 5/15/2023 | Home Health Care Company | Not Disclosed | Not Disclosed | Home Health Care Company |
| 15 | 4/24/2023 | Home Health Care Service | Not Disclosed | Not Disclosed | Home Health Care Service |
| 16 | 12/30/2022 | Medical Home Care | Not Disclosed | Not Disclosed | Medical Home Care |
| 17 | 7/19/2022 | Home Health Care Company | Not Disclosed | Not Disclosed | Home Health Care Company |
| 18 | 3/31/2022 | Non-Medical Home Care | Not Disclosed | Not Disclosed | Non-Medical Home Care |
| 19 | 2/28/2022 | Non-Medical Home Care | Not Disclosed | Not Disclosed | Non-Medical Home Care |
| 20 | 2/21/2022 | Home Health Care Services | Not Disclosed | Not Disclosed | Home Health Care Services |
| 21 | 2/21/2022 | Non-Medical Home Care | Not Disclosed | Not Disclosed | Non-Medical Home Care |
| 22 | 2/9/2022 | Home Health Care | Not Disclosed | Not Disclosed | Home Health Care |
| 23 | 10/12/2021 | Non-Medical Home Care Service | Not Disclosed | Not Disclosed | Non-Medical Home Care Service |
| 24 | 9/30/2021 | Home Health Care Services | Not Disclosed | Not Disclosed | Home Health Care Services |
| 25 | 9/30/2021 | Home Health Care Services | Not Disclosed | Not Disclosed | Home Health Care Services |
| 26 | 5/31/2021 | At-Home Senior Care Services | Not Disclosed | Not Disclosed | At-Home Senior Care Services |
| 27 | 5/24/2021 | Home Health Care Service | Not Disclosed | Not Disclosed | Home Health Care Service |
| 28 | 5/1/2021 | Pediatric Home Health Agency | Not Disclosed | Not Disclosed | Pediatric Home Health Agency |

**CWGL Holdings, LLC**                                                                                                              **Schedule 7.1**

**Guideline Transaction Target Business Descriptions**
**As of December 31, 2024**

| | Close Date | Target Primary Industry | Target | Buyer | Target Business Description |
|---|---|---|---|---|---|
| | **S&P Capital IQ** | | | | |
| 1 | 11/30/2021 | Health Care Services | Dunn & Berger, Inc. | Aveanna Healthcare LLC | Dunn & Berger, Inc. doing business as Accredited Nursing Services, provides home health care services. The company was incorporated in 1980 and is based in Woodland Hills, California. As of November 30, 2021, Dunn & Berger, Inc. operates as a subsidiary of Aveanna Healthcare Holdings Inc. |
| 2 | 8/1/2021 | Health Care Services | Contessa Health, Inc. | Amedisys, Inc. (NasdaqGS:AMED) | Contessa Health, Inc. offers home hospitalization programs to manage episodic risk initiatives. The company provides Home Recovery Care, a risk-based model that combines all the elements of inpatient hospital care in the comfort of the patient's home and an informatics platform to facilitate Home Recovery Care; ContessaCare, a solution that enables providers to deliver hospital-level care to patients in their homes; and ContradoClaim, a claims analytics solution that enables partners to administer prospective payments. Additionally, it offers bundled payment-managed services. Contessa Health, Inc. was incorporated in 2015 and is based in Nashville, Tennessee. As of August 1, 2021, Contessa Health, Inc. operates as a subsidiary of Amedisys, Inc. |
| 29 | 3/5/2021 | Home Health Care Agency | Not Disclosed | Not Disclosed | Home Health Care Agency |
| 30 | 1/17/2021 | Home Health Care Service | Not Disclosed | Not Disclosed | Home Health Care Service |
| 31 | 12/31/2020 | Home Health Care Services | Not Disclosed | Not Disclosed | Home Health Care Services |
| 32 | 11/18/2020 | Provides Home Health Care Services | AM Holdco, Inc. (d.b.a Simplura Health Group) | ModivCare Inc. | Provides Home Health Care Services |
| 33 | 10/31/2020 | Medical Home Care | Not Disclosed | Not Disclosed | Medical Home Care |
| 34 | 9/24/2020 | Home Healthcare Agency | Not Disclosed | Not Disclosed | Home Healthcare Agency |
| 35 | 9/16/2020 | In Home Nursing Care Services | Not Disclosed | Not Disclosed | In Home Nursing Care Services |
| 36 | 8/12/2020 | Home Health Care Provider | Not Disclosed | Not Disclosed | Home Health Care Provider |
| 37 | 7/1/2020 | Private Duty Home Health Business (7 locations) | Not Disclosed | Not Disclosed | Private Duty Home Health Business (7 locations) |
| 38 | 7/1/2020 | Home Health Care Services | A Plus | Not Disclosed | Home Health Care Services |

[1]     Source: S&P Capital IQ and DealStats.